## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH ASHFORD | : | No. **3:11-CV-1060** |
| | : | |
| Petitioner | : | **(JUDGE NELSON)** |
| | : | |
| vs. | : | |
| | : | |
| MIKE WENEROWICZ, ET AL., | : | **(Magistrate Judge Smyser)** |
| | : | |
| Respondents | : | |

---

**RESPONDENT'S REPRODUCED RECORD**

Respectfully submitted,

Duane Ramseur
Senior Deputy Prosecutor
Office of the District Attorney
Supreme Court I.D. # 206132
York County Judicial Center
45 North George Street
York, PA 17401
(717) 771-9600

# **TABLE OF CONTENTS**

## **Volume I**

1. Trial Transcripts .................................................................................... 1

2. Verdict .............................................................................................. 266

3. Motion for Arrest of Judgment .......................................................... 272

4. Trial Court's May 26, 2009 Order Returning Motion for Arrest of Judgment ......... 279

5. Supplemental Motion ....................................................................... 280

6. Transcript on Hearing on Counsel's Motion to Withdraw ........................ 284

7. Trial Court's Order granting Counsel's Motion to Withdraw .................... 292

## **Volume II**

8. Sentencing Transcript ....................................................................... 293

9. Notice of Appeal .............................................................................. 308

10. Direction To File 1925(b) Statement ................................................. 339

11. 1925(b) Statement .......................................................................... 340

12. 1925(a) Opinion ............................................................................. 346

13. Motion for Extension of Time to File Brief ........................................ 358

14. Certificate of Remittal .................................................................... 361

15. Superior Court's Order of January 13, 2010 ...................................... 364

16. Trial Court's Order of January 28, 2010 ............................................ 365

17. Superior Court's Order Dismissing Appeal for Failure to File Brief ........ 366

18 Supreme Court's Order Denying Petition for Allowance of Appeal Nunc Pro Tunc 368

19. Petitioner's Federal Habeas Corpus Petition ...................................... 369

20. USDC Order ordering the Respondent's to Respond.................................................. 391

21. York County Court of Common Pleas Docketing Statement .................................... 393

22. Superior Court's Docketing Statement .................................................................... 412

23. Supreme Court's Docketing Statement .................................................................... 416

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA



|  |  |  |
|---|---|---|
| COMMONWEALTH | : | CP-67-CR-0002467-2008 |
|  | : |  |
| VS | : |  |
|  | : |  |
| KENNETH W. ASHFORD | : |  |


York, Pa., Monday, May 11, 2009
Tuesday, May 12, 2009

Before the Honorable Thomas H. Kelley, VI, Judge


APPEARANCES:

        JUSTIN F. KOBESKI, Esquire
        Assistant District Attorney
        For the Commonwealth

        RONALD J. GROSS, Esquire
        For the Defendant


\* \* \*

TRANSCRIPT OF PROCEEDINGS


Reported by:


Judith A. Greenholt, RPR
Official Court Reporter

1

1

I N D E X
WITNESSES

| FOR THE COMMONWEALTH: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| John D. Brenneman | 77 | 94 | 104 | -- |
| Thomas R. McCune | 106 | 117 | -- | -- |
| Ciprian Igwe | 125 | 129 | -- | -- |
| John D. Brenneman, recalled | 132 | 136 | 143 | -- |
| Shawn Brady | 146 | 159 | 170 | -- |

| FOR THE DEFENDANT: | | | | |
|---|---|---|---|---|
| Eloise White | 192 | 203 | 210 | -- |

EXHIBITS

| COMMONWEALTH EXHIBIT NOS. | ADMITTED |
|---|---|
| 1 - Photographs | 174 |
| 2 - VHS tape | 174 |
| 4 - Screwdriver | 174 |
| 5 - Property sheet | 174 |

| DEFENDANT'S EXHIBIT NOS. | |
|---|---|
| 1 - Photographs | 211 |

1    PROCEEDINGS HELD MONDAY, MAY 11, 2009

2                     *   *   *

3              (The following discussion occurred in

4    chambers:)

5              THE COURT:   So, there is a Rule 600

6    motion pending.  Have you seen something, because I

7    haven't seen it?

8              ATTORNEY GROSS:   Yes, Your Honor.  I

9    think you may have, because you forwarded one to my

10   office that was filed by my client pro se.  I have not

11   filed any motions from counsel.  Therefore, I don't

12   believe there was one pending through counsel that's

13   meritorious at this time.

14             THE COURT:  I am not going to consider

15   it.  You are representing him.  If I got a motion and I

16   forwarded it to you, the reason I forwarded it was

17   because I didn't accept it.  I wanted to forward it so

18   you could accept it.  I am assuming that the fact that

19   you received it and haven't filed anything is it

20   probably lacks a substantial amount of merit to begin

21   with.  But, you haven't filed anything, so there is

22   nothing pending.

23             ATTORNEY GROSS:   Correct.

24             THE COURT:  Any Rule 600 motion is waived

25   because there has not been a motion filed.

                         3                           3

1          ATTORNEY KOBESKI:   Count 1 is charged as

2     a criminal attempt burglary.  The gradation is an F-1.

3     I believe it should be amended to an F-2.  I believe it

4     is not for overnight accommodation.  I believe there is

5     an argument the attempted burglary was the courthouse.

6     The gradation is amended to F-2 here.

7          THE COURT:  What do you think my couch is

8     for?

9          ATTORNEY KOBESKI:   Count 2, the criminal

10    trespass, we are going to withdraw that offense because

11    Count 3, the criminal attempt criminal trespass, I think

12    that's more appropriate.

13          THE COURT:  We'll take care of that

14    outside the earshot of the jury.

15          ATTORNEY KOBESKI:   Yes, Judge.

16          THE COURT:  You can amend.  Obviously,

17    you are amending down and there is not going to be an

18    objection?

19          ATTORNEY GROSS:   None.

20          THE COURT:   All right.  Okay.  I don't

21    know whether -- we'll take care of that.  I don't think

22    we need to deal with that right away.

23          Let's take a break.

24          (The discussion in chambers was

25    concluded.)

4                                    4

1                          *   *   *

2                          (The jury panel entered the courtroom at

3       10:55 a.m.)

4                          *   *   *

5                          THE COURT:  You may swear them now.

6                          *   *   *

7                          (The prospective jury panel was sworn at

8       11:00 a.m.)

9                          *   *   *

10                         THE COURT:   Good morning, ladies and

11      gentlemen.

12                         THE JURY:   Good morning.

13                         THE COURT:  My name is Tom Kelley.  I am

14      the judge that's going to be presiding over the case.

15      The case is the Commonwealth versus Kenneth Ashford.

16                         Attorney Kobeski, please call the case.

17                         ATTORNEY KOBESKI:   May it please the

18      Court, ladies and gentlemen.  This is the case of the

19      Commonwealth versus Kenneth Ashford.  It is Case Number

20      2467 of 2008.  And this is the scheduled date and time

21      for a jury trial.  The Commonwealth is prepared to

22      proceed.

23                         THE COURT:  Attorney Gross.

24                         ATTORNEY GROSS:   Good morning.

25                         THE COURT:  You may proceed.

1          ATTORNEY GROSS:   Yes, Your Honor.

2          THE COURT:  Are you ready to proceed?

3          ATTORNEY GROSS:   Yes, Your Honor.  Thank

4     you.

5          THE COURT:   All right.  Ladies and

6     gentlemen, the procedure that we are about to embark

7     upon is a procedure known as voir dire.  This being your

8     first day here for jury duty, I will tell you a little

9     about the process.  Voir dire is actually two French

10    verbs put together which means to see and to speak.  It

11    is a chance for myself and the attorneys to ask you

12    certain questions concerning qualifications to sit in

13    this case as jurors.  The whole reason and rationale for

14    the questions is to ensure that everyone who is selected

15    to be a juror in this case will be fair and impartial,

16    and that you come to this process with no preconceived

17    notions which would make it difficult for you to be fair

18    and impartial.

19          I am going to ask you -- actually, what I

20    am going to do, I am going to explain some basic

21    principles that apply to the trial in the criminal case.

22    Thereafter, I am going to ask you some questions.  After

23    I have concluded my questions, the attorneys are going

24    to ask you specific questions concerning any thoughts

25    that they have about your ability to be fair and

                         6                        6

1    impartial.  Okay.  I don't think any of the questions

2    will be too probing.  However, if there is an answer

3    that any of you need to give that you believe is

4    somewhat sensitive, if you could let me know and we'll

5    take up matters up here at sidebar.  Okay.

6              Also, when I ask the questions, I am

7    going to frame my questions in such a way that if you

8    have an affirmative response to any of my questions,

9    then you will raise your hand.  After you have raised

10   your hand, I will go down from left to right, first row,

11   second row, third row, fourth row, et cetera.

12             Now, concerning those basic principles of

13   law, let me discuss some basic principles that will

14   apply to the trial of the criminal case.  Listen very

15   carefully to what I have to say, because later, as I

16   told you previously, you will be questioned by me and

17   the attorneys concerning those principles of law.

18             So, at the beginning, I must tell you

19   that if you are selected to be a member of the trial

20   jury, it will be your duty to apply the law as I give it

21   to you.  That will be part of your oath as jurors in

22   this case.  It would be highly improper to permit each

23   juror to decide for himself or herself what law to apply

24   to the trial of the criminal case.  The law which

25   applies to the trial of the criminal case must be in

1    accordance with the Constitution of the United States,

2    the Constitution of the Commonwealth of Pennsylvania,

3    the laws as enacted by our state legislature, and the

4    Rules of Criminal Procedure as established by the

5    Supreme Court of Pennsylvania.

6              So, it is the responsibility of the judge

7    to tell the jury what the law is.  It is the

8    responsibility of the jury to apply that law.  If you

9    cannot or will not do that, you should not be selected

10   as a juror in a criminal case.

11             The Defendant is charged with certain

12   offenses, including burglary.  The charges are not

13   evidence.  Just because a person has been arrested and

14   had informations filed by the District Attorney's Office

15   and is brought here for trial, that's not any evidence

16   against the Defendant.  Charges are only charges.  This

17   is because all persons who come before the Court for

18   trial are presumed to be innocent.  And the presumption

19   of innocence remains until such time as the Commonwealth

20   of Pennsylvania through the District Attorney's Office

21   presents evidence in open court which proves the

22   Defendant's guilt beyond a reasonable doubt.

23             What a reasonable doubt is will be

24   explained to you if you are selected to be a member of

25   the trial jury.  Let me just say at this point it means

1    beyond a reasonable doubt.  It does not mean beyond all

2    doubt or to a mathematical certainty.

3              The burden is on the Commonwealth

4    throughout the trial and relates to all the elements of

5    the crimes charged against the Defendant.

6              In determining the guilt or innocence of

7    the Defendant, the only evidence that may be considered

8    is evidence that comes from the witness stand here in

9    open court.  The charges themselves are not evidence.

10   The law says that a defendant is presumed to be innocent

11   until such time as the Commonwealth proves him guilty

12   beyond a reasonable doubt.  And that cloak of innocence

13   remains with the Defendant throughout the entire trial

14   and right into the jury room when the jury begins

15   deliberating upon its verdict.  This is a principle

16   which each of you must be able to accept or you should

17   not serve as a juror in a criminal case.

18             There is another important point of

19   constitutional law that I want to explain to you.  A

20   defendant does not need to present any evidence during

21   the course of the trial, nor does the Defendant need to

22   take the witness stand.  This must be clearly understood

23   and accepted by you.  The Defendant does have a

24   constitutional right to say, you have made the charges,

25   go ahead and prove them.

1      You must understand that the Defendant

2   does not have to testify.  He does not have to produce

3   evidence.  And the trial jury may not draw any inference

4   adverse to the Defendant if that turns out to be the

5   case in this case.

6      Of course, if the Defendant does present

7   evidence or if the Defendant does take the witness

8   stand, the jury may consider that evidence, along with

9   all the other evidence in the case, in determining

10   whether or not the Commonwealth has proven the Defendant

11   guilty beyond a reasonable doubt.

12      Jurors have a duty of determining what

13   the credibility of witnesses is.  In order to do so,

14   they have to determine believability.  Credibility is

15   just another word for believability, believability of

16   the witnesses.

17      I must tell you that if you are selected

18   to be a juror, it will be your duty to analyze the

19   evidence and determine credibility of the various

20   witnesses.  You must analyze whether and to what extent

21   they had the opportunity to see, to hear, and to

22   understand the things about which they testified.  No

23   one comes before a jury with a ticket entitling him or

24   her to be believed.  The jury is the final and only

25   authority as to credibility of the various witnesses.

1    And, the jury may not consider the credibility of any

2    witness by any standard different than it does the

3    credibility of every other witness.   Okay.

4                    That's pretty much the basic issues

5    relating to a trial that I want to explain to you.

6                    What I would like to do now at this point

7    is ask you some specific questions concerning your

8    ability to be a juror in this case.

9                    First question is, is any member of the

10   panel under the age of 18, or is any member of the panel

11   not a citizen of the United States or not a resident of

12   York County, or has any member of the panel been

13   convicted of a crime punishable by imprisonment for more

14   than one year and you have not been granted a pardon or

15   amnesty therefor?   If any of those things apply, raise

16   your hand.

17                    (No response.)

18                    THE COURT:   No affirmative responses.

19                    Are any of you unable to or are you

20   having trouble understanding the English language?

21                    (No response.)

22                    THE COURT:   No affirmative responses.

23                    Do any of you have any physical, mental,

24   or emotional disability which would make it difficult

25   for you to hear and concentrate upon the testimony of

11                                                          11

1    the witnesses in this case?  Anyone?

2                        JUROR NO. 257:  (Indicating)

3                        THE COURT:  Yes, sir.  Your juror number,

4    please.

5                        JUROR NO. 257:  257.

6                        THE COURT:    257?

7                        JUROR NO. 257:  Yes, sir.  I have a

8    stainless stapes in my left ear.  I had a stapedectomy.

9    And I have trouble discriminating against accents,

10   sometimes understanding people, that type of thing.

11   Sometimes I get vibrations in the ear.  Sometimes I get

12   what's called hyperacousics, like sometimes the volume

13   will get louder.  I don't seem to have any trouble

14   today, but microphones --

15                        THE COURT:  You haven't had any

16   difficulty hearing me?

17                        JUROR NO. 257:  Not at all.

18                        THE COURT:  Even over my accent?

19                        JUROR NO. 257:  Actually, when I went to

20   college -- in 2003, I graduated -- I couldn't take

21   Spanish.  They had to get me out of that because they

22   couldn't reproduce the sounds.

23                        THE COURT:  Well, everyone has an accent

24   for you.  Right?  Well, if you have any difficulty --

25                        JUROR NO. 257:  I meant foreign accents.

1          THE COURT:  If you have any difficulty

2     whatsoever, if you could point that out and we can

3     always ask witnesses or individuals who are speaking to

4     repeat questions.  And actually, what I need for you to

5     do is, if you could, promise that if there is anything,

6     if you are selected as a juror, anything you don't hear,

7     if you could let us know immediately, because it is far

8     easier for us to kind of go back at that point than it

9     is for you to say, hey, during this testimony, I didn't

10    hear very well, I couldn't understand very well.  So,

11    you promise to do that?

12          JUROR NO. 257:  I promise.

13          THE COURT:  Thank you very much.

14          Counsel, I am not sure, is there anyone

15    anticipated to testify in this case that may have a

16    heavy accent?

17          ATTORNEY KOBESKI:   Your Honor, we do

18    have a witness that may have an accent.

19          THE COURT:   Do you know -- he may be

20    able to -- it sounds to me like there is specific

21    accents he may have difficulty with.

22          ATTORNEY KOBESKI:   I believe it is West

23    African, Judge.

24          THE COURT:   We will have to see, sir.

25    Depending how heavy the West African accent is, we may

1    have some difficulty.  But, as long as you are willing

2    to promise us that you will ask any questions of

3    anything that you miss, we should be okay.  All right?

4                    JUROR NO. 257:  Yes, sir.

5                    THE COURT:  Thank you very much.

6                    Anyone else?

7                    (No response.)

8                    THE COURT:  Okay.  I am going to

9    introduce some of the players involved in this case and

10   I want to ask you whether or not you are related to any

11   of those people by blood or marriage or whether you have

12   any kind of close association with those people, whether

13   it be professional or personal.  The first person I'd

14   like to introduce is the Assistant District Attorney,

15   Attorney Kobeski.  Does anybody recognize or know or are

16   you related to Attorney Kobeski?

17                    (No response.)

18                    THE COURT:  No affirmative responses.

19                    Counsel for the Defendant is Attorney Ron

20   Gross.  Does anybody recognize or know Ron Gross?

21                    JUROR NO. 234:  (Indicating)

22                    THE COURT:  Ma'am, your juror number is?

23                    JUROR NO. 234:  234.

24                    THE COURT:  234?

25                    JUROR NO. 234:  Yes.

                              14                        14

1           THE COURT:  How do you know Attorney

2    Gross?

3           JUROR NO. 234:  I have seen him at my

4    workplace a few times.

5           THE COURT:  Would that fact predispose

6    you towards one side or the other?

7           JUROR NO. 234:  I don't know him well

8    enough for it to do that.  So, I just know him, he says

9    good morning, hello.

10           THE COURT:  Would you be able to set that

11   aside and render your decision in this case based solely

12   upon the evidence as you hear it from the witness stand

13   and take your knowledge of Attorney Gross and set it

14   aside?

15           JUROR NO. 234:  Yes.

16           THE COURT:  Could you still be a fair and

17   impartial juror even though you know, however remotely,

18   Attorney Gross?

19           JUROR NO. 234:  Yes.

20           THE COURT:  You may be seated.  Thank

21   you.

22           Anyone else?

23           (No response.)

24           THE COURT:  Okay.  Attorney Gross, you

25   may be seated.

1     The Defendant in this case is Kenneth

2 Ashford.   Does anybody recognize or know Kenneth

3 Ashford?

4     (No response.)

5     THE COURT:   No affirmative responses.

6     I am going to ask Attorney Kobeski the

7 names of any witnesses he might call and see if you

8 recognize any of those names.

9     Attorney Kobeski.

10    ATTORNEY KOBESKI:   Thank you, Judge.

11    Does anyone seated here recognize the

12 name John Brenneman?   He's a deputy sheriff here in York

13 County.

14    (No response.)

15    ATTORNEY KOBESKI:    No affirmative

16 response.

17    Does anyone recognize the name Thomas

18 McCune?   Again, he is a corporal with the York County

19 Sheriff's Department.

20    (No response.)

21    ATTORNEY KOBESKI:    No affirmative

22 response.

23    Ciprian Igwe, again, he is a deputy

24 sheriff here in York, does anyone recognize that name?

25    (No response.)

1           ATTORNEY KOBESKI:   No affirmative
2    response.
3           Finally, Corporal Shawn Brady, does
4    anybody know or recognize Shawn Brady?
5           (No response.)
6           ATTORNEY KOBESKI:   No affirmative
7    response.
8           Thank you, Your Honor.
9           THE COURT:  Okay.  Attorney Gross.  What
10   I would like to do for Attorney Gross is ask if there
11   are any individuals that he would like to identify for
12   the jury.  But, I want to refresh your recollection,
13   remember, the defense is under no obligation to call any
14   witnesses.  These are witnesses that they might call
15   just out of an abundance of caution to see whether or
16   not you recognize those names.
17           ATTORNEY GROSS:   Your Honor, the only
18   witness I may be calling for our case would be Eloise
19   White, Mr. Ashford's mother, standing right now.
20           THE COURT:  Does anybody recognize her?
21           (No response.)
22           THE COURT:  No affirmative responses.
23           Go ahead.
24           ATTORNEY GROSS:   And, Your Honor, Justin
25   Bortner, B-o-r-t-n-e-r.  He resides in York City.

1    Justin Bortner.

2                    THE COURT:   Does anyone recognize that

3    name?

4                    (No response.)

5                    THE COURT:   No.   Okay.   No affirmative

6    responses.

7                    I don't recognize any individuals.   Does

8    anyone recognize me?

9                    JUROR NO. 64:   (Indicating)

10                    THE COURT:   Yes, ma'am.   Your juror

11   number?

12                    JUROR NO. 64:   64.

13                    THE COURT:   Okay.

14                    JUROR NO. 64:   I worked with Natalie at

15   Limited II.

16                    THE COURT:   Quite some time ago.

17                    JUROR NO. 64:   Yes.

18                    THE COURT:   All right.   Natalie would be

19   my wife.   Did she tell you any bad things about me?

20                    JUROR NO. 64:   No.

21                    THE COURT:   Surprising.   Okay.   Would

22   that fact predispose you towards one side or the other?

23                    JUROR NO. 64:   No.

24                    THE COURT:   Would you be able to set it

25   aside and render a decision in this case based solely

1    upon the evidence you hear from the witness stand?

2                    JUROR NO. 64:  Yes.

3                    THE COURT:  Could you be fair and

4    impartial?

5                    JUROR NO. 64:  Yes.

6                    THE COURT:  Thank you.

7                    JUROR NO. 257:  (Indicating)

8                    THE COURT:  Sir, juror number again,

9    please?

10                   JUROR NO. 257:  257.

11                   THE COURT:  Okay.

12                   JUROR NO. 257:  I was trying to think of

13   the name John Brenneman where it came from, but I am

14   reading a book on the history of Rose Rhoades right now

15   and I don't remember what context it was, but --

16                   THE COURT:  You recognize the name John

17   Brenneman from that?

18                   JUROR NO. 257:  A lot of different

19   Brennemans.

20                   THE COURT:  That's a big York County

21   name.

22                   Do you know anything more, Attorney

23   Kobeski?

24                   JUROR NO. 257:  I can't recall --

25                   THE COURT:  You don't know other than

                              19                          19

1       reading?

2                       JUROR NO. 257:  Other than reading

3       property owners' history.

4                       THE COURT:  Other than that, there is

5       nothing that comes to mind?

6                       JUROR NO. 257:  Right.

7                       THE COURT:  Let's assume for the sake of

8       argument it is the same Brenneman you would have read

9       about.  Would you be able to set that aside and render a

10      decision based solely upon the evidence that you hear in

11      this case?

12                      JUROR NO. 257:  Absolutely.

13                      THE COURT:  Could you be fair and

14      impartial?

15                      JUROR NO. 257:  Yes.  Absolutely.

16                      THE COURT:   Ladies and gentlemen, have

17      you or any member of your family or any close friends

18      been the victim of any crime or have you been present

19      when any crime was committed?  Okay.  We will have to go

20      down the row.

21                      Yes, ma'am.  My far left.

22                      JUROR NO. 144:  My son was mugged at

23      Cobblestones restaurant in September of '08.

24                      THE COURT:  Your juror number?

25                      JUROR NO. 144:  144.

1    THE COURT: Would that fact predispose

2    you toward one side or the other?

3    JUROR NO. 144: No.

4    THE COURT: Could you set it aside and

5    render a decision in this case based solely upon the

6    evidence you hear from the witness stand?

7    JUROR NO. 144: Yes.

8    THE COURT: Could you be fair and

9    impartial?

10    JUROR NO. 144: Yes.

11    THE COURT: Thank you very much. Okay.

12    Yes, ma'am, juror number?

13    JUROR NO. 254: 254.

14    THE COURT: Okay.

15    JUROR NO. 254: I witnessed a shooting

16    when I was walking down from my law office to the

17    parking garage when I used to work in town several years

18    ago. Plus, my brother's house had been robbed.

19    THE COURT: Would that fact predispose

20    you toward one side or the other?

21    JUROR NO. 254: No.

22    THE COURT: Could you set that aside and

23    render a decision in this case based solely upon the

24    evidence you hear from the witness stand?

25    JUROR NO. 254: Yes.

1        THE COURT:  Could you be fair and

2   impartial?

3        JUROR NO. 254:  Yes.

4        THE COURT:  Thank you very much.

5        Anyone else in that row?  Your juror

6   number?

7        JUROR NO. 284:  284.  I was working at a

8   bank and it got robbed while I was working.

9        THE COURT:  So, you were actually a

10  witness to the robbery.  Is that correct?

11       JUROR NO. 284:  Yes.

12       THE COURT:  Would that predispose you

13  towards one side or the other?

14       JUROR NO. 284:  No.

15       THE COURT:  Could you set it aside and

16  render your decision in this case based solely upon the

17  evidence as you hear it from the witness stand?

18       JUROR NO. 284:  Yes.

19       THE COURT:  Could you be fair and

20  impartial?

21       JUROR NO. 284:  Yes.

22       THE COURT:  Juror number?

23       JUROR NO. 284:  284.

24       THE COURT:  Thank you very much.

25       Anyone else in that row?

1          JUROR NO. 190:  190.

2          THE COURT:  Okay.

3          JUROR NO. 190:  My house was broken into

4   and robbed.  And I also had a stalker years ago.

5          THE COURT:  Would that fact predispose

6   you towards one side or the other?

7          JUROR NO. 190:  No.

8          THE COURT:  Could you set that aside and

9   render your decision in this case based solely upon the

10  evidence as you hear it from the witness stand?

11         JUROR NO. 190:  Yes, sir.

12         THE COURT:  Could you be fair and

13  impartial?

14         JUROR NO. 190:  Yes, sir.

15         THE COURT:  Okay.  Second row.  Ma'am, I

16  missed you juror number.

17         JUROR NO. 137:  137.  I am not sure if

18  this pertains to this, but we have a business in Spry

19  and we had a car stolen from the lot, things like that.

20         THE COURT:  So, you have a car business

21  and one of the cars was stolen?

22         JUROR NO. 137:  Yes.

23         THE COURT:  Would that fact predispose

24  you towards one side or the other?

25         JUROR NO. 137:  No.

23                                                  23

1          THE COURT:  Could you set that aside and

2     render your decision in this case based solely upon the

3     evidence as you hear it from the witness stand?

4          JUROR NO. 137:  Yes.

5          THE COURT:  Could you be fair and

6     impartial?

7          JUROR NO. 137:  Sure.

8          THE COURT:  Second row.  Okay.  Juror

9     number?

10          JUROR NO. 64:  64.  My daughter's car was

11     vandalized.

12          THE COURT:  Okay.  Would that fact

13     predispose you towards one side or the other?

14          JUROR NO. 64:  No.

15          THE COURT:  Could you set that aside and

16     render a decision in this case based solely upon the

17     evidence as you hear it from the witness stand?

18          JUROR NO. 64:  Yes.

19          THE COURT:  Could you be fair and

20     impartial?

21          JUROR NO. 64:  Yes.

22          THE COURT:  Thank you very much.

23          Yes, sir, your juror number, please.

24          JUROR NO. 47:  47.

25          THE COURT:  Okay.

1          JUROR NO. 47:  Many years ago, I

2     witnessed a purse snatching and chased the perpetrator.

3     Then also, years -- around the same time this many years

4     ago as well, I was set upon by three people and

5     basically received a pretty thorough thrashing.  I think

6     those are all pretty quite long ago.

7          THE COURT:  Would those incidents

8     predispose you toward one side or the other?

9          JUROR NO. 47:  No.

10          THE COURT:  Could you set them aside and

11     render your decision in this case based solely upon the

12     evidence as you hear it from the witness stand?

13          JUROR NO. 47:  Yes.

14          THE COURT:  Could you be fair and

15     impartial?

16          JUROR NO. 47:  Yes.

17          THE COURT:  Thank you.

18          Anyone else in that row?  Third row.

19     Yes, ma'am, far left, my far left.

20          JUROR NO. 204:  204.  Back about eight

21     years ago, a guy tried to rob me and it made me very

22     angry, so I kind of backed up.  I said to him, You are

23     not going to get my money.  And he didn't.  He ended up

24     running.

25          THE COURT:  Would that incident

1    predispose you towards one side or the other?

2                 JUROR NO. 204:  No.

3                 THE COURT:  Could you set it aside and

4    render a decision in this case based solely upon the

5    evidence as you hear it from the witness stand?

6                 JUROR NO. 204:  Yes.

7                 THE COURT:  Could you be fair and

8    impartial?

9                 JUROR NO. 204:  Yes.

10                THE COURT:  Yes, ma'am.

11                JUROR NO. 12:  Juror Number 12.  This

12   came up because that lady reminded me, my brother was

13   mugged probably about three years ago.

14                THE COURT:  Would that affect or

15   predispose you towards one side or the other?

16                JUROR NO. 12:  No.

17                THE COURT:  Could you set that aside and

18   render your decision in this case based solely upon the

19   evidence as you hear it from the witness stand?

20                JUROR NO. 12:  Yes.

21                THE COURT:  Could you be fair and

22   impartial?

23                JUROR NO. 12:  Yes.

24                THE COURT:  Thank you.  Anyone else in

25   that row?  No.

26                                                    26

1                          How about the fourth row?  Yes, sir, your

2    juror number, please.

3                          JUROR NO. 167:  167.

4                          THE COURT:  Okay.

5                          JUROR NO. 167:  My parents and my in-laws

6    probably over a time spanning 25 years had their homes

7    burglarized.

8                          THE COURT:  Would that fact predispose

9    you towards one side or the other?

10                         JUROR NO. 167:  No.

11                         THE COURT:  Would you be able to set that

12   aside and render your decision in this case based solely

13   upon the evidence as you hear it from the witness stand?

14                         JUROR NO. 167:  Yes.

15                         THE COURT:  Could you be fair and

16   impartial?

17                         JUROR NO. 167:  Yes.

18                         THE COURT:  All right.  Okay.  Anyone

19   else in that row?  I thought I saw another.

20                         Your juror number, please.

21                         JUROR NO. 242:  242.

22                         THE COURT:  Okay.

23                         JUROR NO. 242:  I was assaulted quite a

24   few years ago and my purse was stolen.  And that was a

25   while ago.

27                                                            27

1          THE COURT:  Was that one episode or two?

2          JUROR NO. 242:  One.

3          THE COURT:  So, you were assaulted while

4    your purse was being stolen?

5          JUROR NO. 242:  Correct.

6          THE COURT:  Would that affect or

7    predispose you towards one side or the other?

8          JUROR NO. 242:  No.

9          THE COURT:  Could you set that aside and

10   render your decision in this case based solely upon the

11   evidence as you hear it from the witness stand?

12         JUROR NO. 242:  Yes.

13         THE COURT:  Could you be fair and

14   impartial?

15         JUROR NO. 242:  Yes.

16         THE COURT:  Thank you.

17         Your juror number?

18         JUROR NO. 53:  53.

19         THE COURT:  Okay.

20         JUROR NO. 53:  Had my car broken into.

21         THE COURT:  Would that predispose you

22   toward one side or the other?

23         JUROR NO. 53:  No, sir.

24         THE COURT:  Could you set that aside and

25   render your decision in this case based solely upon the

28                                                    28

1    evidence as you hear it from the witness stand?

2                    JUROR NO. 53:  Yes.

3                    THE COURT:  Could you be fair and

4    impartial?

5                    JUROR NO. 53:  Yes, sir.

6                    THE COURT:  Anyone else in that row?

7    Juror number, again.

8                    JUROR NO. 257:  257.  Three incidents,

9    Your Honor.  When I was a child, probably eight or ten

10   years old, I was downtown with my mother, heard

11   gunshots, and witnessed someone following the police

12   out, apparently.  I think I saw them leave the place and

13   someone was shot and killed.  So, I gave my mother the

14   tag number and eventually gave that to the police, that

15   type of thing.

16                   THE COURT:  Okay.

17                   JUROR NO. 257:  Then quite some years

18   ago, I was held up at gunpoint while working at a place.

19                   And I witnessed a man taking a very bad

20   beating in front of the place, called and met with the

21   police.

22                   THE COURT:  Your voice is trailing off.

23                   JUROR NO. 257:  I was held up at gunpoint

24   while I worked at a place.

25                   And then some time after that, I

                              29                          29

1    witnessed somebody beaten very badly in front of the

2    place.  The police came and all that.

3                    And I guess about 27 years ago, I was --

4    someone came to me and said that this girl had been

5    beaten and grabbed at the store front.  I went out with

6    my friend.  The guy pulled a gun on me.  That got

7    complex.  I don't know if I should expand upon that.

8                    THE COURT:  No.  That's fine.  Would

9    those facts predispose you toward one side or the other?

10                   JUROR NO. 257:  Well, I guess when it got

11   complex, it was more involved.

12                   THE COURT:  Then my question is, however

13   involved, would it predispose you towards one side or

14   the other?

15                   JUROR NO. 257:  No.

16                   THE COURT:  Would you be able to set it

17   aside and render your decision in this case based solely

18   upon the evidence as you hear it from the witness stand?

19                   JUROR NO. 257:  Yes.

20                   THE COURT:  Could you be fair and

21   impartial?

22                   JUROR NO. 257:  Yes.

23                   THE COURT:  Okay.  Thank you.

24                   Anyone else?  No.  Yes, ma'am.  Juror

25   number, please.

1                        JUROR NO. 159:  159.  May I speak

2        privately?

3                        THE COURT:  Sure.

4                                *   *   *

5                        (The following discussion occurred at

6        sidebar:)

7                        THE COURT:  Ma'am, step forward, please.

8                        JUROR NO. 159:  I have been the victim of

9        sexual assault.

10                       THE COURT:  How long ago was this?

11                       JUROR NO. 159:  About 15 years.

12                       THE COURT:  Okay.  Would that fact --

13       obviously, it doesn't apply whatsoever to the charge

14       that the Defendant has been charged with.  Would that

15       predispose you towards one side or the other?

16                       JUROR NO. 159:  No.

17                       THE COURT:  Would you be able to set that

18       aside and render your decision in this case based solely

19       upon the evidence that you hear from the witness stand?

20                       JUROR NO. 159:  Yes.

21                       THE COURT:  Could you be fair and

22       impartial?

23                       JUROR NO. 159:  Yes.

24                       THE COURT:  Okay.  Do you have any

25       questions?

1          ATTORNEY GROSS:   No, I have none.

2          THE COURT:  Do you have any questions?

3          ATTORNEY KOBESKI:   No.

4          THE COURT:  Thank you very much, ma'am.

5          (The discussion at sidebar was

6  concluded.)

7                         *   *   *

8          THE COURT:  Okay.  Folks, next question.

9  Have you or any member of your family ever been charged

10  with, arrested for, or been convicted of any crime?

11          Yes, ma'am, your juror number, please.

12          JUROR NO. 284:  284.

13          THE COURT:  Okay.

14          JUROR NO. 284:  My daughter was.

15          THE COURT:  What type of offense?

16          JUROR NO. 284:  A misdemeanor.

17          THE COURT:  Would that fact predispose

18  you towards one side or the other?

19          JUROR NO. 284:  No.

20          THE COURT:  Would you be able to set that

21  aside and render your decision in this case based solely

22  upon the evidence that you hear from the witness stand?

23          JUROR NO. 284:  Yes.

24          THE COURT:  Is that yes?

25          JUROR NO. 284:  Yes.

1          THE COURT:  You need to be clear for the

2     record.  Could you be fair and impartial?

3          JUROR NO. 284:  Yes.

4          THE COURT:  There was someone else.

5          JUROR NO. 12:  12.  DUI.

6          THE COURT:  Who?

7          JUROR NO. 12:  That was me.

8          THE COURT:  Would that fact predispose

9     you towards one side or the other?

10          JUROR NO. 12:  No.

11          THE COURT:  Would you be able to set that

12     experience aside and render your decision in this case

13     based solely upon the evidence as you hear it from the

14     witness stand?

15          JUROR NO. 12:  Yes.

16          THE COURT:  Could you be fair and

17     impartial?

18          JUROR NO. 12:  Yes.

19          THE COURT:  Anyone else?  Yes, sir.  Your

20     juror number, please.

21          JUROR NO. 52:  52.

22          THE COURT:  I am going to need you to

23     speak up.

24          JUROR NO. 52:  52.

25          THE COURT:  What was it?

1          JUROR NO. 52:  Summary offense.

2          THE COURT:  Is that you?

3          JUROR NO. 52:  Yes.

4          THE COURT:  Would that fact predispose

5   you towards one side or the other?

6          JUROR NO. 52:  No.

7          THE COURT:  Is that yes or no?

8          JUROR NO. 52:  No.

9          THE COURT:  Would you be able to set that

10  aside and render your decision in this case based solely

11  upon the evidence you hear from the witness stand?

12         JUROR NO. 52:  Yes.

13         THE COURT:  Could you be fair and

14  impartial?

15         JUROR NO. 52:  Yes.

16         THE COURT:  All right.  Yes, your juror

17  number?

18         JUROR NO. 257:  257.  This is the other

19  part of that story where I said it got complex.  When I

20  tried -- when I went out to help that girl, these two

21  guys -- the man pulled a gun.  Then when I went to -- I

22  was leaving on that morning to go testify against them,

23  I was served with a criminal summons where he accused me

24  of malicious destruction of his door, I think it was, or

25  something, which I didn't do.  But any way, I had to

                              34                              34

1    show up and it was nol prossed.

2                    THE COURT:  So, you didn't have a

3    conviction?

4                    JUROR NO. 257:  No.  It was nol prossed.

5                    THE COURT:  Okay.  Would that affect or

6    predispose you towards one side or the other?

7                    JUROR NO. 257:  Your Honor, it was 27

8    years ago.

9                    THE COURT:  Could you set that aside and

10   render your decision in this case based solely upon the

11   evidence as you hear it from the witness stand?

12                    JUROR NO. 257:  Yes.

13                    THE COURT:  Could you be fair and

14   impartial?

15                    JUROR NO. 257:  Yes.

16                    THE COURT:  Thank you.  All right, ladies

17   and gentlemen, a few more questions for you.  Do any of

18   you have any doubts or reservations about your

19   willingness and ability to follow my instruction that

20   the truthfulness of the testimony of each witness is to

21   be judged by the exact same standard as every other

22   witness?  Let me give you an explanation for that.

23   Every witness's truthfulness is to be judged by the

24   exact same standard.  No person comes before you with a

25   ticket entitling him or her to be believed.

                              35                        35

1          So, let's say, for instance, I will give

2     you an example of it, a member of the cloth of your

3     church, mosque, synagogue, temple, et cetera, comes into

4     court and testifies.  You may be inclined because of

5     their affiliation with the church, mosque, temple,

6     synagogue, et cetera, to grant them a little bit of a

7     benefit of the doubt when it comes to assessing their

8     credibility.  And again, credibility is just

9     believability.  That would be improper, because each

10    witness is to be judged by the exact same standard.

11         So, again, having given you that

12    explanation, does anyone have any doubts or reservations

13    about following my instruction that you should evaluate

14    the testimony of each witness by the exact same standard

15    as you do every other witness?

16              (No response.)

17              THE COURT:  No affirmative responses.

18    Thank you.

19              Do any of you have any moral, religious,

20    ethical scruples against passing judgment on the guilt

21    or innocence of the Defendant on the charges made in

22    this case?

23              (No response.)

24              THE COURT:  No affirmative response.

25              Do any of you have doubts or reservations

1      about following my instruction that the Defendant is

2      presumed to be innocent until proven guilty beyond a

3      reasonable doubt by the evidence presented in court?

4                    (No response.)

5                    THE COURT:   No affirmative responses.

6                    Do any of you have any doubts or

7      reservations about being able to consider the evidence

8      in this case fairly and impartially?

9                    (No response.)

10                   THE COURT:   No affirmative responses.

11                   Do any of you have any doubts or

12     reservations about following my instruction that the

13     mere arrest of the Defendant and his mere presence for

14     trial is not to be considered as evidence against him?

15                   (No response.)

16                   THE COURT:   Again, no affirmative

17     responses.

18                   Do any of you have doubts or reservations

19     about following my instruction that if the Defendant

20     does not take the witness stand or does not present

21     evidence, that is not to be considered as evidence

22     against him?

23                   (No response.)

24                   THE COURT:   No affirmative responses.

25                   Do any of you have any doubts or

37                                              37

1    reservations about your willingness to accept and apply

2    the law as I instruct you?

3                    (No response.)

4                    THE COURT:  No affirmative responses.

5                    Do any of you have any fixed opinion

6    about the guilt or innocence of the Defendant on the

7    charges made against him?

8                    (No response.)

9                    THE COURT:  No affirmative responses.

10                   And this is kind of a catchall.  Do any

11   of you have any reason if you were selected to be a

12   trial juror in this case that you could not give the

13   Defendant and the Commonwealth a fair and impartial

14   trial?

15                   Yes, ma'am, your juror number again.

16                   JUROR NO. 234:  234.  I just want to make

17   a statement on that.  When I filled that out, I did put

18   yes because of my workplace.  If I did know any of the

19   individuals, I would just deal with them and their

20   identities.  I wasn't sure I'd be able to.

21                   THE COURT:  Let me see you up at sidebar.

22                              *   *   *

23                   (The following discussion occurred at

24   sidebar:)

25                   THE COURT:   Where do you work?

                              38                              38

1        JUROR NO. 234:  The York County Prison.

2        THE COURT:  Okay.  That's how you know

3   him, from coming down to visit people?

4        ATTORNEY GROSS:   I apologize.  I didn't

5   recognize you at all.

6        JUROR NO. 234:  You probably wouldn't.

7   You guys are in the side rooms when I am coming in and

8   out.  I just wanted to let you know that if somebody

9   says something.

10        THE COURT:  Do you recognize the

11   Defendant?

12        JUROR NO. 234:  I don't think so.  We see

13   so many people in the medical department that I am going

14   to say I don't think so right now.

15        THE COURT:  You work in the medical

16   department?

17        JUROR NO. 234:  Yes.

18        THE COURT:  All right.  All right.  Let's

19   assume for the moment that all of a sudden it dawns on

20   you that maybe I did treat him or something, would you

21   be able to set that aside and render your decision?

22        JUROR NO. 234:  With him, yes.  Like, for

23   instance, I dealt with a guy -- I am the administrative

24   assistant.  I don't do treatment.  I dealt with a guy

25   that came in and I had to send him out for medical

1   information.  He did nothing.  But, being truthful, if

2   it was one of those guys, I would have a hard time.

3   But, I don't believe I recognize this guy.

4             THE COURT:  Okay.  All right.  Do you

5   have any questions?

6             ATTORNEY KOBESKI:   No, Your Honor.

7             THE COURT:  Do you have any questions?

8             ATTORNEY GROSS:  I don't.

9             THE COURT:  Thank you very much.

10            (The discussion at sidebar was

11   concluded.)

12                        *   *   *

13            THE COURT:  Yes, sir.

14            JUROR NO. 257:  One other thing.  I

15   remember one thing.  My wife was convicted for DUI or

16   DWI many years ago.

17            THE COURT:  Would that affect you or

18   predispose you towards one side or the other?

19            JUROR NO. 257:  No.

20            THE COURT:  Would you be able to set that

21   aside and render your decision based solely upon the

22   evidence that you hear from the witness stand?

23            JUROR NO. 257:  Yes, I would.

24            THE COURT:  Would you be fair and

25   impartial?

1              JUROR NO. 257:  Yes.

2              THE COURT:  Yes, ma'am.

3              JUROR NO. 80:  80.  And the same thing,

4    it was almost 40 years ago and I was very young, and my

5    sister pled guilty to trespassing in New Jersey.  So, I

6    mean, it is a fact, so I have got to tell you.  I don't

7    know anything else about the circumstances.

8              THE COURT:  Would that affect or

9    predispose you towards one side or the other?

10              JUROR NO. 80:  Absolutely not.

11              THE COURT:  Could you set it aside and

12    render your decision in this case based solely upon the

13    evidence as you hear it from the witness stand?

14              JUROR NO. 80:  Yes.

15              THE COURT:  Could you be fair and

16    impartial?

17              JUROR NO. 80:  Yes.

18              THE COURT:  Yes, sir.

19              JUROR NO. 257:  Is that just for

20    household members or are you talking any family?

21              THE COURT:   It says have you or any

22    member of your family been charged with, arrested for.

23    It depends upon are you thinking about someone that's

24    close enough that you consider them family.

25              JUROR NO. 257:  I had a brother with a

41                                    41

1    DUI, also, DWI.

2              THE COURT:  Anyone else?

3              JUROR NO. 257:  No.

4              THE COURT:  Are you sure?

5              JUROR NO. 257:  No.

6              THE COURT:  Now is the opportunity.

7              JUROR NO. 257:  Thank you, sir.

8              THE COURT:  Would you be able to set that

9    aside and render your decision in this case based solely

10   upon the evidence as you hear it from the witness stand?

11             JUROR NO. 257:  Yes.

12             THE COURT:  Could you be fair and

13   impartial?

14             JUROR NO. 257:  Yes.

15             THE COURT:  All right.  Okay.  Counsel.

16   Attorney Kobeski.

17             ATTORNEY KOBESKI:   May it please the

18   Court, Attorney Gross, ladies and gentlemen.  Good

19   morning.  I know it is almost afternoon, but for now, I

20   will say good morning.

21             First of all, can everybody hear me okay?

22             THE JURY:  Yes.

23             ATTORNEY KOBESKI:   If at any point

24   during the voir dire process or if at any point during

25   the trial, if you are selected, you can't hear me or I

1    am speaking too quickly or if I am not speaking loudly

2    enough, raise your hand, as Judge Kelley indicated, and

3    let me know.  I will speak up, slow down, whatever I

4    have to do.  I just want to make sure everyone can hear.

5                    JUROR NO. 64:  64.  I am used to speaking

6    back.

7                    ATTORNEY KOBESKI:   Judge Kelley already

8    introduced me.  I'd like to personally introduce myself.

9    My name is Justin Kobeski.  I am an Assistant District

10   Attorney here in York County.  Basically, it is my job

11   to represent the people of the Commonwealth of

12   Pennsylvania, more specifically, the people of York

13   County.

14                   Judge Kelley also alluded to the charges

15   in this case.  The Defendant is charged with, I guess

16   you could put it, burglary-related offenses.  More

17   specifically, the Defendant is charged with criminal

18   attempt to commit burglary, criminal attempt to commit

19   criminal trespass, possession of an instrument of crime,

20   and finally, he is charged with institutional vandalism.

21                   Obviously, during this trial and before

22   each of you deliberate on a verdict, you are going to

23   get more instructions on what the elements of the crimes

24   are.  The Judge will instruct you at the end of the

25   trial.

1     Just to give everyone a brief summary so

2     they know what these charges basically mean, first of

3     all, an attempted crime, obviously, is not a completed

4     crime.  The person is caught before the crime was

5     completed.

6     Now, with burglary, I know some people

7     indicated they had their homes broken into and they were

8     robbed.  In fact, what a burglary is, it is a little

9     different from robbery.  A burglary is when someone

10     breaks into a building, whether it is a business or a

11     home, where they don't have permission, they have no

12     authority to be there, and they go in there to commit a

13     crime, vandalize, steal something.  So, essentially,

14     that's what a burglary is.

15     Criminal trespass is kind of similar.

16     All that involves is a person breaks into a building

17     when they have no permission to be in there.

18     Possession of an instrument of a crime is

19     essentially just possessing some utensil that's used in

20     the commission of a crime.

21     THE COURT:  Wait.  After she is shown the

22     facilities -- first, take her downstairs and have her

23     excused for the day.

24     (Juror Number 137 excused from the jury

25     panel.)

44                                          44

1          ATTORNEY KOBESKI:   Does everyone else

2     feel okay?  Again, I apologize.  I know some people are

3     looking out of concern for your fellow juror.

4          But real quickly, burglary is when

5     someone breaks into a building that they have no

6     permission to be in and they steal something or

7     vandalize something.

8          Criminal trespass is a person breaks into

9     a building where they have no permission to be there in

10    the first place.

11         And possession of an instrument of a

12    crime, like I said, is just having some type of utensil

13    or instrument, whether it be a legal or an illegal

14    instrument, that's used in the commission of a crime.

15    So, for instance, if someone robs a bank and they have a

16    gun they are possessing, that gun with the commission of

17    the crime, that would be possession of an instrument of

18    a crime.

19         And finally, institutional vandalism is

20    just, for lack of a better word, just damaging either a

21    courthouse, school, a building that's codified in the

22    statute.

23         Again, I just wanted to give everyone a

24    brief summary of all the charges so you know what you

25    are dealing with in this case.

1     Knowing and understanding a little bit

2  about the charges the Defendant is facing, and just

3  knowing that fact alone, would that prevent anybody from

4  being fair and impartial in this case?

5     (No response.)

6     ATTORNEY KOBESKI: No affirmative

7  response.

8     Now, when I was going over my witness

9  list, my potential witnesses I am going to call during

10  this trial, I essentially called, I believe, four

11  people.  And they were all members of the York County

12  Sheriff's Department.  Does anyone have any affiliation

13  whatsoever with the York County Sheriff's Department,

14  whether they know someone that works there, whether they

15  donate money to the department, or anything aside from

16  that?

17     Ma'am, juror number?

18     JUROR NO. 144:  144.

19     ATTORNEY KOBESKI:  Okay.

20     JUROR NO. 144:  Sheriff Rich Keueleber.

21  I don't know how to say his last name.  The sheriff.

22     ATTORNEY KOBESKI:  He works here

23  currently.

24     JUROR NO. 144:  Yes.

25     ATTORNEY KOBESKI:  Are you friends with

1   him?

2                   JUROR NO. 144:  No.  His son played

3   volleyball with my son.

4                   ATTORNEY KOBESKI:   Understood.  Anyone

5   else that you know of with the department?

6                   JUROR NO. 144:  Of the Sheriff's

7   Department?  No.

8                   ATTORNEY KOBESKI:   Would that prevent

9   you from being fair and impartial in this case?

10                  JUROR NO. 144:  No.

11                  ATTORNEY KOBESKI:   Anyone else in the

12  front row?

13                  JUROR NO. 8:  Is that also Penn Township?

14                  ATTORNEY KOBESKI:   York.  They work here

15  in the courthouse.  They do a lot of calls and runs,

16  things like that.  It wouldn't be the township.

17                  Anyone else?  Juror Number 234?

18                  JUROR NO. 234:  Yes.

19                  ATTORNEY KOBESKI:   Do you know a member

20  of the Sheriff's Department?

21                  JUROR NO. 234:  Yes.

22                  ATTORNEY KOBESKI:   That's through your

23  job?

24                  JUROR NO. 234:  Yes.

25                  ATTORNEY KOBESKI:  So, potentially

1   knowing there are four witnesses with the Sheriff's

2   Department that are going to testify in the trial, would

3   that prevent you from being fair and impartial in this

4   case?

5                    JUROR NO. 234:   No.

6                    ATTORNEY KOBESKI:   Anyone else in the

7   second row?

8                    What about the third row?

9                    Last, but not least, the fourth row?

10                   (No response.)

11                   ATTORNEY KOBESKI:   When I was briefly

12  trying to describe and go over what the Defendant was

13  charged with, two of the crimes I mentioned are

14  attempted crimes, attempted burglary and attempted

15  criminal trespass.  Obviously, they involve an attempt.

16  I indicated later the crimes weren't completed.  The

17  Defendant was caught before he completed the crimes.

18  Does anyone seated here believe that since the crime

19  wasn't actually completed, it was just attempted, it

20  shouldn't be a crime at all?

21                   (No response.)

22                   ATTORNEY KOBESKI:   No affirmative

23  response.

24                   Under Pennsylvania law, an attempted

25  crime is looked at and viewed the same as actually a

48                                                    48

1    completed crime.  So, would anyone disagree with that

2    premise?

3                    (No response.)

4                    ATTORNEY KOBESKI:    No affirmative

5    response.

6                    Now, selecting 12 of you is essentially a

7    guessing game.  I will just preface that by saying,

8    everyone can't be selected.  There are 12, plus two

9    alternates.  If you are not selected, don't hold it

10   against myself or Attorney Gross.  Again, it is just a

11   guessing game.

12                   Lastly, aside from the lady who already

13   left us, does anyone not want to listen and sit during

14   this trial?  It is going to last to the end of today and

15   go into tomorrow.  It shouldn't go past tomorrow.  For

16   any reason, you don't like the way I comb or don't comb

17   my hair or don't like my suit, it is finally not raining

18   outside and you can be outside, anybody that doesn't

19   want to be here for any reason whatsoever?

20                   Ma'am, juror number?

21                   JUROR NO. 234:  234.  I don't want to sit

22   in a criminal case.

23                   ATTORNEY KOBESKI:    You'd rather sit in a

24   civil case?

25                   JUROR NO. 234:  Yes, because of my

1    position and my job.

2              ATTORNEY KOBESKI:   Do you think by your

3    position and your job, you don't think you would be able

4    to sit and listen to a criminal case and be fair and

5    impartial?

6              JUROR NO. 234:  It's not that -- could I

7    come up to answer this?

8              THE COURT:  Do you want to come to

9    sidebar?

10             JUROR NO. 234:  Yes, please.

11                         *   *   *

12             (The following discussion occurred at

13   sidebar:)

14             THE COURT:  Okay.

15             JUROR NO. 234:  I'm sorry.  The only

16   reason I didn't want to sit on a criminal case, if they

17   were committed to jail and they are aware of where I

18   work, I have four children that, you know, I worry

19   about.  And I don't want them -- I just don't want to be

20   open to whoever they may be.  I don't want him to walk

21   into medical and say that's a juror that sat on my case

22   and then have contact.

23             THE COURT:  Do either of you have any

24   questions?

25             ATTORNEY KOBESKI:   No questions.  I

1      appreciate your honesty.

2                  ATTORNEY GROSS:   I have no questions.  I

3      can definitely understand where you are coming from.

4                  THE COURT:  Thank you.

5                  ATTORNEY KOBESKI:   Thank you, ma'am.

6                  ATTORNEY GROSS:   Your Honor, with regard

7      to Juror 24, we have got --

8                  THE COURT:  Hold on.

9                  ATTORNEY GROSS:   We don't have a problem

10     with striking for cause.

11                 THE COURT:  Obviously, for the record,

12     Ruth Ann Keeney was stricken for cause.  She had to

13     leave to get sick, I believe.  So, we have some extras,

14     which is why I do that.  If you are agreeing she should

15     be struck for cause, that's fine.  I don't know that she

16     will get the same consideration in every court, but --

17                 ATTORNEY KOBESKI:   Yes.

18                 THE COURT:  So, we are going to add two.

19     We are now at Lynn Ann Butterbaugh and Laurine

20     Sobota-Minion as part of our initial panel.

21                 ATTORNEY GROSS:   I am with you.

22                 (The discussion at sidebar was

23     concluded.)

24                       *   *   *

25                 ATTORNEY KOBESKI:   The burden of proof

1   in a criminal case is a high burden of proof.  I must

2   prove that the Defendant is guilty beyond a reasonable

3   doubt of each of the crimes that he has been charged

4   with.

5              Now, you are going to hear beyond a

6   reasonable doubt, that term, during the trial.  You are

7   actually going to get the definition at the conclusion

8   of the trial by Judge Kelley.  Just keep in mind when

9   you do hear the term beyond a reasonable doubt during

10  the trial and when you are actually deliberating back in

11  the jury room, it does not mean beyond all doubt.  It

12  does not mean beyond a mathematical certainty.

13  Obviously, it is not 100 percent, but it is still beyond

14  a reasonable doubt.  You will get an instruction as to

15  that before you go back to the jury room.

16              With that being said, I appreciate your

17  patience.  I will talk to you guys soon.

18              ATTORNEY GROSS:   Thank you.

19              May it please the Court, Attorney

20  Kobeski, ladies and gentlemen of the jury.

21              I have not made anyone sick in the past

22  25 years.  I will stand back.

23              In this case, Mr. Kobeski told you a

24  little about what the charges are.  That's just the

25  flavor of what we are dealing with throughout.

52                                                    52

1          I think it is very interesting he has

2     asked you who might you know as far as the attorneys,

3     the judge, the officers, the witnesses, but does anyone

4     here in the jury panel know one another before you got

5     here today?

6               (No response.)

7               ATTORNEY GROSS:    Let the record reflect

8     no response.

9               We do ask that because sometimes exes

10    have ended up on the jury panel.  It is fun to watch,

11    because this is the administration of justice.

12              As Attorney Kobeski indicated, this case

13    should be about a day or day and a half.  Does anyone

14    have any pressing medical or personal issues that would

15    keep them from being here until roughly tomorrow

16    afternoon?

17              (No response.)

18              ATTORNEY GROSS:    Let the record reflect

19    no response.

20              As well, our commercial mediums are

21    flooded with police shows, CSI, Law & Order, A & E.  I

22    am going to let you know right now, this is not going to

23    be run like Law & Order.  There are no gongs that go off

24    when the major point happens.  We don't foresee any

25    stuff going on where you are on the edge of your seat.

1       That being said, here we are not going to have a Law &

2       Order episode in the courtroom.

3               Does anyone here believe that they would

4       not be able to take this seriously just as if they would

5       be a Law & Order type of show just because of the lack

6       of theatrics?

7                       (No response.)

8               ATTORNEY GROSS:   Let the record reflect

9       no response.

10              As well, Attorney Kelley had asked you

11      certain questions, and told you that the Defendant does

12      not have to take the stand in a criminal case.  He is

13      absolutely right under the Constitution.

14              THE COURT:   Have you somehow demoted me?

15              ATTORNEY GROSS:   What?  Did I call you

16      Attorney Kelley?

17              THE COURT:   Attorney.

18              ATTORNEY GROSS:   Judge Kelley.  For so

19      long.  For so long.  Let the record reflect, it is no

20      indication of how this case is going to go.

21              Judge Kelley is going to tell you about

22      whether the Defendant takes the stand or not.  Here is

23      the way I turn it.  Does anyone agree with the statement

24      that if a person is innocent of what they are charged

25      with, they are going to get up on the stand and tell?

                              54                              54

1          Does anyone here agree with that statement?  Be honest.

2                          (No response.)

3                          ATTORNEY GROSS:   Does anyone agree with

4          that statement that if you didn't do anything wrong, get

5          up on the stand and tell us.  If you would raise your

6          hand.  Ma'am, in the front, your number, please.

7                          JUROR NO. 190: 190.

8                          ATTORNEY GROSS:   Do you agree with that

9          statement, ma'am?

10                         JUROR NO. 190: Yes.

11                         ATTORNEY GROSS:   Second row.  And for

12         the record, ma'am, you are Juror Number 234?

13                         JUROR NO. 234: Yes.

14                         ATTORNEY GROSS:   I think we can agree

15         that you don't have to answer any further questions.

16                         Anyone else in the second row agree with

17         that statement?

18                         Third row?  Ma'am, you are?

19                         JUROR NO. 204: 204.

20                         ATTORNEY GROSS:   You agree with the

21         statement if you didn't do anything wrong, get up there

22         and tell us?

23                         JUROR NO. 204: No.

24                         ATTORNEY GROSS:   Sir, on the end.

25                         JUROR NO. 52: 52.

1              ATTORNEY GROSS:   You as well agree with

2    that statement?

3              JUROR NO. 52:   Yes.

4              ATTORNEY GROSS:   Fourth row?   Anybody

5    agree with that statement that if you did nothing wrong,

6    get up on the stand and tell us?

7              JUROR NO. 80:   Juror 80.   It makes sense.

8    It doesn't make sense.   I am torn on this one.

9              ATTORNEY GROSS:   That's why we ask it

10   different ways.   I understand that when you fill out

11   these forms, you get into a flow pattern of answering

12   questions.   I do understand.

13             As well, because this case does involve

14   charges against Mr. Ashford about attempting to trespass

15   or to break into a structure, those individuals that

16   have spoken to the Court today about crimes of their

17   family about theft, does anyone feel, just knowing what

18   these charges are, you wouldn't be in a position to sit

19   in judgment of Mr. Ashford?   Does anyone feel as if they

20   believe they wouldn't be able to do that?

21             (No response.)

22             ATTORNEY GROSS:   Let the record reflect

23   no response.

24             And here's a surprise, too.   Mr. Ashford

25   is not white.   Okay.   I know that comes as a shocker

1    seeing him here.  He is an African American gentleman.

2    Does anyone here take issue with the fact that Mr.

3    Ashford is, in fact, non-Caucasian, but African

4    American?

5                      (No response.)

6                      ATTORNEY GROSS:   Let the record reflect

7    no response.

8                      And as well, everyone here, can you

9    clearly see Mr. Ashford?  Stand up.  Can everyone

10   clearly see Mr. Ashford?

11                     THE JURY:  (Affirmative response.)

12                     ATTORNEY GROSS:  Thank you.  Please have

13   a seat.

14                     And finally, by the mere fact that Mr.

15   Ashford was arrested, does anyone here agree with the

16   statement that innocent people don't get arrested?  Does

17   anyone -- does anyone agree with that statement?

18                     Ma'am, your juror number?

19                     JUROR NO. 284:  284.

20                     ATTORNEY GROSS:   To that end, you think

21   that he must have done something?

22                     JUROR NO. 284:  No.  I said I don't

23   believe just because you are arrested you are guilty.

24                     ATTORNEY GROSS:   Does anyone agree with

25   the statement that you must have done something wrong to

                              57                        57

1    get arrested?  Does anyone here agree with that

2    statement?

3                    (No response.)

4                    ATTORNEY GROSS:  Let the record reflect

5    no response.

6                    Thank you.  I appreciate it.  And that's

7    the only question I have.

8                    THE COURT:  Yes, sir.

9                    JUROR NO. 257:  May I approach?

10                   THE COURT:  Come on up, counsel.

11                             *   *   *

12                   (The following discussion occurred at

13   sidebar:)

14                   THE COURT:  Yes.

15                   JUROR NO. 257:  I have a lot of things

16   lately, a lot of things.  I have taken something for

17   anxiety and depression.  I am sitting there getting

18   pretty anxious.  I don't think it is going to affect me,

19   but I am just getting pretty nervous.

20                   THE COURT:  Are you okay?

21                   JUROR NO. 257:  Yes, I am okay.  I am

22   okay.

23                   THE COURT:  Do you need me to do

24   something?

25                   JUROR NO. 257:  No.  I think that it's

                              58                        58

1      just --

2                     THE COURT:  All right.  You may step

3      away.

4                     JUROR NO. 257:  Just wanted to make you

5      aware of that.

6                     THE COURT:  You may return to your seat.

7                     (Juror No. 257 returned to his seat with

8      the prospective jury panel.)

9                     THE COURT:  Okay.  Attorney Kobeski.

10                     Off the record.

11                     (The discussion at sidebar was

12     concluded.)

13                            *   *   *

14                     THE CLERK:   The following people have

15     been selected for the jury panel.  As I call your juror

16     number, please take a seat in the jury box.  Number 144,

17     Number 159, Number 254, Number 218, Number 25, Number

18     244, Number 279, Number 14, Number 12, Number 187,

19     Number 161, Number 167, Number 53, Number 80.

20                     THE COURT:  Ladies and gentlemen from the

21     panel, I want to thank you for your service in this

22     case.  We will have you return to the Central Jury Room.

23     You will probably break for lunch and you will be

24     available for the afternoon session.  Thank you very

25     much.

1                              *    *    *

2                        (Prospective jury panel left the

3      courtroom at 12:14 p.m.)

4                        THE COURT:    Okay.  Ladies and gentlemen,

5      I am going to release you for lunch right now.   I am

6      going to ask you to return to my jury room at 1:15.

7      We'll get started promptly at 1:15.  We will break a

8      little early.  I have to follow up on surgery I had

9      done.  I have to leave at 2:45.  We are not going to

10     have an extremely long afternoon.  I apologize for that.

11     That's the only appointment I can get.

12                              *    *    *

13                        (Luncheon recess taken from 12:15 p.m. to

14     1:15 p.m.)

15                              *    *    *

16                        AFTER RECESS

17                              *    *    *

18                        ATTORNEY GROSS:    Your Honor, if I may

19     before the jury comes in.  Mr. Ashford's mother, he was

20     trying to explain things to her, she brought something

21     to my attention that she wishes to bring to the Court's

22     attention.

23                        THE COURT:    Yes.

24                        MS. WHITE:    Sheriff Igwe escorted the

25     jurors into Subway.  That's where I was headed to lunch.

1   I take issue with that because he is escorting them.  He

2   is a person --

3                   THE COURT:  Who?

4                   MS. WHITE:  Igwe, the sheriff, Igwe, the

5   one you asked the jury did they know him.

6                   ATTORNEY KOBESKI:   He is one of the

7   potential witnesses, Ciprian Igwe, the one who would

8   have the West African accent.

9                   THE COURT:  What did he do?

10                  MS. WHITE:  He escorted the jurors into

11   Subway.

12                  THE COURT:  What juror or jurors?

13                  MS. WHITE:  Yes, the jurors.

14                  THE COURT:  Do you know which jurors they

15   were?

16                  MS. WHITE:  I don't know exactly.  I

17   can --

18                  THE COURT:  Were they the people here or

19   the people seated on the jury?

20                  MS. WHITE:  They were the people that was

21   involved, the whole row.

22                  THE COURT:  They were not people who were

23   seated on the jury?

24                  MS. WHITE:  I know the one person that

25   they --

1          THE COURT:  Was it the people that were

2    actually selected for the jury, ma'am?

3          MS. WHITE:  Yes.

4          THE COURT:  That are sitting here in the

5    jury room?

6          MS. WHITE:  They were the people that was

7    sitting.

8          THE COURT:  Fine.  Let's bring the jury

9    in.  I cannot pull your teeth out, ma'am.

10         The individual indicated there was no one

11   on the jury panel.  It may have been from voir dire.

12                    *   *   *

13         (Jury entered the courtroom at 1:20 p.m.)

14                    *   *   *

15         THE COURT:   Folks, if you would remain

16   standing.  Everyone else may be seated.

17         You may swear in the jury.

18                    *   *   *

19         (Jury sworn at 1:20 p.m.)

20                    *   *   *

21         THE COURT:  Ladies and gentlemen, during

22   the course of the lunch hour, has anyone discussed this

23   case with anyone or has anyone had this case discussed

24   in front of them?

25         THE JURY:  No.

62

1          THE COURT:  No affirmative responses.

2          Has anyone been approached by any of the

3    witnesses or individuals who were identified as

4    witnesses in this case?

5          (No response.)

6          THE COURT:  How about any of the parties?

7          (No response.)

8          THE COURT:  No affirmative response.

9          Okay.  Ladies and gentlemen, what I am

10   going to do next, I am going to give you my preliminary

11   instructions for the beginning of trial.

12          Members of the jury, you have been

13   selected to perform one of the most solemn duties of

14   citizenship.  You are to sit in judgment upon criminal

15   charges made by the Commonwealth against one of your

16   fellow citizens.

17          The services you render as jurors in this

18   case are as important to the administration of justice

19   as those rendered by me as judge and by the attorneys

20   involved in the case.  You should pay very close

21   attention to everything that is said and everything that

22   occurs throughout the trial so that you can faithfully

23   perform your sworn duties as jurors.

24          Let me discuss in a general way what is

25   going to transpire over the next day or so.  We are not

1    going to finish today because, as I said, I have to

2    leave early today.  But, after I have concluded these

3    instructions, the attorneys are going to give their

4    opening statements.  The Commonwealth's attorney,

5    Attorney Kobeski, will go first and defense counsel will

6    go next.  Defense counsel may reserve his closing for

7    later.

8              After that unfolds, after the opening

9    statements, the Commonwealth will call any witnesses the

10   Commonwealth wants you to consider during the course of

11   your deliberations.  Of course, any witnesses called by

12   the Commonwealth may be cross-examined by defense

13   counsel.

14             After the Commonwealth's case has been

15   completed, defense counsel may, if he elects to do so,

16   introduce any witnesses that he wants you to consider.

17   Although, bear in mind, of course, as I told you on two

18   separate occasions, the Defendant is under no obligation

19   whatsoever to present any evidence or any witnesses, and

20   the Defendant does not need to take the witness stand.

21   Any witnesses called by the defense may be

22   cross-examined by the Commonwealth.

23             At the conclusion of the evidence, the

24   parties will give you their closing statements, followed

25   by my final instructions which will be in the form of

1   describing for you the laws that the Defendant has been

2   charged with violating as well as telling how you are to

3   consider various items of evidence.

4   In addition to these instructions I am

5   giving you right now and the instructions I am going to

6   give you at the conclusion of the trial, I am likely to

7   give you various other instructions during the course of

8   trial.  Taken as a whole, they comprise the law to be

9   applied by you during the course of your deliberations.

10  One of the key elements of that law is

11  that a defendant is presumed to be innocent.  The mere

12  fact that the Defendant was arrested and is charged with

13  offenses is not any evidence of the Defendant's guilt.

14  It is not the Defendant's burden to prove that he is not

15  guilty.  Instead, it is the Commonwealth that always has

16  the burden of proving each and every element of the

17  crimes charged and that the Defendant is guilty of those

18  crimes beyond a reasonable doubt.

19  Although the Commonwealth has the burden

20  of proving that the Defendant is guilty, this does not

21  mean that the Commonwealth must prove its case beyond

22  all doubt or to a mathematical certainty, nor must it

23  demonstrate the complete impossibility of innocence.  A

24  reasonable doubt is a doubt that would cause a

25  reasonably careful and prudent person to pause and

65                                              65

1   hesitate or refrain before acting upon a matter of

2   highest importance in his or her own affairs.   A

3   reasonable doubt must fairly arise out of the evidence

4   that was presented or out of the lack of evidence that

5   was presented with regard to some element of each of the

6   crimes charged.   A reasonable doubt must be a real

7   doubt.   I may not be an imagined doubt, nor may it be a

8   doubt manufactured to avoid carrying out an unpleasant

9   duty.

10          When you deliberate upon your verdict,

11   you have to rely upon your own recollections of what was

12   said and what occurred here in the courtroom.   This is

13   because, based upon the length of the trial, I am not

14   going to have you take any notes.   What this does mean

15   is that you must pay very close attention to everything

16   that transpires in front of you so that you can

17   faithfully perform your sworn duty as jurors.   If you

18   feel that you have missed something from the testimony,

19   it is best for you to let us know immediately so we can

20   go back and have whatever question was asked or answered

21   repeated for you to your satisfaction.

22          You should not permit any sympathy you

23   feel for any witnesses or for the victim or the

24   Defendant to divert you from your sworn duty to consider

25   all the evidence fairly and impartially when

66                                                      66

1   deliberating upon your verdict.

2              As I said to you previously, you are the

3   sole judges of the credibility and weight to be given to

4   all the evidence, including the testimony of the

5   witnesses.  You must consider and weigh the testimony of

6   each witness and give it such weight as you believe that

7   it is fairly entitled to receive.  Each of you must keep

8   a completely open mind throughout the trial.  In the

9   oath you just took, you swore to do just that.  We are

10  unable to give you all the evidence in one fell swoop.

11  The evidence must be given to you witness by witness,

12  question by question, and answer by answer.  Therefore,

13  you must keep a completely open mind throughout the

14  trial until such time as you have heard all the evidence

15  and I have instructed you on the way and manner you are

16  to consider that evidence.

17             You should not talk about this case

18  amongst yourselves, nor should you talk about this case

19  with anyone else.  You can talk about this case amongst

20  yourselves at the conclusion of the trial after I have

21  instructed you on the way and manner to consider the

22  evidence that you have heard.

23             During the trial, as I said, you must not

24  talk about this case with anyone or listen to others

25  talk about this case, including members of your family.

1    There are some persons with whom you must avoid even

2    casual conversations having nothing to do with this

3    case.  Those persons are the Defendant, counsel for both

4    sides, the witnesses, and myself.

5              Statements made by counsel do not

6    constitute the evidence.  It is the answers that the

7    witnesses give that constitute the evidence to be

8    considered by you.  You should not assume a certain set

9    of facts to be true merely because an attorney asked a

10   question that assumes a certain set of facts.  Again, it

11   is the answers that are to provide you with the

12   evidence.

13             During the course of the trial, I may

14   question some witnesses myself.  The only reason I would

15   do so is because after listening to the evidence unfold

16   for the first time just like you, I believe that there

17   might be some questions that you might have concerning

18   some of the evidence.  That is the only reason I would

19   ask any questions.  You should not infer from the fact

20   that I might ask questions that I take a position with

21   regard to the guilt or innocence of the Defendant.

22   Indeed, I am duty-bound not to take any position

23   whatsoever with regard to the guilt or innocence of the

24   Defendant.

25             In addition to some of my other duties, I

1   am also to rule on objections during the course of

2   trial.  And all an objection is, it is a legal way of an

3   attorney saying, judge, I don't think that the jury

4   should consider this evidence.  My job under those

5   circumstances is to consider that.  If I sustain an

6   objection, that's another way of me saying, I agree, the

7   jury should not consider the evidence.  If, on the other

8   hand, I overrule the objection, that's another way of me

9   saying, I disagree, I believe the jury should hear the

10  evidence.  Okay.  Sometimes if there is an objection

11  that I sustain, you may have already heard the answer,

12  for instance, if a witness blurts out the answer before

13  I can rule on the objection.  Under those circumstances,

14  I may instruct you to disregard the question, disregard

15  the answer.  Under those circumstances, literally what

16  you should do is take that information out of your mind,

17  set it aside, not to be considered at all during the

18  course of your deliberations.  Okay.  Sometimes I can

19  rule on evidence quite quickly.  I hear an objection, I

20  hear a response, and I can rule on it.  Other times, I

21  might need to hear additional arguments or facts before

22  I can rule properly.  Under those circumstances,

23  normally, what I will do is take up matters at sidebar.

24  Of course, I have a white noise machine.  Under those

25  circumstances, you should not try to determine why it is

69                                              69

1    at sidebar, nor, of course, should you try to overhear

2    what we are discussing.  Obviously, I can't rule on an

3    objection when someone is arguing that you shouldn't

4    consider evidence and then allow them to banter back and

5    forth about the evidence in your presence.  That is the

6    reason why we take up matters at sidebar.

7         Okay.  In addition, you should not

8    concern yourselves with what the penalty might be at the

9    conclusion of the trial if you find the Defendant

10   guilty.  The issue of guilt and the issue of penalty are

11   decided separately.  You decide the guilt or innocence

12   of the Defendant.  Thereafter, if necessary, I determine

13   what the appropriate sentence might be.

14        That's all the instructions I have for

15   you at this point in time, ladies and gentlemen.  We are

16   going to proceed to opening statements.

17        Commonwealth.

18        ATTORNEY KOBESKI:  May it please the

19   Court, Attorney Gross.  Good afternoon, ladies and

20   gentlemen.

21        If a person looks like they are about to

22   commit a burglary, and if a person is acting like they

23   are about to commit a burglary, then I submit to each of

24   you that that person is, in fact, about to commit a

25   burglary.

70                    70

1          Now, the testimony during the trial will

2     show that on March 17, 2008, that man, the Defendant,

3     was here at this very building.  Now, it was a Monday

4     morning, but it was not during normal, typical business

5     hours.  And the Defendant was certainly not here for

6     jury duty.  What you are going to hear is that it was

7     3:00 in the morning.  The Defendant was dressed in all

8     dark clothing.  He had a black knit cap on, black

9     gloves, a dark or black hooded sweatshirt top, and he

10    had dark jeans on.  And you are going to hear that he

11    was in the back of this courthouse.  You will hear a

12    description from the sheriffs of what the back of the

13    courthouse looks like.  You may have even seen it when

14    you walked in here.  But nonetheless, the Defendant was

15    back there dressed all in black 3:00 in the morning.

16         The testimony will show that the

17    Defendant was looking through the windows near the back

18    doors of the courthouse, and then the Defendant pulled

19    out a screwdriver.  The Defendant proceeded to put the

20    screwdriver in between the crevices of one of the back

21    doors of the courthouse and started to pry it open.  He

22    got on his knees.  He was even successful in opening the

23    door a little bit, the bottom of the door at least.

24         Now, how do we know all this happened?

25    First of all, most of it is on video.  Not surprisingly,

1    there is a video surveillance system in place here in

2    the courthouse.  It is supposed to be at least a secure

3    location, although it wasn't on that evening.

4                    And number two, Deputy Sheriff John

5    Brenneman of the York County Sheriff's Department saw

6    the Defendant doing this the entire time on the video

7    live as it was happening.

8                    Corporal Shawn Brady, also of the

9    Sheriff's Department, he even went around to the back

10   doors of the courthouse and caught that man red-handed.

11                   Now, you are going to hear that he was

12   taken into custody, some evidence was collected, a

13   screwdriver.  And you are going to hear all of this.

14                   Now, I am confident that after hearing

15   all the testimony and looking at all the evidence which

16   will occur today and tomorrow, that each of you will be

17   convinced, not only convinced, but you will be convinced

18   beyond a reasonable doubt that this man, the Defendant,

19   damaged the back doors of this courthouse with a

20   screwdriver.  That will be institutional vandalism.

21   That the Defendant had in his possession that

22   screwdriver and used it in a criminal endeavor trying to

23   break open the door.  And that's possession of an

24   instrument of a crime.  That the Defendant attempted to

25   break into this very courthouse when he had no

                              72                        72

1    permission to do so.  That will be the attempted

2    criminal trespass.  And I am confident that the evidence

3    will also show that when the Defendant was trying to pry

4    open the back door of this courthouse, he had the

5    intent, he was planning on committing a crime once he

6    got inside.  That will be the attempted burglary.  Those

7    are the four charges that the Defendant is charged with

8    for your consideration.

9              Now, members of the jury, actions speak

10   much louder than words.  The Defendant's actions on

11   March 17 of 2008 are undeniable.  And once everything is

12   said and done, I am going to ask each of you to return a

13   verdict of guilty on all offenses.

14             Thank you.

15             THE COURT:  Counsel, do you wish to open

16   at this time?

17             ATTORNEY GROSS:   I do, Your Honor.

18             May it please the Court, Attorney

19   Kobeski, ladies and gentlemen of the jury.  I don't like

20   to say this, but I agree with Attorney Kobeski on

21   certain points.  First and foremost, my client, Ken

22   Ashford, he was arrested March 17, 2008, about 3:00 in

23   the morning outside the back of the courthouse.

24   Actually, there is a videotape, VHS, antiquated, but it

25   shows the story--my client being ordered to get down on

73

1    the ground and he is placed under arrest.  So, you are

2    probably thinking to yourself, okay, then why are we

3    having this trial.

4              You are also going to see evidence on the

5    DVD depicting a gentleman with a black hooded

6    sweatshirt, pair of jeans and gloves pulling on the back

7    door of the courthouse.  You are also going to see

8    someone fussing around the bottom of the door of the

9    courthouse.  Although you are not going to see that on

10    the VHS, you will be able to see that on the DVD.  That

11    way, you will see if the evidence matches the

12    Commonwealth's evidence.

13              You also have evidence that the

14    Commonwealth will submit that my client damaged the back

15    door of the courthouse.  Specifically, you will see

16    little marks on the door, two doors that are open and

17    used for bringing in and taking out equipment.  It is a

18    loading dock.  Big objects going through the doors.

19    Marks occur.  Again, keep that in mind, common sense, as

20    you are processing the information in this case.

21              Also, criminal trespass, you will hear

22    evidence from the witnesses of the Commonwealth that

23    they have cameras that pan the rear of the courthouse,

24    around the back, the front, and the sides, and they keep

25    track, because there are people that would walk through

74

1   the back of the courthouse and go through the recycling

2   bins, garbage, what have you, throughout all hours of

3   the evening.  And when you look at that, you will see

4   that other people are out and about in the back area of

5   the courthouse.  People walk through, cut through from

6   George Street and Philadelphia.  We are on George Street

7   and Philadelphia runs to our right, again, depending on

8   where you are looking.  Also, you will hear evidence

9   that it is not uncommon for people walking down the

10  alleyways to cut through to go from place to place in

11  the city, nor is it uncommon for folks to go out at this

12  time of the evening.

13          What this case comes down to is not the

14  arrest of Mr. Ashford, but a few shots on that DVD and

15  you will see a man looking up at the camera, which is

16  purported to be right above the loading dock area in the

17  back of the courthouse, and you will see a face.  And

18  that face, the Commonwealth is going to tell you that it

19  is this gentleman, my client, Kenneth Ashford.  But, the

20  picture you see is going to be somebody much, much

21  lighter complected.  I am not going to argue about that

22  now.  Just roll the film.  That's all I ask.  Take a

23  look and see if it is possible that individual could be

24  Mr. Ken Ashford.  And use your common sense.

25          Then after the evidence is presented, I

75

1    am going to come back before you and ask you to find my

2    client not guilty of attempted burglary, because what's

3    the reason to break into the back of the courthouse

4    where you see garbage cans.  And I am not sure what

5    crime you committed in there.  As well as attempted

6    criminal trespass.  What is he attempting to do to enter

7    into the building even if you think it is him and not

8    somebody else on that film?  And also, institutional

9    vandalism, what was broken?  It is a door.  You are

10   going to see marks on there, dents, nicks, scratches.

11           It is for you to determine whether or not

12   the Commonwealth has met their burden and shown you that

13   my client, Ken Ashford, was the man behind the door and

14   even if he caused any damage.

15           With that being said, I ask that you

16   listen to the evidence as presented to you.  Bring your

17   own common sense and experience to the table.  Process

18   it.  Figure out what makes sense.  And I will ask that

19   at the end of the trial when I speak with you that you

20   return a verdict in favor of my client.

21           Thank you.

22           THE COURT:  Okay.  Attorney Kobeski.

23           ATTORNEY KOBESKI:   Your Honor, before I

24   call my first witness, I would move to sequester all

25   defense witnesses.

1          ATTORNEY GROSS:  Absolutely.

2          THE COURT:  Okay.

3          ATTORNEY KOBESKI:  With that being said,

4    we call Deputy John Brenneman.

5                    *   *   *

6                JOHN D. BRENNEMAN,

7    called as a witness on behalf of the Commonwealth,

8    having been duly sworn according to law, testified as

9    follows:

10                   *   *   *

11               DIRECT EXAMINATION

12   BY ATTORNEY KOBESKI:

13        Q.   Can you state your name for the record,

14   deputy.

15        A.   John D. Brenneman.

16        Q.   Sir, how are you employed?

17        A.   York County Sheriff's Department.

18        Q.   How long have you been involved in law

19   enforcement?

20        A.   January 28, 2002, was my hiring date.

21        Q.   That was with the York County Sheriff's

22   Department?

23        A.   Correct.

24        Q.   Deputy, let me draw your attention to March 17

25   of 2008.  Do you recall if you were on duty on that

                        77

1    date?

2         A.   I was.

3         Q.   And do you remember what shift you would have

4    been working?

5         A.   11:00 p.m. to 7:30 a.m.

6         Q.   What were the nature of your job

7    responsibilities on that date?

8         A.   For most of that night, I was in the control

9    room down in the basement.  But, it would have been the

10   booking center.

11        Q.   Let's back up for a minute and try to get a

12   better handle on that department.  Where is the

13   sheriff's headquarters located?

14        A.   Sheriff's Office is on the first floor of this

15   building.

16        Q.   Of the courthouse?

17        A.   Correct.

18        Q.   And are there other facilities that the

19   sheriffs have access to in this building?

20        A.   The basement is where the booking center is,

21   our holding cells for adults and juveniles.

22        Q.   Now, you indicated that on March 17 of 2008,

23   you were in the control room most of the night?

24        A.   Correct.

25        Q.   What exactly is the control room?

1          A.   The control room is more or less the brain of

2     the whole building.  It is where all the alarms are, all

3     the monitors that monitor every single camera, the

4     outside cameras.  We control doors to the cells, the

5     secure cells.  The doors have to be -- you have to push

6     a button to open up the door to get to some of the

7     stairwells.

8          Q.   That's in the basement of the courthouse?

9          A.   Correct.

10         Q.   Now, deputy, aside from yourself, were there

11    any other sheriffs on duty on March 17, 2008?

12         A.   Yes.

13         Q.   Who were those deputies?

14         A.   Corporal Brady, who is sitting next to you,

15    was the supervisor.  Deputy Lease, L-e-a-s-e, and Deputy

16    Igwe, I-g-w-e, and myself.

17         Q.   So, there were four sheriffs total on duty

18    that evening --

19         A.   Correct.

20         Q.   -- at least, in the courthouse?

21         A.   Probably on duty.

22         Q.   Let me ask you this, deputy.  Did you observe

23    anything unusual during your shift that evening or early

24    morning?

25         A.   Yes.

79                                        79

1    Q.   Can you tell the jury exactly what you

2    observed.

3    A.   At approximately 3:10 in the morning, Corporal

4    Brady had brought to my attention someone walking around

5    the loading dock at the back of the building by the

6    alley.

7    Q.   Now, Corporal Brady alerted you to this.  Were

8    you guys in the same room when he did this?

9    A.   Correct, in the control room.

10   Q.   Were there any other deputies or sheriffs in

11   the control room with yourself and Corporal Brady?

12   A.   No.

13   Q.   Do you recall prior to Corporal Brady alerting

14   you that something was going on what you guys were doing

15   before that?

16   A.   Corporal Brady had just gotten back from doing

17   a building check through town.  We own a couple other

18   buildings and he was making the checks on those.  And I

19   was in the control room just monitoring the cameras and

20   answering phones.

21   Q.   So, I believe you testified it was about 3:10

22   in the morning?

23   A.   Um-hum.

24   Q.   Do you recall what day of the week this was?

25   A.   Since there was only four on, it should have

80

1    been Sunday night into Monday morning.

2         Q.   Now, when Corporal Brady alerted you that

3    something was going on, where did you first look?

4         A.   I looked at the one camera.  I pulled the

5    camera up on our main monitor.  With that camera, we can

6    zoom, pan with the joy stick.  And that's what I did.  I

7    brought the -- moved the joy stick to where the

8    individual was standing.

9         Q.   Is it fair to say you were viewing a monitor?

10        A.   Yes.

11        Q.   And do you recall how big that display was?

12        A.   I want to say it is maybe about a 21-inch

13   monitor.

14        Q.   And this particular evening, you were just

15   looking at this one screen at this very moment?

16        A.   Yes.

17        Q.   Now, you testified that you can pan.  What

18   exactly does that mean?

19        A.   You can move it left, right, down, up, zoom in

20   closer and make it wider.

21        Q.   And you manually controlled this?

22        A.   Yes.

23        Q.   Now, do you recall where this person was that

24   you were looking at?

25        A.   In the corner, right by the gentleman, Ray

81

1    Torres.  There is a space that he was standing looking

2    left and right like he was looking for somebody.

3         Q.   Let me ask you this.  Is that the front of the

4    building, side, back?

5         A.   It is in the back by the loading dock.

6         Q.   Do you know, is there an alley or street?

7         A.   There is an alley that cuts between us and the

8    restaurant next-door to us.

9         Q.   So, nonetheless, it is in the back of the

10   courthouse?

11        A.   Correct, on the loading dock.

12        Q.   3:00 in the morning, I am assuming it is dark

13   outside?

14        A.   Yes.

15        Q.   Do you recall what the lighting conditions

16   were back in this area when you were watching?

17        A.   On the pad, it is pretty well lit up.  And the

18   alley is lit up.  Back where the individual was, it is a

19   little bit darker.  There is maybe about a two-foot

20   space between the wall and generator and he was back in

21   around that area.

22        Q.   Is it fair to say it wasn't at least pitch

23   black?

24        A.   No.

25        Q.   When you were observing this individual, could

82                                                          82

1   you tell if this person was a male or female?

2        A.   Once they got a little closer, I could tell it

3   was a male.

4        Q.   How are you able to tell that, deputy?

5        A.   Looked like he had a little bit of a mustache.

6        Q.   Can you tell as you were watching or observing

7   this, what skin color the individual had?

8        A.   At first, I thought it was either a dark

9   Hispanic or light black male.

10       Q.   Well, deputy, do you recall what this

11   individual was wearing?

12       A.   Blue jeans, a black sweatshirt with a hood,

13   and glasses.

14       Q.   Now, this hood that you testified was on the

15   sweatshirt, was it pulled over the head or laying back?

16       A.   No, it was pulled over his head.

17       Q.   Could you tell if this suspect was wearing a

18   hat at this time?

19       A.   I don't recall.

20       Q.   Do you know whether or not this individual had

21   on gloves?

22       A.   After I saw the video, I am pretty sure that

23   he did have gloves on.  But  at that moment, I didn't

24   realize it.

25       Q.   Now, tell the jury what action or actions you

83

1   took once you started to watch this person.

2       A.   Okay.  Corporal Brady and I were both in

3   there.  I moved the monitor over.  As I said, he was

4   looking left and right as if he was looking for

5   somebody.  Then he started walking towards where the

6   Sheriff's Office windows are.  And we have our blinds

7   open.  And then there is rollable garbage cans along

8   that wall that recyclable items can be put in there,

9   plastic bottles and newspapers and stuff like that.

10  That's where he stopped and looked into the Sheriff's

11  Office.

12      Q.   Now, is this through a window?

13      A.   Yes.

14      Q.   You testified the blinds were open?

15      A.   The blinds were open, lights were on.

16      Q.   It is easy to see in if it is dark outside?

17      A.   Yes.

18      Q.   What did you observe this suspect do next?

19      A.   Well, I thought he was going into the garbage

20  cans to start to look through some of the recycling

21  stuff.  We have people that do that.  I saw him reach in

22  his pocket and pull something out and start walking

23  toward the back door.  That's when -- Corporal Brady

24  already had the car keys in his hand and said he was

25  going to go out and see what this guy was doing.

1    Q.   At any point in time, did this suspect or

2    individual go into the garbage cans?

3    A.   No.

4    Q.   So, I am assuming at this point in time you

5    thought something was up?

6    A.   Yes.

7    Q.   You testified that this suspect was looking

8    through the blinds through the windows of the Sheriff's

9    Department.  Do you recall about how long this

10   individual was doing this for?

11   A.   I want to say maybe only about five seconds.

12   Q.   You testified the individual looked left and

13   right.  Was this before or after he looked in the

14   window?

15   A.   That was before when he was back by the

16   generators.

17   Q.   You testified the individual reached in his

18   pocket.  Did you see what pocket?  Was it a coat pocket,

19   pants pocket?

20   A.   No.  It was the hoodie.

21   Q.   Did you see if anything was brought out of the

22   hoodie pocket?

23   A.   It appeared to be a long skinny-type tool.  I

24   wasn't sure what it was.  Later on, I found out it was a

25   screwdriver.

85

1    Q.   When you were observing the video, you weren't

2    certain?

3    A.   No.  No.

4    Q.   You just saw that he pulled something out?

5    A.   Correct.

6    Q.   Was there anything in the suspect's hands

7    prior to him reaching in his hoodie pocket?

8    A.   No.

9    Q.   You testified that this suspect was going

10   towards the back doors of the courthouse?

11   A.   Correct.

12   Q.   What happened next?

13   A.   Corporal Brady had the keys, went out of the

14   control room.  I started following him with the camera,

15   the individual that we saw out on the loading dock.  And

16   then I had to leave about two to three seconds to go

17   push a button so he could go get out through the

18   stairwell, a secure door.

19   Q.   Who is this you're referring to?

20   A.   I had to push the button for Corporal Brady so

21   he could get out in the garage.  When I came back, I

22   continued following the individual at the back door.

23   Q.   You mean you were following him with the

24   video?

25   A.   With the camera, correct.

1      Q.   Do you know where Corporal Brady was going?

2      A.   He said he was going to go out and find out

3  what this guy was doing.

4      Q.   You said he had car keys.  What are these keys

5  to?

6      A.   Patrol car.

7      Q.   Now, once Corporal Brady left with the car

8  keys and you were observing this suspect on the video,

9  did you have any communications with anyone during this

10  time?

11      A.   I kept in communication with Corporal Brady

12  over a radio letting him know what his progress was,

13  what he was doing, prying at the door, mostly the bottom

14  of the door, with the tool.

15      Q.   So, I am assuming by your testimony the

16  suspect actually made it to the back doors?

17      A.   Yes.

18      Q.   What exactly did you see the suspect do once

19  he was at the back doors?

20      A.   He kneeled down and with the tool put it in

21  between the two -- it's a double door that had pins in

22  the top and the bottom and a push bar in the center that

23  you can only get out.  And he pried at the door with the

24  tool.  And towards the end, he did get the bottom part

25  of the door partially open, maybe only a crack, but it

1    was still open.  And I was letting Corporal Brady know

2    what the individual was doing.

3         Q.   Did you see the suspect taken into custody?

4         A.   Yes.

5         Q.   How long would you say it was from when you

6    first saw the suspect until he was taken into custody?

7         A.   Three minutes, maybe maximum of five.  But, it

8    was pretty quick.

9         Q.   Now, during this entire incident, deputy, did

10   you see any other persons in the near vicinity of this

11   suspect?

12        A.   No.

13        Q.   So, there is only one that you saw the entire

14   time?

15        A.   Correct.

16        Q.   I believe you already testified to this, but

17   did you observe the entire incident?

18        A.   Yes.

19        Q.   Was this live as it was happening?

20        A.   Yes.

21        Q.   I believe you testified there was a period of

22   time two to three seconds where you left the cameras?

23        A.   Correct.

24        Q.   Now, prior to leaving the cameras for those

25   two or three seconds, did you get a good look at the

88

1    suspect?

2         A.   I got a fairly good glimpse of him.   There was

3    maybe only just the oval of his face that was shown

4    through the hoodie and then the glasses that were

5    covering the eyes, too.

6         Q.   Is it fair to say that most of his face was

7    covered?

8         A.   Most of it.

9         Q.   And he had a sweatshirt and jeans, so you

10   couldn't see any other part of his body?

11        A.   Right.

12        Q.   When you came back from two to three seconds

13   letting Corporal Brady out, was it the same person that

14   you saw?

15        A.   Yes.

16        Q.   Still the same person dressed all in dark

17   clothing?

18        A.   Yes.

19        Q.   Hoodie over the head?

20        A.   Yes.

21        Q.   That was the only two to three seconds that

22   you weren't watching this incident?

23        A.   Correct.

24        Q.   Just to be clear, were there any other times

25   when you had to go do something and take your view away

89

1   from the camera?

2       A.   No.   Just that one time.

3            ATTORNEY KOBESKI:   Your Honor, may I

4   have a moment, please.

5            THE COURT:   Yes.

6   BY ATTORNEY KOBESKI:

7       Q.   Deputy, did you collect any evidence in this

8   case?

9       A.   Yes.   I had evidence provided to me that I

10  collected and packaged.

11      Q.   Who provided you evidence?

12      A.   Deputy Igwe.

13      Q.   And at what point in time did he provide you

14  evidence?

15      A.   When he went to the back door, the door was

16  being jammed open by the screwdriver, which is what I

17  found out that it was later on.   He picked up the

18  screwdriver and I told him to bring it down to me so we

19  could keep it for evidence.

20      Q.   Was this the same morning?

21      A.   Yes.   It was maybe about five minutes after he

22  was taken into custody.

23      Q.   So, Deputy Igwe brought the screwdriver

24  directly to you?

25      A.   Correct.

1      Q.   What did you do once you received it?

2      A.   Packaged it up and sealed it.

3           ATTORNEY KOBESKI:  May I approach the

4    witness, please.

5           THE COURT:  You may.

6           ATTORNEY KOBESKI:  Let the record reflect

7    I am handing the witness what has been marked as

8    Commonwealth's Exhibit Number 4.

9    BY ATTORNEY KOBESKI:

10     Q.   Deputy, do you recognize that package?

11     A.   Yes, I do.

12     Q.   Can you please tell the jury what that package

13   is?

14     A.   It is a package containing the screwdriver

15   with my writing on.

16     Q.   Did you seal that package?

17     A.   Yes, I did.

18     Q.   When did you seal that package, sir?

19     A.   Right after the charges were done.  That day.

20   That day.

21     Q.   Is that the -- did you place that red evidence

22   tape over the package?

23     A.   Yes, I did.

24     Q.   Why did you do that?

25     A.   Well, this is real easy to tear, so if anybody

91

1    tries to get in it, it will just rip.

2         Q.   So, you tape to secure it?

3         A.   Correct.

4         Q.   Do you recall what you did with that packaged

5    evidence once you taped it up and secured it?

6         A.   We have an evidence drop box.  It is like an

7    old mailbox that you drop it in.  And then the evidence

8    clerk picks it up, signs it in.

9         Q.   Is that a secure location, do you know?

10        A.   Yes, in our squad room.

11        Q.   Is that where the evidence was taken from

12   today to bring to court, from the evidence locker or

13   evidence room?

14        A.   I would imagine that's where Corporal Brady

15   got it from.

16        Q.   Does it look like it is in the same condition

17   as when you packaged it?

18        A.   Yes.  Yes.  It is my writing on the

19   description and everything.

20        Q.   Deputy, can you kindly open the package,

21   please.

22        A.   Sure.  This one, also?

23        Q.   Please.

24        A.   This one, this stuff just kind of pulls.

25        Q.   Deputy, just for the record, the bag you are

                              92

1    about to cut open, did you place the screwdriver in that

2    bag?

3        A.   Yes, I did.

4        Q.   Can you tell, is that the screwdriver that was

5    collected --

6        A.   Correct.

7        Q.   -- on the night in question?

8             After the suspect was taken into custody,

9    do you know where -- how that individual was brought in?

10       A.   Corporal Brady and Deputy Lease put him in the

11   patrol car and Corporal Brady drove him down to the

12   control center.

13       Q.   That's inside the courthouse?

14       A.   Correct, Philadelphia Street door.

15       Q.   Did you see them bring the individual in?

16       A.   I saw him pull in the sally port with the

17   individual.

18       Q.   And the individual that you saw in custody,

19   was it the same individual you were observing on the

20   video?

21       A.   Yes.

22             ATTORNEY KOBESKI:   Your Honor, that's all

23   the questions I have.

24             THE COURT:   Cross-examination.

25             ATTORNEY GROSS:   Thank you, Your Honor


93

1              *   *   *

2              CROSS-EXAMINATION

3    BY ATTORNEY GROSS:

4         Q.   The individual that you saw come to the sally

5    port and into the holding area, you said that was the

6    same one you saw on the video?

7         A.   Yes.

8         Q.   Is that based on the black hoodie and blue

9    jeans that you saw?

10        A.   Correct.

11        Q.   Quite frankly, the face was very hard to make

12   out through the video.  Is that correct, sir?

13        A.   Yes.

14        Q.   Sitting here in the courtroom today under

15   oath, can you say that person on that video is, in fact,

16   Mr. Kenneth Ashford just by looking at that video and

17   looking at him?

18        A.   No.

19        Q.   And so, that morning when you were reviewing

20   what purported to be Mr. Ashford outside the back of the

21   courthouse, was that unusual for people to be out in the

22   back alleyway area?

23        A.   Not at all, no.  I mean, we have people

24   walking all the time back and forth in the alley.

25        Q.   Myself included.  You probably saw myself

                            94

1    today?

2         A.   Might have.

3         Q.   So, you see people out there in the evenings.

4    Correct, sir?

5         A.   Yes, but not on the back -- not on our loading

6    dock.

7         Q.   And just to give a depiction for the folks

8    that might not be familiar with downtown York, as you

9    are looking out the back of the courthouse at the

10   loading dock area where the door was being pried open,

11   where would you be facing if you looked straight across?

12        A.   Okay.  Are you talking as if you are at the

13   back door?  It would actually be looking west.  You look

14   at the generators, the parking garage to the right of

15   that on Market Street, and there is a car repair shop

16   just on the other side of the alley.

17        Q.   So, coming at you is an alley that runs east

18   and west?

19        A.   Correct.

20        Q.   And another one that runs north and south?

21        A.   It runs to the bank parking lot and then you

22   have got to make a left or right.

23        Q.   Right.

24        A.   Right.

25        Q.   And people routinely cross throughout that

1   area?

2         A.   Yes.

3         Q.   And to the best of your knowledge from working

4   there for the last five, six, seven years, is there a

5   sign about no trespassing?

6         A.   Yes, sir.

7         Q.   When was was that posted, do you know?

8         A.   No.   I would imagine when the building was put

9   up.

10        Q.   But, you really don't know?

11        A.   No.

12        Q.   And is it in that area where people cut

13   through?

14        A.   No.   It is near the back door.

15        Q.   So, that's like no trespassing like in our

16   building?

17        A.   In the building or -- I mean, we own the

18   loading dock.

19        Q.   But, people cut through there?

20        A.   Not the loading dock.   You can't be here.

21        Q.   You said people have gone through the garbage

22   cans before?

23        A.   I have caught one or two through the recycle

24   bins.

25        Q.   Are they arrested?

1      A.    Usually, once they open the garbage can, it's

2   like you don't want to do that.   There is an intercom at

3   the back door.

4      Q.    You can spook them?

5      A.    Yes.

6      Q.    You can use the intercom and scare them?

7      A.    Get their attention.

8      Q.    Alert them?

9      A.    Yes.

10      Q.    Sir, you mentioned the gentleman in that video

11   was wearing blue jeans or black jeans?

12      A.    Blue jeans.

13      Q.    Is that based on your review of the tape or

14   your recollection?

15      A.    It was the tape.   I knew they were either blue

16   or black.   Once I reviewed the tape, it was blue jeans.

17      Q.    Is there some inconsistency that you aren't

18   very clear from the tape and your memory?

19      A.    Some, right.   It was over a year ago.

20      Q.    What about the gloves, do you recall saying he

21   wore gloves?

22      A.    Once I reviewed the tape, gloves, he had them

23   on.   But, I don't recall them live.

24      Q.    On that video that you watched live, did you

25   take notice of him looking at the video camera at any

97

1    point?

2          A.   The individual when he was prying the door was

3    looking up, looking at the door trying to figure out why

4    the door wouldn't pop open.  That's what I surmise.  The

5    bottom was popped a little open, but the top was still

6    locked in.

7          Q.   But, the pop of the door is not evident in the

8    DVD, in the video?

9          A.   I think it is.

10         Q.   And as well, the individual, you said they are

11   down on all fours?

12         A.   Hunched down.

13         Q.   And were you involved with taking pictures of

14   the purported damage to the door?

15         A.   No.

16         Q.   Were you involved in collecting or being

17   provided any other evidence from this situation, except

18   for the screwdriver that was --

19         A.   Just the screwdriver.

20         Q.   So, you weren't aware if the hat was gathered

21   or the hoodie was gathered?

22         A.   No.  I had no contact with the individual at

23   all except just to see him being brought in.

24         Q.   You mentioned you were in control of the video

25   camera?

98

98

1      A.   Correct.

2      Q.   Is that because you took over and had more

3  experience on that than other --

4      A.   Before I went to booking, I was down there

5  quite a bit.  I know where the alarms are, which cameras

6  are where.

7      Q.   And briefly describe for the jury the video

8  camera you are looking at.  We know it was a 21-inch

9  screen.  Are you able to look into a specific smaller

10  screen and bring it into the larger screen to focus on?

11      A.   The way it first happens, the main screen we

12  usually always have on the adult cell block because

13  that's where most of the action goes on.  Then there is

14  about ten smaller video monitors that monitor inside the

15  front door and around the building.  And that's where we

16  saw it first was that smaller screen.  So, once I

17  punched up Camera 109 that I control, that's when I put

18  on the big monitor that you could see better.

19      Q.   And from working that area for some time, are

20  you aware if when you would record a video or DVD that

21  the camera number would affix to the recording?

22      A.   I don't think it does.

23      Q.   And you said there was a short time span, a

24  few seconds, where you had to lose sight of the video to

25  let Mr. -- Corporal Brady out?

99

1    A.   Correct.

2    Q.   Also, during that time period when you were

3  scanning on what was purported to be Mr. Ashford, did

4  you look away at all?

5    A.   No.

6    Q.   Were there areas when you were following him

7  that you were not able to see on the video?

8    A.   No.

9    Q.   I thought you said there were areas that were

10  dark or blurry?

11    A.   When we first saw him, he was back by the

12  generator and it is a little dark back there.

13    Q.   So, he went from the generator where it was a

14  little darker towards the light?

15    A.   And the back door has a light right over it.

16    Q.   And from the door, it was out back to the

17  recycling?

18    A.   The generators and recycle bins, which is by

19  the Sheriff's Office, too.  Then there is a ramp that

20  comes up to the steps to the back door and then right to

21  the back door.  It is almost like an L.

22    Q.   But then when Corporal Brady came and arrested

23  Mr. Ashford, he was actually on the other side of the

24  parking lot, was he not?

25    A.   Once Corporal Brady got on the scene, the

100

1    individual that was at the back door got up and started

2    walking down the ramp towards the generator.  Corporal

3    Brady went around the back of the patrol car, and you

4    can't hear because I don't have the speakers on there,

5    but he pointed to the ground and the individual kept on

6    walking.  Corporal Brady pulled out his expandable baton

7    and pointed to the ground again.  That's when the

8    individual went down to the ground.

9        Q.   Went down to the ground voluntarily?

10       A.   Correct.

11       Q.   Not as a result of --

12       A.   No.

13       Q.   And as well, sir, as you were watching this

14   transpire, did you see the individual with the black

15   hooded sweatshirt on tinker around with the door in the

16   middle section or just the bottom?

17       A.   I want to say it was mostly the bottom,

18   because that was the part that was almost open.

19       Q.   And as well, the doors that the individual was

20   standing at, is that the doorway where machinery would

21   have been moved in and out of the courthouse and your

22   people would use for access in and out?

23       A.   The back door is mostly used by us for

24   deliveries.  Now, there is a roll open door that's a

25   little bit further over from there that you can bring

101

1    bigger pieces of machinery in.  It is mainly for

2    deputies, mail delivery, that kind of stuff.

3         Q.   The general public is not going through there?

4         A.   No.

5         Q.   As you walk through that doorway, can you tell

6    me what's just behind that door?

7         A.   There is an extra machine for mail, incoming

8    packages.

9         Q.   So, it is functional?

10        A.   Yes.  To the left of that is the mail room.

11   To the left of that is a maintenance -- like a closet

12   where they keep their snow shovels and equipment like

13   that.  To the right of the extra machine is the

14   maintenance office itself.  And then just to the right

15   of that there is the doors that come out to the atrium.

16        Q.   You mean the main part of the courthouse?

17        A.   Right.

18        Q.   Once you get past those back doors, do you

19   have to have an access card to get to other areas?

20        A.   The secure areas, yes.  But, once you get

21   through those back doors, you have got more or less free

22   reign of everywhere else the public can go.

23        Q.   The public is not allowed --

24        A.   Not the back door.  But once you get to the

25   atrium, you have access.

1   Q.   Do you have to swipe to get from the back door

2   x-ray machine out to the atrium?

3   A.   No.

4   Q.   Are there any computers, financial records,

5   moneys kept in that locale when you walk in the back

6   door of the courthouse?

7   A.   There is a safe when people pay their fines

8   and costs and stuff that we have.  It is like a drop

9   safe.  You have got a little handle and the money drops

10   into the safe.  So, there is a safe back there.

11   Q.   Are you able to move that safe?

12   A.   I have never tried.

13   Q.   Is it thousands of pounds?

14   A.   No.  It doesn't look that big.  It is a foot

15   and a half by about two foot.  It is not a big safe.

16   Q.   When you are outside looking in, can you see

17   the safe?

18   A.   Once you get inside, you can see it.

19   Q.   It is not sitting there for the public to see?

20   A.   No.  It is by the roll door.

21   ATTORNEY GROSS:   All right, sir.  Thank

22   you.  That's all I have.

23   THE COURT:   Redirect.

24   *   *   *

25

103

REDIRECT EXAMINATION

BY ATTORNEY KOBESKI:

Q.   Did you ever lose sight of the suspect on the video?

A.   No, except when I opened his doors.

Q.   For two or three seconds?

A.   Yes.  And even then, if you watch the video, he just kind of like gets off to the side of the video. I follow back with the camera to get him centered.

Q.   You saw this same suspect taken into custody?

A.   Yes.

Q.   And you saw the suspect who was in custody brought into the booking area or in around that area?

A.   Yes.

Q.   That person is, in fact, the Defendant. Correct?

A.   We found out later that's who it was.

ATTORNEY GROSS:   Objection, Your Honor. Nonresponsive.  He can only speak to himself.

THE COURT: Reask the question.  Is the person you see in court the person you saw being brought into booking?

THE WITNESS:  I couldn't tell, Judge.  He had the face more or less covered.

THE COURT:  Even while he was being

104

1  brought into booking?

2                    THE WITNESS:  Yes.

3                    THE COURT:  There you go.

4                    ATTORNEY KOBESKI:   Thank you, Your

5  Honor.

6  BY ATTORNEY KOBESKI:

7       Q.   Deputy, when is the courthouse open to the

8  public?

9       A.   8:00 until 4:30.  Now, they do have some after

10  hour things with probation and stuff like that.

11       Q.   That has to be with permission?

12       A.   Correct.

13       Q.   That's Monday through Friday?

14       A.   Correct.

15       Q.   Now, the doors that this suspect appeared to

16  be prying open to try to get in, were they locked at the

17  time in question?

18       A.   Those are always locked.  The only way to get

19  in through there is with a pass card.

20       Q.   Now, you testified earlier, deputy, that this

21  suspect was looking through blinds into the Sheriff's

22  office where the light was on.

23       A.   Correct.

24       Q.   What would the person see?  What was in the

25  office where he was looking?

1          A.    All the cubicles, computers, the typewriters.

2    If you walk down the Sheriff's Office, you can see the

3    whole Sheriff's Office.  But mainly, computers and

4    personal items on desks.

5          Q.    So, like electronics and personal items?

6          A.    Yes.

7                ATTORNEY KOBESKI:    That's all I have,

8    Judge.

9                THE COURT:  Any re-cross?

10               ATTORNEY GROSS:    No, Your Honor.  Thank

11   you.

12               THE COURT:  You may step down.  Thank

13   you.

14               Next witness.

15               ATTORNEY KOBESKI:    Commonwealth calls

16   Corporal Thomas McCune.

17                         *    *    *

18                    THOMAS R. MCCUNE,

19   called as a witness on behalf of the Commonwealth,

20   having been duly sworn according to law,

21   testified as follows:

22                         *    *    *

23                    DIRECT EXAMINATION

24   BY ATTORNEY KOBESKI:

25         Q.    Could you state your name for the record.

                            106                        106

1      A.    Yes.   Corporal Thomas R. McCune.   I am

2  currently employed with the York County Sheriff's

3  Office.

4      Q.    How long have you been involved in law

5  enforcement?

6      A.    Well, I retired from Northern Regional after

7  30 years and I have approximately six years in here with

8  the York County Sheriff's Office.

9      Q.    And your title is corporal?

10      A.    That's correct.

11      Q.    Are you familiar with the video surveillance

12  system here in place in the courthouse?

13      A.    Yes, I am.

14      Q.    And how are you familiar with it?

15      A.    I was working when Berkshire Systems installed

16  the system.   I worked with them since -- I guess they

17  just completed the installation and I worked with their

18  contract.   I have been watching for the last five years.

19      Q.    Did you receive any training relative to the

20  surveillance system?

21      A.    Yes.   Berkshire did provide training as far as

22  how to operate the cameras, how to operate the monitors,

23  how to back up the systems, that type of thing.

24      Q.    I am assuming that was shortly after it was

25  installed?

1      A.   Yes.

2      Q.   Have there been any modifications or

3  improvements in the monitoring system?

4      A.   During the past five and a half years that I

5  have viewed the system, I think we had one camera

6  failure.  We replaced the camera.  We replaced a few of

7  the monitors that we view.  They simply burn out, that

8  type of thing.  We have not really enhanced the system.

9      Q.   So, a couple of replacements, but no

10  modifications?

11      A.   That's correct.

12      Q.   Well, can you explain to the jury how this

13  surveillance system operates.

14      A.   It works off -- we have approximately between

15  50 to 100 cameras at this building.  Every exit and

16  entranceway is recorded to a hard disk.  It is a

17  computer hard disk.  Those hard disks are what they call

18  a Desa system, which is basically a hard drive and a CD

19  burner.  That's manufactured by the Phillips Group.

20  Each of the Desa banks records up to 16 different

21  cameras simultaneously 24 hours a day.  They can be

22  modified to run on motion only.  Most of our cameras, at

23  least all the ones to the exits and entrances, record 24

24  hours a day, though.  They don't stop and they are not

25  on motion.  They can record for up to, I'd say, anywhere

1    from two weeks to a month and a half before it starts to

2    overwrite the old data.

3              And in this case, we were using Desa Bank

4    1, which is -- what would happen, these -- most of the

5    cameras that we have are pan/tilt/zoom cameras.  In

6    order to operate those, we have like a little console,

7    small console with a joy stick you can rotate the camera

8    360 degrees.  You can zoom in with that camera.  It has

9    a 10-power optical zoom and then goes to digital zoom

10   after that.  Best quality is with the 10-power optical.

11             The other cameras are fixed cameras.  You

12   can't do anything with them.  They are fixed.  As far as

13   the lighting and everything else, that's fixed.  You

14   can't do anything with them.  Some of those cameras are

15   also backed up 24 hours a day.

16        Q.   Let me ask you this, Corporal.  I am sure it

17   can get pretty complex.  Let's specifically talk about

18   the cameras back near the loading dock area, the

19   generators, back doors to the courthouse.

20        A.   Yes.

21        Q.   Are those both fixed cameras?

22        A.   We are using Cameras 109 and 111.  Camera 111

23   is a fixed camera.  Camera 109 is a pan/tilt/zoom.  It

24   can be controlled by joy stick and control.

25        Q.   So, that's both?

1      A.   Correct.

2      Q.   I might have misunderstood or just didn't

3   understand, are these cameras controlled by computer or

4   by a person manually?

5      A.   They are controlled by a person who is

6   operating that joy stick.

7      Q.   And is there a delay associated with these

8   cameras?  Like, if you are watching the video on a

9   monitor, do you see it live or is there a delay?

10     A.   That's live.  When we are viewing, it is live.

11     Q.   Now, the video footage captured from these

12   cameras, is it preserved in any way?

13     A.   Yes.

14     Q.   Can you tell me or tell the jury how it is

15   preserved.

16     A.   Yes.  It goes to -- as I said, we have two

17   groups.  We have Desa 1 and Desa 2.  Desa banks are

18   based on a hard drive system.  It does have a CD burner

19   in to allow us to do a backup or make a copy of a

20   section of video that we want to show later.  And these

21   cameras that record 24 hours a day, they keep recording

22   until they get to the end of the hard drive.  Then they

23   basically go back and start to overwrite old data.  So,

24   it is a constant thing.  A lot of the time, like I said,

25   it can be anywhere from two weeks to a month and a half

110

1   record time.  A lot of that depends on out of 16 cameras

2   on there how many are operated 24 hours a day and how

3   much data comes from the cameras that are only operated

4   whenever motion is seen.  For example, out on the

5   atrium, you may see a camera up there at nighttime.  A

6   lot of times, those are only going to record when there

7   is motion or a change in scenery.  So, they are like

8   they are dormant.  As soon as light is on or off or

9   there is motion, movement, somebody walks through, it

10  begins to record immediately.  Once that picture goes

11  back to a still image again and the camera does not see

12  any more motion, it stops recording.  Therefore, it

13  conserves the hard drive space.  So, we can actually get

14  more information on the hard drive.

15      Q.   So, from what I can take from your testimony,

16  the footage is captured on the hard drive?

17      A.   That's correct.

18      Q.   Is there any way to transfer from the hard

19  drive to some kind of hard copy, like a disk, tape,

20  something like that?

21      A.   Yes, sir, but not from the control room.  I

22  have to go to a different location to retrieve that.

23  That comes from the Desa bank, which is housed in

24  another location in the basement.

25      Q.   How would you go about doing that, Corporal?

111                                        111

1          A.   Basically, burns the information to a CD

2     optical disk.  I go back to the room that's equipped

3     with a monitor and the actual Desa bank is there.  I put

4     the CD into the CD burner and go through the program,

5     the Desa program, which basically asks you which camera

6     do you want pictures from, what time frame do you want

7     the data retrieved from, and how do you want it

8     retrieved.  And typically, it retrieves it from what's

9     known as an AVI file, audio-video file.  That's how this

10    was backed up.

11         Q.   As long as the footage wasn't erased over the

12    two weeks --

13         A.   It is there.

14         Q.   -- you can record it and preserve it on a hard

15    copy?

16         A.   Absolutely.

17         Q.   Is footage ever preserved on VHS or cassette?

18         A.   Yes.  That's in the control room.  That's

19    attached to our primary monitor.  The primary monitor

20    allows us to view any camera in the whole complex.  I

21    can bring up any camera in the building.  It is a

22    19-inch monitor and with the VHS that's hooked to that

23    at any give time, there is a toggle switch, and if I

24    want to get quick video, I can hit the toggle switch and

25    I will get 30 seconds of video without having to touch

                              112                        112

1   anything else.

2                   Another way to record would be to

3   actually hit the record button on the recorder itself.

4   And then it will continue to record until you run out of

5   tape or until you stop it.

6        Q.   So, a person watching the footage live can

7   actually hit a button and it will be preserved VHS

8   cassette?

9        A.   Yes, sir.

10        Q.   Or you can go in and look at the different

11   cameras, different views and record that on DVD?

12        A.   Yes.  Anything I can bring up on that monitor

13   I can record at any given time.

14        Q.   Is there a difference between footage on the

15   DVD and VHS?

16        A.   Yes.

17        Q.   Tell the jury what that is.

18        A.   DVD, it is automatically going to be an AVI

19   file, commonly referred to as AVI, audio-video

20   interface.  Most DVD players play it back -- and it

21   doesn't always play it back in the home-style DVD

22   player.  But, it can be viewed on that kind of computer.

23   Just refresh the question.

24        Q.   The VHS versus DVD, the difference.

25        A.   VHS is played back real time, plays all the

113

1    frames it is seeing. Whereas, our backup system is set

2    up to only record two to three frames per second, which

3    is extremely slow, two to three frames per second.

4              For real video, you would want 29 to 30

5    frames per second. If I want to stop motion and I want

6    to stop high speed, then I want to go even more frames

7    per second. A good example is, the new show that's on,

8    I think, Discovery Channel, it is called Time Warp, they

9    use a high-speed camera that records 400 frames per

10   second. There are projectiles flying through. It all

11   depends on what you want. For our purpose, we only need

12   two, three frames per second. That's taking three

13   frames per second of any given location.

14        Q.   Let's talk about the overall quality of this

15   video footage. First of all, is it black and white or

16   in color?

17        A.   It is in color.

18        Q.   Now, when an individual is watching footage,

19   can they interpret anger or what they are saying in any

20   way whatsoever?

21        A.   No, not per se.

22        Q.   You said not per se.

23        A.   Can a digital image be altered? Yes, it could

24   be, if I had the right programming and had the right

25   expertise. A lot of things in motion pictures is done

114

1    with computer graphics.  Did that event happen?  Well,

2    no, it is done by computer graphics.  Then you need

3    separate training and special programs to do that.  That

4    I am not trained in.

5         Q.   Do you know if any sheriffs are trained in

6    that capacity?

7         A.   No, sir, I don't believe they are.

8         Q.   Let's talk about this particular case,

9    Corporal.  Did you have any involvement whatsoever

10   relative to this surveillance footage?

11        A.   Not while it was being taken.

12        Q.   Did you have any involvement after the night

13   in question or morning in question?

14        A.   The following morning, my lieutenant requested

15   that I make a backup copy of the information that was on

16   the Desa bank, Desa 1.

17        Q.   You are referring to the DVD copy?

18        A.   That's correct.

19        Q.   Did you do that?

20        A.   Yes, I did, sir.

21        Q.   Did you alter the footage that was captured

22   in any way whatsoever?

23        A.   To the best of my knowledge, no.  For one

24   thing, the program doesn't really allow you to do that.

25   Doesn't have any ability to allow you to.  Even if I

115

1  would try to enhance the brightness of it, I can't do

2  that.  I can do it temporarily on a monitor by turning

3  up the image, stopping the frame, turning up the image

4  to brighten it.  But, when it actually records that

5  footage, it is not going to record the bright section.

6  It is going to record it as it was recorded.  It doesn't

7  let me make any changes to it.

8      Q.  Is it fair to say you didn't edit the footage

9  in any way whatsoever?

10     A.  That's correct.

11     Q.  You didn't enhance the quality of the footage?

12     A.  No, I didn't.

13          ATTORNEY KOBESKI:   Your Honor, may I

14  approach the witness, please.

15          THE COURT:  Yes.

16          ATTORNEY KOBESKI:   Let the record

17  reflect I am handing the witness what has been marked as

18  Commonwealth's Exhibit 2.

19          Your Honor, before the witness opens the

20  evidence, there is a stipulation to place between

21  defense counsel and myself as to the chain of custody of

22  the video surveillance.

23          ATTORNEY GROSS:   That's correct, Your

24  Honor.

25          THE COURT:   Okay.


116                    116

BY ATTORNEY KOBESKI:

Q.   Corporal, can you please open the package.

A.   It is empty at this point.  Can I cut that with scissors?

Q.   Oh, yes.  We had that problem before.  Can you tell the jury what was in that evidence package.

A.   Yes.  One VHS tape, video tape.  And this contains -- and this is my -- this is the way I packaged this.  I hand stapled it.  But, this is the CD.

Q.   Is it fair to say that the VHS copy would have been recorded on the night in question for the person who was watching the video?

A.   It would have been, yes, sir.  It would have been activated by switch in the control room.

ATTORNEY KOBESKI:  Your Honor, that's all the questions I have.

THE COURT:  Cross-examine.

ATTORNEY GROSS:   Few questions, Your Honor.  Thank you.

*   *   *

CROSS-EXAMINATION

BY ATTORNEY GROSS:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Let me get this straight.  The information

1    that you see from the video cameras as it goes to the

2    hard drive, you don't have the ability to change what's

3    being recorded, just to record it to a different media.

4    Is that essentially what you can do?

5         A.   Basically, it has to go to that hard drive at

6    the Desa bank.  Yes, the camera sees it.  That's how --

7    it travels to the Desa bank and records to the hard

8    disk.

9         Q.   The VHS time that was created based on what

10   occurred on March 17, 2008, that recording was done by

11   an officer reviewing what was occurring at that moment?

12        A.   Yes.  The VHS tape, this would have been

13   recorded by an actual person sitting in the control room

14   who is watching something on the monitor and threw the

15   toggle switch or hit the record button, one of two.

16        Q.   So, if you are with the toggle switch, you can

17   record as well through that device?

18        A.   Yes.  The toggle switch is set at 30 seconds.

19   The timing device records, 30 seconds, records again,

20   and hit the switch.

21        Q.   30-second increments?

22        A.   Yes.

23        Q.   As opposed to record button?

24        A.   If you hit the record button on the recorder,

25   that will record indefinitely until it runs out of tape

1   or until you stop it.

2        Q.   And two cameras, you mentioned 109 and 111?

3        A.   Yes.

4        Q.   111 is a fixed camera directly above the entry

5   doors into the loading dock, from the loading dock into

6   the mail room.

7        A.   Camera 111 is a fixed camera, yes.

8        Q.   And 109 you said is portable?

9        A.   Pan/tilt/zoom.  It actually would rotate.  I

10  can zoom in with that camera.  I can do a lot of

11  different things with it.

12       Q.   Where is that mounted?

13       A.   That's mounted on the opposite end of the --

14  111 is the one overlooking some doors.  109 is at the

15  opposite end of the loading dock and also shoots across

16  the loading dock.  You can actually see anything

17  occurring on the loading dock.

18       Q.   You can see all the way around the courthouse?

19       A.   Correct.

20       Q.   As I recall, we had a rash of break-ins last

21  year and that camera shot all the way around?

22       A.   Yes.

23       Q.   So, let me ask you.  Now, are you the main

24  individual in charge of the cameras?  Are you the guy

25  that knows the most?

119

1    A.   If something breaks down, I am basically,

2    being corporal, I am kind of in charge of making sure

3    maintenance is made aware of these issues, because they

4    have contracts with some of these companies to replace

5    equipment if it breaks down.

6    Q.   And when you record or are asked to record for

7    court or what have you, do you have the ability to have

8    time elapsed digits on the recordings showing what date

9    and time and exact location of the camera?

10    A.   On the video?  On the VHS?

11    Q.   On the VHS or any other DVD you would be

12    recording on, can you place a date, time and --

13    A.   I think that's all built in the format of the

14    program, I believe.

15    Q.   So, what you prepare is just the information

16    you record, not time, date, or camera number?

17    A.   Right.  Unless it is recorded automatically by

18    that program.

19    Q.   You also mentioned, sir, that you are not sure

20    if anyone has the ability to tinker with these devices

21    or to modify recordings.  Do you recall testifying?

22    A.   Yes.  Not to my knowledge.

23    Q.   Right.  By the same token, you are not sure

24    what other individuals can or cannot do?

25    A.   I don't know if anybody has a graphics

1    background or not, no.

2         Q.   Who else has access to the recording of the

3    videos that are recorded in the courthouse?

4         A.   Whoever would be operating in the control room

5    at the time.

6         Q.   And so, whoever is stationed in an area would

7    have access.  Correct?

8         A.   Well, one or two deputies, yes.

9         Q.   At a time or overall?

10        A.   Each shift, because we are operating 24 hours

11   a day.  So, there is -- somebody is always at the

12   control.

13              ATTORNEY GROSS:   Thank you, sir.  That's

14   all I have.

15              THE COURT:  Any redirect?

16              ATTORNEY KOBESKI:   I don't believe so,

17   Judge.

18              THE COURT:  You may step down.

19              Ladies and gentlemen, I don't think we

20   are going to be able to get another witness.  I am going

21   to break early at this point.  I am going to ask you to

22   return tomorrow at 9:15 to the same room or the same

23   room you returned to after lunch.  My apologies for

24   this.

25              Over the course of the evening hours, do

1    not discuss this matter with anyone, nor should you

2    allow anyone to discuss it in your presence.  And I am

3    sure when you get home, your significant others are

4    going to ask were you selected for a jury, what kind of

5    case was it.  You can tell them you were selected for a

6    jury.  Don't go any further beyond that.  Something they

7    are saying spontaneously could affect you.  You can say,

8    yes, I was selected for a jury.  I will tell you about

9    it after it is all over.

10                  Anything else?

11                  ATTORNEY KOBESKI:   No, Your Honor.

12                  ATTORNEY GROSS:   One item once the jury

13   leaves.

14                  THE COURT:  Drive safely, ladies and

15   gentlemen.  We'll see you at 9:15.

16                         *   *   *

17                  (Jury left the courtroom at 2:35 p.m.)

18                  ATTORNEY GROSS:   Thanks, Your Honor.  I

19   just have a quick matter at 9:00 I am going to take care

20   of with Judge Dorney.

21                  Also, is it okay if his mother comes out

22   to see him at the prison and drops off another shirt and

23   slacks?

24                  THE COURT:  I don't think there is any

25   problem.

1          ATTORNEY GROSS:   Sometimes it causes

2     issues if you don't have prior court approval.  We

3     thought it was a one-dayer and here we are.

4          THE COURT:   The Court hereby indicates

5     that the prison is to allow a new shirt to be dropped

6     off for the Defendant.  They haven't seen his pants yet.

7          ATTORNEY GROSS:   They haven't.

8          THE COURT:   Unless they are underneath

9     his desk, meaning the jurors.

10         ATTORNEY GROSS:    I am with you.

11         THE COURT:   So, new shirts would be

12    sufficient under the circumstances.

13         Let's deal with the -- I believe, while I

14    have it on my mind, you wish to amend Count Number 1?

15         ATTORNEY KOBESKI:    I do, Judge.  Count

16    1, criminal attempt burglary, was charged as a felony of

17    the first degree.  The Commonwealth would amend that to

18    a felony of the second degree.

19         THE COURT:   You have no objection to

20    that?

21         ATTORNEY GROSS:    No.

22         THE COURT:   We'll allow the amendment of

23    Count Number 1 to a felony of the second degree.

24         ATTORNEY KOBESKI:    Count Number 2 we

25    wish to withdraw.

123

1                          THE COURT:   Count Number 2 is hereby

2     withdrawn.

3                          (Proceedings were adjourned at 2:35 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    PROCEEDINGS HELD TUESDAY, MAY 12, 2009

2                          *   *   *

3         THE COURT:   Do you want to bring the

4    jury out, please.

5                          *   *   *

6         (Jury entered the courtroom at 9:40 a.m.)

7                          *   *   *

8         THE COURT:  Folks, has anyone overheard

9    anything about this case or discussed this case over the

10   evening hours?

11        THE JURY:   No.

12        THE COURT:  Next witness.

13        ATTORNEY KOBESKI:   Commonwealth calls

14   Deputy Ciprian Igwe.

15                         *   *   *

16             CIPRIAN IGWE,

17   called as a witness on behalf of the Commonwealth,

18   having been duly sworn according to law, testified as

19   follows:

20                         *   *   *

21             DIRECT EXAMINATION

22   BY ATTORNEY KOBESKI:

23        Q.   Sir, can you state your name and spell it for

24   the record.

25        A.   My name is Ciprian Igwe.  C-i-p-r-i-a-n,

                              125

1    I-g-w-e.

2        Q.   And, sir, how are you employed?

3        A.   Employed by York County Sheriff's Office.

4        Q.   And how long have you been a sheriff?

5        A.   Three years and three months.

6        Q.   Deputy, do you recall if you were working on

7    March 17 of 2008?

8        A.   Yes, I do.

9        Q.   And do you remember what hours you were

10   working?

11       A.   I work 11:00 p.m. to 7:30 a.m.

12       Q.   Now, deputy, did you collect any evidence or

13   any other items on that date relative to this case?

14       A.   Yes, I did.

15       Q.   And where did you collect these items?

16       A.   I collected an eyeglass, a hat, and a

17   screwdriver that was laying between the two doors.

18       Q.   Deputy, these items, were they located outside

19   or inside?

20       A.   They were located outside.

21       Q.   Where relative to the courthouse?

22       A.   That was at the back door/loading dock area.

23       Q.   Do you remember what time you went out in this

24   vicinity near the back doors?

25       A.   Around 3:00, 3:13 or 3:15 a.m.

126

1    Q.   Now, when you got out back, deputy, did you

2   see any other people outside?

3    A.   Yes, I did.

4    Q.   Can you tell the jury who you saw?

5    A.   I saw Corporal Brady and Deputy Lease.

6    Q.   So, there was two deputies out there?

7    A.   Yes.  And an individual who I don't know his

8   name at that time.

9    Q.   And this other individual, aside from the two

10   sheriffs, how was he positioned when you went outside?

11    A.   When I went outside, I saw Corporal Brady give

12   the individual a command to drop on the ground and he

13   did.

14    Q.   Did you observe Corporal Brady take this

15   individual into custody?

16    A.   Yes, I did.

17    Q.   Now, once the individual was taken into

18   custody, I am assuming he was taken away from the scene?

19    A.   Yes.  When they took him into custody, they

20   placed him into the sheriff's car and drove him to the

21   booking area.

22    Q.   Now, is it at this point when you collected

23   these items that you were talking about?

24    A.   Yes, that was the time I collected all those

25   items.

127

1    Q.   After the person was already in custody?

2    A.   Yes.

3    Q.   Now, you testified or you began to testify you

4  collected a hat and some glasses, I believe?

5    A.   Yes, eyeglasses, yes.

6    Q.   Where exactly did you find those items and how

7  did you find them?

8    A.   When Corporal Brady asked him to drop on the

9  ground, he did.  I guess his eyeglasses fell off at that

10  same place.  That's where I collected the eyeglasses and

11  the hat.  Then I went towards the door where I found the

12  screwdriver.

13    Q.   So, the eyeglasses and hat were in the same

14  place as the person was taken into custody?

15    A.   That's true.

16    Q.   Now, you said you collected a screwdriver from

17  the doors.  What doors were you talking about?

18    A.   The back door that leads to the loading dock

19  area.

20    Q.   Now, exactly how did you find the screwdriver?

21    A.   The screwdriver was laying between the two

22  doors.  It has two doors just like this one here.  The

23  screwdriver was just laying between the two doors.

24    Q.   Was it in between the doors or was it on the

25  ground?

128

1       A.   Just on the ground between the two doors

2    cracked open a little bit.

3       Q.   What did you do with the screwdriver once you

4    collected it?

5       A.   When I collected it, I gave it to Deputy John

6    Brenneman.

7       Q.   Now, the screwdriver that's in front of you

8    marked Commonwealth's Exhibit 4, is that the same

9    screwdriver that you collected that night or that

10   morning, I should say?

11      A.   Yes.

12               ATTORNEY KOBESKI:   Your Honor, that's

13   all I have.

14               THE COURT:   Cross-examination.

15               ATTORNEY GROSS:   Thank you.

16                    *   *   *

17                 CROSS-EXAMINATION

18   BY ATTORNEY GROSS:

19      Q.   Good morning, sir.

20      A.   Good morning.

21      Q.   This screwdriver that you retrieved from the

22   doors, was it wedged between the bottom of the doors or

23   underneath the doors?

24      A.   It was wedged between underneath the doors.

25      Q.   So, it was on top -- it was between the ground

129

1    and the door?

2         A.   Yes.

3         Q.   As opposed to between the two doors.  So, it

4    was on the ground?

5         A.   Yes.  On the ground -- the two doors just like

6    this here, right here (Indicating).

7         Q.   Two doors together, underneath was the

8    screwdriver?

9         A.   Yes.

10        Q.   How far away was the gentleman who was placed

11   under arrest from where the screwdriver was found?

12        A.   About 20 feet.

13        Q.   And you were not involved, were you, with

14   monitoring the individual around the back of the

15   courthouse?  You weren't watching this individual

16   walking around, were you?

17        A.   No.

18        Q.   And do you recall what type of glasses you

19   found near the individual that was arrested?

20        A.   That was a white eyeglass.

21        Q.   White eyeglass?

22        A.   Yes.

23        Q.   Like a white-rimmed eyeglass?

24        A.   All I know is the glass itself was white.  I

25   don't know whether it was prescription glass or not.  I

130

1   am not sure.

2          Q.   Do they look similar to the eyeglasses you are

3   wearing now?

4          A.   I would say, yes.

5          Q.   So, they were square framed?

6          A.   The shape of the eyeglass, I don't think

7   you --

8          Q.   But, the color, like on the sides and around

9   the rim, was it a darker color like yours?

10         A.   I don't recall the color.

11                ATTORNEY GROSS:   Thank you, sir.  That's

12   all I have.

13                ATTORNEY KOBESKI:   Nothing additional,

14   Judge.

15                THE COURT:  You may step down.  Thank

16   you.

17                ATTORNEY KOBESKI:   May this witness be

18   excused?

19                THE COURT:  Yes.

20                ATTORNEY GROSS:   No objection, Your

21   Honor.

22                ATTORNEY KOBESKI:   The Commonwealth

23   would like to recall Deputy John Brenneman.

24                        *   *   *

25

JOHN D. BRENNEMAN,

recalled as a witness on behalf of the Commonwealth,

having previously been duly sworn according to law,

testified as follows:

\* \* \*

DIRECT EXAMINATION

BY ATTORNEY KOBESKI:

Q.   Now, deputy, just to clarify some things from yesterday.  You testified that you observed this entire incident on the surveillance.  Correct?

A.   Correct.

Q.   Did you record what you were watching?

A.   On the VHS, yes.  The other cameras automatically record.

Q.   Now, from what we learned yesterday after you testified, you can either record by pushing a button or controlling a toggle switch?

A.   For the VHS, yes.

Q.   Do you recall which one of those two ways you recorded?

A.   The toggle switch.

Q.   So, that wouldn't be a straight through, it would be like 30-second intervals?

A.   Approximately 30 seconds.  And then it would stop and I'd have to hit it again.

132

1    Q.  Do you recall how many times you had to hit

2  the toggle switch to keep recording?

3    A.  I want to say maybe two or three times, that I

4  can recall.

5    ATTORNEY KOBESKI:  Your Honor, at this

6  point in time, I would ask the Court's permission to

7  publish the VHS and the DVD tapes.

8    THE COURT:  Do you have that taken care

9  of over there?

10    ATTORNEY KOBESKI:  Yes, Judge.

11    *   *   *

12    (Videotape played in open court.)

13    *   *   *

14  BY ATTORNEY KOBESKI:

15    Q.  Deputy, if you can also while you are watching

16  the video tell the jury exactly what you are saying and

17  what actions --

18    A.  Do you want to take the lights down?

19    Q.  Yes.

20    A.  I think we missed a little bit over by the

21  generator.

22    Q.  Rewind a little bit, please.

23    A.  Just a little background on that camera.

24  That's the one you can zoom in with the joy stick, pan

25  left and right, up and down.

133

1          Q.   So, that's not the fixed camera?

2          A.   That's not the fixed camera.  The 109 is the

3     one you can move it to the alley and everything.

4               And those yellow posts, they go around

5     the generator.  And that's the corner of the generator

6     beside the building.  Those are the windows and the

7     garbage cans along the Sheriff's Office.

8               At that time, I am pretty sure that's

9     when the toggle kind of went off and I had to let

10    Corporal Brady out.

11              And you can barely see, but there is

12    somebody kneeling down by the door there.  And that's

13    Corporal Brady pulling up in the patrol car.  He is

14    pointing to the ground.  That's him taking his asp out.

15    He is looking for his radio when he got out of the

16    patrol car.

17              Now you see the door hanging there.

18    That's the screwdriver holding the door open.

19         Q.   Understood.

20         A.   That's why the alarm went off, because the

21    screwdriver is holding the door open.

22                         *   *   *

23              ATTORNEY KOBESKI:   I am going to publish

24    the DVD that Corporal McCune made.

25                         *   *   *


                                134

1        (DVD played in open court.)

2                *   *   *

3    BY ATTORNEY KOBESKI:

4        Q.   Deputy, is this the fixed camera over the back

5    doors?

6        A.   Correct.   Now, while he was kneeling at the

7    bottom, that's when the bottom of the door started to

8    come open a little bit.   And I was relaying that

9    information to Corporal Brady on his way out there.   I

10   don't know if you notice the screwdriver, but it is at

11   the very bottom of the door still laying there.

12       Q.   Now, deputy, in a moment, the view is going to

13   change.   Do you know what the differences in the views

14   are?

15       A.   The next view will be of Camera 109.

16       Q.   Is that the rotating camera?

17       A.   That's the rotating.   The one that can zoom.

18   The one I am controlling on the joy stick, that's

19   strictly a fixed camera.

20            It is hard to see back there, but he is

21   still pulling at the door and trying to pry it open.

22   And then you will see the headlights come up.   There he

23   starts to walk away when the patrol car comes up.

24       Q.   Deputy, the fixed camera one and the rotating

25   camera one, are they operating at the same time?

135

1    A.   Yes.  All this footage that you see here is

2  all backed up on the computer in the computer room.

3              ATTORNEY KOBESKI:  Thank you, Judge.

4  That's all the questions I have.

5              THE COURT:  Do you need me to keep the

6  lights off?

7              ATTORNEY GROSS:  We would request,

8  please.

9              May I proceed?

10              THE COURT:  Yes.

11                   *   *   *

12                   CROSS-EXAMINATION

13  BY ATTORNEY GROSS:

14    Q.   Good morning, sir.

15    A.   Good morning.

16    Q.   On the camera that you were controlling that

17  we just saw facing the back of the courthouse, where is

18  that camera mounted?

19    A.   Just above the Dumpsters.  About, I would say,

20  15, 20 feet in the air.

21    Q.   And I ask because of the angle that we see.

22  That's a 360-degree turning radius.

23    A.   It is a 360-degree turning radius when you

24  turn it backward.  All you are going to see is the wall

25  of the Judicial Center.  Once you get to the alley, the

136

1    Judicial Center cuts it off.  So, you can't go any

2    further that way either.

3         Q.   You will agree with me that looking at the DVD

4    and the VHS tape, you cannot make out who the individual

5    was outside of the back of the courthouse?

6         A.   Correct.

7         Q.   And you will agree with me as well that nobody

8    kicked in doors or broke windows or defaced the

9    building?

10        A.   Once we got outside to the doors, there were

11   marks, like pry marks on the metal doors.  That's about

12   it.

13        Q.   Who took pictures of those marks, if you

14   remember?

15        A.   I don't know.  I don't know.

16        Q.   And will you agree with me that those back

17   doors were marked up on the sides even before this

18   incident?

19        A.   That I don't know.

20        Q.   Scratch marks.  Did you take notice of any

21   other doors of the courthouse if they have scratch

22   marks, cuts, nicks in them?

23        A.   Not really.  When we do courtroom inspecting

24   in the morning, you are supposed to note certain things

25   like that.

137

1    Q.   Like damage?

2    A.   Correct.

3    Q.   And when you say courtroom inspections, you

4  mean the two doors back there and the two doors that

5  lead out to the hallway?

6    A.   Yes, and inside here.

7    Q.   And looking at the VHS, I am going to ask you,

8  did you notice that on the VHS there was only one time

9  when the person was on the back door as opposed to the

10 DVD that showed twice, two times?

11   A.   Yes.  The fixed camera showed two times.

12   Q.   And what you were looking at as it was

13 transpiring, was it more in line with the DVD or the

14 VHS?

15   A.   The VHS.  On the fixed camera, when it comes

16 back the second time is when we actually -- that's just

17 prior to when we noticed him.  I think that he tried to

18 get in once before, like maybe a minute or two before

19 that, something spooked him, he went back over, and

20 that's when we saw him.  Corporal Brady saw him at first

21 walking around on the back pad and then came back.

22   Q.   But, you will agree that the person, from the

23 fixed camera perspective, that person had on gloves,

24 correct, from reviewing that tape?

25   A.   I didn't really look this time.


138

1    Q.   But, you looked prior to?

2    A.   I watched it once before and that's just more

3    or less to refresh my memory.  I am pretty sure he did

4    at that time.  I didn't take notice at that time.  I

5    wasn't looking for them.

6    Q.   This time, you mean the time right now today

7    in court?

8    A.   Right.  I wasn't looking for them right now.

9    Q.   You many agree, sir, in the VHS you did notice

10   a gentleman near those yellow pillars putting on gloves?

11   A.   Fixing something on his hands, correct.

12   Q.   And then coming back to the back of the

13   courthouse?

14   A.   Correct.

15   Q.   And you will agree as well that from the angle

16   that we saw in the DVD, from the camera that you are

17   controlling, it is a blur and you can't see anything, it

18   is black?

19   A.   On that, yes.  It's a bad video.  But, now

20   when it is live, you can really see it a lot better.

21   What I am seeing -- what I was seeing in the control

22   room, I just think it is the pixels and, what is it,

23   like three, three frames per second or something --

24   frame per three seconds, it makes it hard to see.

25   Q.   But, from the perspective that the jury and

139

1    myself and everyone else is looking at just before on

2    the camera that you are controlling, it is black.  You

3    can't see the individual doing anything from that angle.

4    Would you agree with that?

5         A.   Not really.  I mean, it is dark, but there --

6    are you talking about when he was prying at the door?

7         Q.   I am talking about I think it was a minute,

8    minute and a half there, there was a black space.

9              THE COURT:  I don't want to hear your

10   testimony, counsel.

11   BY ATTORNEY GROSS:

12        Q.   From where you were looking at, deputy, from

13   my perspective when we are looking, if you came towards

14   us, would that be bringing you close to the alleyway?

15        A.   The building and alley.  I think -- I am not

16   sure what you are asking on that way.

17        Q.   When we were looking at the perspective

18   controlling the camera looking at the back door, from

19   the left of the back door, if a person was coming away

20   from that door towards where the camera was.

21        A.   Yes, that would be the alleyway then.

22        Q.   And in the area where it was dark as well?

23        A.   By the generators?

24        Q.   Correct.  Correct.  Is there a way for you to

25   walk through there?

140

1      A.   Yes, to the other alley.

2      Q.   So, would that camera pick up other

3 individuals walking through the back of the courthouse

4 in that dark area that we were looking at?

5      A.   Only once they come outside that you can

6 actually see them.

7      Q.   And is there anything keeping folks from, like

8 a wall, keeping the folks from getting inside the

9 camera's view?

10      A.   No.

11      Q.   So, they can just freely walk right through?

12      A.   Correct.

13      Q.   As well, sir, the individual that we saw in

14 that picture, I noticed there was a jump in the DVD.

15 Can you account for that jump that we saw, or that break

16 in the filming, I should say?

17      A.   I think the break was in the VHS.  Correct.

18      Q.   I believe it was.  Right when the person was

19 walking towards -- past the Dumpsters.

20      A.   Yes.  I had to hit the toggle switch again.

21      Q.   That's every 30 seconds?

22      A.   Approximately 30 seconds, correct.

23      Q.   You would agree there is a space where we

24 don't have recording?

25      A.   Correct.  I mean, it is not much.  Maybe about

1    two, three seconds.

2         Q.   And as well, the individual seen on there you

3    cannot say is Mr. Ashford?

4         A.   No.  Correct.

5         Q.   And were you involved with the collection of

6    any evidence in this case?

7         A.   Just when Deputy Igwe handed me the

8    screwdriver.

9         Q.   And that was underneath the door?

10        A.   It was lodged underneath the door, correct.

11        Q.   You mentioned you could see it in the video?

12        A.   On the fixed camera.  Yes, there was a line

13   coming off of the door.  You can see a little line

14   coming off.  That's the screwdriver that was still

15   there.

16        Q.   At the left door?

17        A.   Almost center.

18        Q.   And tell me, too, did you take notice to one

19   of the doors, namely, the right door, looking from the

20   outside in being open?

21        A.   I didn't notice that one being -- well, you

22   mean the one the screwdriver was lodged underneath?  I

23   think that was the one closest to Camera 111, the fixed

24   camera, which would have been, if you are looking

25   outside, to the left.  The left.

142

1       Q.   Looking outside from inside the courthouse?

2       A.   Correct.

3       Q.   And that door being opened, do you know who

4   opened that door?

5       A.   Deputy Leas opened it first.  And when he went

6   to help Corporal Brady take the individual into custody

7   more or less, he helped him pick him up and put him in

8   the patrol car, he pushed the door open and the

9   screwdriver got lodged underneath the door and held it

10  open.  And that's when Deputy Igwe came out.

11      Q.   As the person opened it, it created that

12  force?

13      A.   That pushed the door over top the screwdriver

14  and kept it open.

15      Q.   Just like opening your car door on top of a

16  curb?

17      A.   Yes.

18      Q.   So, when that person left who seemed to be

19  fiddling with the door, when they left, the door wasn't

20  open?

21      A.   No.

22      Q.   It wasn't unlocked?

23      A.   You are talking about the individual who tried

24  to break in.  Correct?

25      Q.   I am talking about the individual who was at

143

1    the back door.

2         A.   Who tried -- who was prying at the door?

3         Q.   Correct.

4         A.   The first time, like I stated previously, I

5    think he tried to get in once before.

6         Q.   You noticed --

7         A.   But we didn't notice that time.  We noticed

8    the second time.

9         Q.   And from what you could see on that video, a

10   person was sticking the device on top of the handles?

11        A.   In between the door toward the middle the

12   first time, and then the second time towards the bottom.

13             ATTORNEY GROSS:  Thank you, sir.  That's

14   all I have.

15             THE COURT:  Can you turn on the lights,

16   please.

17             ATTORNEY KOBESKI:   Yes, Judge.

18                    *   *   *

19             REDIRECT EXAMINATION

20   BY ATTORNEY KOBESKI:

21        Q.   Now, deputy, you testified that the quality of

22   when you were watching it live when it was happening was

23   better than the video depicted today.  Correct?

24        A.   Correct.

25        Q.   Now, you testified that there may have been a

1    jump in the VHS for like a second or two when you hit

2    the toggle switch to record again?

3        A.   Correct.

4        Q.   When you had to do that, did you ever lose

5    vision of what was going on?  Did you ever lose sight?

6        A.   No.

7        Q.   And you saw the suspect until he was taken

8    into custody.  Correct?

9        A.   Yes.

10              ATTORNEY KOBESKI:   That's all I have,

11   Judge.

12              THE COURT:  All right.

13              ATTORNEY GROSS:   Prompts nothing.

14              THE COURT: Okay.  You may step down.

15              ATTORNEY KOBESKI:   Your Honor, the

16   Commonwealth would like to call Corporal Shawn Brady.

17                       *   *   *

18                   SHAWN BRADY,

19   called as a witness on behalf of the Commonwealth,

20   having been duly sworn according to law, testified as

21   follows:

22                       *   *   *

23              ATTORNEY GROSS:   Your Honor, before the

24   Commonwealth begins, I'd like to ask what information

25   Corporal Brady has in front of him that he might be

                          145

1    referring to, if it is something that's not provided in

2    discovery as of yet.

3                    THE COURT:  Come up and take a look at

4    it.

5                    ATTORNEY GROSS:    Thank you, Your Honor.

6                          *   *   *

7                    DIRECT EXAMINATION

8    BY ATTORNEY KOBESKI:

9        Q.    Please state your name, Corporal.

10       A.    Shawn Brady.

11       Q.    And what is your occupation?

12       A.    Corporal with the York County Sheriff's

13   office.

14       Q.    How long have you been with the Sheriff's

15   Department?

16       A.    A little under five years.

17       Q.    Corporal Brady, do you recall if you were on

18   duty on March 17th of last year?

19       A.    I was.

20       Q.    And again, what hours would you have been

21   working?

22       A.    I was working the 6:00 p.m. to 6:00 a.m. shift

23   at Central Booking.

24       Q.    And do you recall where you would have been in

25   the early morning hours on March 17?

146

1          A.   The early morning hours of March 17, I just

2     completed a security check of the buildings in York.   We

3     own a building at 100 West Market Street and, of course,

4     the building at 28 East Market Street.   We had to do

5     building checks of those every two hours if Central

6     Booking wasn't busy to make sure there were no break-ins

7     or -- make sure everything in the building was still

8     secure.

9          Q.   And once you were finished completing those

10    tasks, Corporal, what did you do?

11         A.   I returned to the Judicial Center here, parked

12    the cruiser in the parking lot or the parking garage in

13    the basement, and returned to the control room.

14         Q.   Now, when you went down to the control room,

15    were there any deputies or sheriffs present?

16         A.   Deputy John Brenneman was in the control room.

17         Q.   And what were you doing once you got down to

18    the -- back to the control room?

19         A.   When I returned to the control room, I was

20    hanging up the keys from my patrol and taking off my

21    duty belt.

22         Q.   Can you tell the jury what happened next,

23    Corporal.

24         A.   As I was walking, I was staring up at the

25    cameras and I noticed an individual back at the loading

147

1    dock.  When I pointed it out to Deputy Brenneman, he

2    started to record what was going on.  I watched the

3    individual for a few moments and then I told Deputy

4    Brenneman to buzz me out the door, I was going to see

5    what the individual was doing.

6         Q.  You said a few moments you were watching this

7    video.  Do you remember about how long specifically it

8    was?

9         A.  10 to 15 seconds.  I saw the individual back

10   at the generator.  I saw him walk around.  I saw him

11   make his way to the doors.  I didn't see him make it to

12   the doors.  I saw him walking towards the doors.  That's

13   when I left.

14        Q.  What time did you first notice this

15   individual?

16        A.  Right around 3:10 a.m.

17        Q.  And now, what actions did you take next?

18        A.  I grabbed the keys that I had just hung up to

19   the cruiser that was parked in the garage, put on my

20   duty belt again, ran out of the control room through the

21   one locked door.  Had to unlock another door.  Ran out

22   to the garage and got in the car and exited the garage.

23        Q.  And you exited the garage, I am assuming, in a

24   marked police vehicle?

25        A.  Marked sheriff's unit, yes.

148

1     Q.   Now, where exactly does this garage -- where
2  do you exit?

3     A.   The exit to the garage is right on
4  Philadelphia Street.  It is a big metal door right next
5  to the alley that runs, I guess it would be behind us
6  right now.

7     Q.   And once you pulled out of the garage onto
8  Philadelphia Street, where did you drive to?

9     A.   I immediately took a right right outside the
10  garage door, which put me in the alley directly behind
11  us.  And then as I went around the building, I came to
12  the door and made another right and pulled right into
13  the loading dock.

14     Q.   And from the video, we can see you didn't
15  activate your emergency lights or anything like that.

16     A.   Correct.  I just pulled up.

17     Q.   Now, when you got to the back of the
18  courthouse, what did you see, if anything?

19     A.   I saw an individual that matched the
20  individual I saw in the video walking away from the
21  doors.  I exited my vehicle and I took that individual
22  into custody.

23     Q.   Now, you testified that this individual was
24  near the doors when you pulled up.

25     A.   Correct.  When I first noticed him, he was

149

1    walking off of the step to the doors.

2        Q.   Now, did he look in your direction of your

3    vehicle?

4        A.   Yes, he did.

5        Q.   Now, when you parked your vehicle, how close

6    or how far away would you say you were from him?

7        A.   Originally, probably 15 feet.  As the scenario

8    continued, within five feet.

9        Q.   In which direction was this individual or this

10   suspect walking?  Was he walking towards your car or

11   away from the vehicle?

12       A.   He was walking towards the vehicle.

13       Q.   I am assuming you got out of the car because

14   you took the individual into custody?

15       A.   Correct.

16       Q.   When you got out of the vehicle, did you say

17   anything to this individual?

18       A.   I identified who I was, directed the

19   individual to get on the ground numerous times.  He

20   refused.  I pulled out my baton and expanded it and at

21   that time the individual laid down.

22       Q.   Now, you said you identified who you were.

23   You told him to stop or get down?

24       A.   I told him to get down to the ground.

25       Q.   Now, you said he refused at first?

150

1        A.   I told him at least, at least three times.

2   The first two times, he continued walking towards the

3   back of the courthouse and past my vehicle.

4        Q.   Was he looking at you when you were giving

5   these commands?

6        A.   Yes, he was.

7        Q.   Did he appear to hear you?

8        A.   He appeared to hear me.  He just ignored me.

9        Q.   What tone of voice were you using?

10       A.   Very stern or loud voice.

11       Q.   Now, you said once you pulled out your baton

12   and went towards him, he went right down?

13       A.   As soon as I pulled my baton out and expanded

14   it, he lay down on the ground.

15       Q.   Is that when you took the individual into

16   custody?

17       A.   That's correct.

18       Q.   The individual that you took into custody that

19   morning, corporal, do you see him in the courtroom

20   today?

21       A.   Yes, I do.

22       Q.   Can you point out that individual and tell me

23   where that individual is seated?

24       A.   He is seated next to defense counsel in a

25   bluish shirt with white spots on it.

151

1          ATTORNEY KOBESKI:   Let the record

2  reflect the witness has identified the Defendant.

3          THE COURT:   It will so reflect.

4  BY ATTORNEY KOBESKI:

5      Q.   How was the Defendant dressed?

6      A.   He had a black hoodie, black knit cap, black

7  gloves, jeans, and dark sneakers or boots.  I can't

8  remember which they were.  And glasses.

9      Q.   Now, corporal, how much time would you say

10 passed from when you first started to leave the control

11 room to go outside until you actually saw the Defendant

12 and took him into custody?

13     A.   No more than two minutes from the time I saw

14 him until the time I took him into custody.

15     Q.   Now, at any point during this entire incident,

16 did you see any other person back in the vicinity of

17 where the Defendant was?

18     A.   No, I did not.

19     Q.   Is it fair to say that if there were other

20 people in that vicinity, the camera would have caught

21 them?

22          ATTORNEY GROSS:   Objection.

23 Speculation.

24          THE COURT:   Sustained.

25 BY ATTORNEY KOBESKI:

152

1      Q.   Once you put him into custody, where did you

2   take the Defendant?

3      A.   I alerted County Control that I had one in

4   custody.  I went from the back of the loading dock back

5   down to the garage and into Central Booking.

6      Q.   In Central Booking, does your department have

7   a property form that they use?

8      A.   Yes, we do, for everyone that comes in, yes.

9      Q.   Can you tell the jury how the property form is

10  used.

11     A.   When an individual comes into Central Booking,

12  usually outside in the sally port before they enter we

13  have them remove all their property from their pockets,

14  jewelry, anything like that.  We put it into a bin.

15  They have to enter through a metal detector.  Once they

16  do that, they bring the bin in with the property, laying

17  it on the shelf or bench next to them.  At that time or

18  as soon as we get to it, a deputy will do their property

19  on a Sheriff's Department property form.  Then we have

20  the individual sign that's the property they came in

21  with.

22              ATTORNEY KOBESKI:  Your Honor, may I

23  approach the witness?

24              THE COURT:  Yes.

25              ATTORNEY KOBESKI:  Let the record reflect

153

1    I am handing the witness what has been marked as

2    Commonwealth's Exhibit Number 5.

3    BY ATTORNEY KOBESKI:

4        Q.   Corporal, do you recognize that document?

5        A.   I do.

6        Q.   Could you please tell the jury what this

7    document represents.

8        A.   This is the property form for Mr. Ashford the

9    night he was brought in.

10       Q.   Can you tell the jury if there is any

11   signatures or anything like that on the document?

12       A.   There is.  Mr. Ashford's appears twice on the

13   document.

14       Q.   Why are there two signatures on the document?

15       A.   The first signature would be for once we take

16   everything off and inventory it, we have the individual

17   sign saying, yes, this is everything I had when I came

18   in.  The second signature is when he leaves that, yes,

19   everything I got back is what I had originally.

20       Q.   And can you tell the jury what items of the

21   Defendant's are listed on the property sheet?

22       A.   We marked one jacket, two keys, a wallet,

23   brown, driver's license, Social Security cards, Access

24   cards, Gateway cards, one Dauphin County library card,

25   one pair of eyeglasses, and one black hat.

154

1      Q.   Now, you indicated there is a jacket.  Is that

2    the hoodie?

3      A.   That's correct.

4      Q.   One thing I noticed that isn't on the list is

5    a pair of gloves.

6      A.   Correct.

7      Q.   Can you explain why the gloves were not?  Were

8    they given back to him?  Why are they not on the list,

9    if you know?

10     A.   When I originally took the individual into

11   custody, I had to remove his gloves to put the handcuffs

12   on because you couldn't get them on over top.  And I

13   can't remember whether or not I put them in his pockets

14   of his jacket or not.  If they were in the jacket, there

15   is a good chance they wouldn't have made it on the

16   property sheet.

17     Q.   Are you positive when you took the Defendant

18   into custody he had gloves on?

19     A.   Absolutely.

20     Q.   Now, you are the affiant in this case.  You

21   were the one who filed the charges.  Correct?

22     A.   Correct.

23     Q.   Now, in other words, you were like the lead

24   investigator in the case you could say?

25     A.   I was the lead affiant, yes.

1     Q.   Understood.  Now, there was a screwdriver

2  collected as evidence in this case.  Correct?

3     A.   Correct.

4     Q.   Did you have the screwdriver dusted or tested

5  for fingerprints?

6     A.   I did not.

7     Q.   Any reason why you didn't do that?

8     A.   There were two reasons.  I took the individual

9  directly into custody as the incident unfolded.  And

10  two, the individual was wearing gloves.

11     Q.   So, there wouldn't be any prints on it?

12     A.   No.

13     Q.   Corporal, do you know if pictures were taken

14  of the alleged damage to the door that was trying to be

15  pried open by the Defendant?

16     A.   I did ask maintenance to take pictures of any

17  damage that they noted on the door.

18     Q.   Did you personally observe this damage as

19  well?

20     A.   I went and looked the next day or so.

21          ATTORNEY KOBESKI:  May I approach the

22  witness, Judge?

23          THE COURT:  Yes.

24          ATTORNEY GROSS:   Your Honor, I would

25  agree to the authenticity of that being the doorway,

156

1   even though the corporal took pictures and has

2   familiarity.

3                    ATTORNEY KOBESKI:   Let the record

4   reflect I am handing the witness what has been marked

5   Commonwealth's Exhibit Number 1.

6   BY ATTORNEY KOBESKI:

7        Q.   Can you identify what Commonwealth's Exhibit

8   Number 1 is?

9        A.   Yes.   These were the pictures and were added

10  to the file.

11       Q.   How many?

12       A.   Four.

13       Q.   Do these photographs fairly and accurately

14  depict the damage to the door that you observed either

15  the next day or the day after?

16       A.   Yes.

17                    ATTORNEY KOBESKI:   Permission to publish

18  on the Elmo.

19                    THE COURT:   Okay.

20  BY ATTORNEY KOBESKI:

21       Q.   Corporal, can you describe to the jury what

22  each photo represents.

23       A.   The first photo, I am talking upper left-hand

24  corner, is what appears to be a pry mark.  The finger

25  point is, I am assuming, someone from the maintenance

157

1  department.

2          The second photo to its right still in

3  the upper part is the middle part of the door where,

4  there again, appears to be a pry mark on it.

5          ATTORNEY GROSS:   I object to any further

6  testimony as to what it appears to be.  I think we

7  should stick with damage as that goes to the ultimate

8  element of the break and enter.

9          THE COURT:  What exactly is your

10  objection?

11          ATTORNEY GROSS:   My objection is that I

12  don't think this individual is qualified to talk about

13  what caused damage that --

14          THE COURT:  I think he is.  Overruled.

15          Go ahead.

16          THE WITNESS:  The bottom left photo is a

17  picture of the whole door.  You really can't see much.

18  But, if you look to the bottom of that picture, you will

19  notice a mark on the door, on the left-hand door that's

20  lighter than the other parts of the door.  That's where

21  the paint or metal was disturbed and moved.

22          And then the photo next to it is that

23  area enlarged.

24          ATTORNEY KOBESKI:  Understood.  Your

25  Honor, that's all the questions I have for this witness.

1                THE COURT:  Cross-examination.

2                ATTORNEY GROSS:  Thank you.  May I keep

3  the lights down and pictures up for cross?

4                THE COURT:  Sure.

5                      *  *  *

6                CROSS-EXAMINATION

7  BY ATTORNEY GROSS:

8     Q.  Good morning, sir.

9     A.  Good morning.

10     Q.  Let's first look at the pictures here.  The

11  screwdriver that is in front of you, did you have the

12  opportunity to re-enact the event by trying to place the

13  screwdriver into the doors?

14     A.  I did not.

15     Q.  And would you agree with me looking at these

16  doors that there are many nicks and scratches on these

17  back doors to the loading dock of the courthouse?

18     A.  They are the doors that are used by anyone

19  from computer repair people to the U.S. Mail coming in.

20  We do have bay doors that are off to the left that if

21  anyone is bringing anything large we open that and let

22  them bring it in that way.

23     Q.  Would you agree there have been nicks and

24  marks on those doors over the last four years, four and

25  a half years that the courthouse has been open?

159

1    A.    Sure.

2    Q.    I am now drawing your attention to Picture

3  Number 2 in the upper right-hand corner.  Are you

4  focusing on that whiter mark right at the bottom part of

5  the handles?

6    A.    Right in between the two handles, yes, I am.

7    Q.    Is that the same mark you're referring to on

8  the left-hand picture?

9    A.    Yes, sir.

10    Q.    The left-hand side is closer up?

11    A.    Yes.

12    Q.    That's the bottom part of the handles.  I am

13  also looking to the right-hand side lower picture.

14  That's very close.  And there am I looking at what door?

15    A.    That's also going to be the left-hand door.

16    Q.    In that same spot as the picture above?

17    A.    No.  That's the picture below.  The below left

18  picture and the below right picture are the same area.

19  You can see the mat underneath it.

20    Q.    Okay.  That's looking at the bottom of the

21  door?

22    A.    That's correct.

23    Q.    Much further below the handles?

24    A.    Correct.

25    Q.    Thank you.  You mentioned that the individual,

160

1   according to the property records, there is no mention

2   of gloves, and that may have been an oversight based on

3   how you processed them or gave them back to Mr. Ashford

4   or the individual involved?

5       A.   That's correct.  I know at the time of this

6   happening and Mr. Ashford being brought in, I know the

7   property was not done right away.  Some of the deputies,

8   Deputies Lease and Igwe were still upstairs at this

9   time.  I was downstairs with Mr. Ashford in the holding

10  cell/Central Booking area.  I did not do his property, I

11  know that.

12      Q.   Do you recall the eyeglasses that Mr. Ashford

13  had on --

14      A.   I do.

15      Q.   -- when he was taken into custody?

16      A.   They fell off when he laid down.  But, yes, I

17  do remember.

18      Q.   And were they similar to what Deputy Igwe

19  testified to, dark rim or like silvery thin rim around

20  the glass?

21      A.   They looked like prescription glasses.  I

22  wasn't focusing on what the glasses looked like.

23      Q.   And do they look similar to the glasses that

24  Mr. Igwe was wearing this morning?  Do you recall?

25      A.   I would just be guessing.

1    Q.   Okay.  Did they appear to be thick gold-rimmed

2  glasses?

3    A.   No.

4    Q.   Now, speaking about what occurred out back of

5  the courthouse, is it correct to say that you did not

6  see any individual trying to gain access to the

7  courthouse?

8    A.   Correct, no, I did not.

9    Q.   And what you saw -- strike that.  When you

10  left the courthouse, grabbed your keys, went to the car

11  and left to apprehend the individual, what route did you

12  have to take to get to the back of the courthouse?

13    A.   When I left the garage, I turned right, drove

14  maybe 300, 400 feet, turned right again and was at the

15  dock, at the loading dock.  The garage and the alleyway

16  that I turned right on are right next to each other.  I

17  almost immediately had to back up and go in again it was

18  that close.

19    Q.   You didn't go down Philly, down George.  Not

20  to say you went the wrong way on the roadway, but you

21  took the short route?

22    A.   Yes.  Correct.

23    Q.   Because time is of the essence?

24    A.   That's correct.

25    Q.   And when you came upon the individual, you

162

1   said he was walking from the doorway?

2        A.   He was walking away from the door.  He was

3   just stepping off of the -- when I first noticed him, he

4   was just stepping off of the raised area that's by the

5   doors.  He was making the step down to exit.

6        Q.   And then he was walking towards the alleyway

7   toward the bank parking lot?

8        A.   Toward the back alleyway, yes, past my patrol

9   car.

10       Q.   And as well, you can't say that the individual

11   trying to get -- or making any action at the doorway

12   would be Mr. Ashford, correct, because you weren't

13   there?

14       A.   Not orally, no, I wouldn't be able to say

15   that.

16       Q.   You were only there at the end to place the

17   individual under arrest?

18       A.   That's correct.

19       Q.   And as well, from where you were watching, did

20   you notice anyone else around that area?

21       A.   There would have been no one else in the

22   alleyway behind us, because that's the alleyway I came

23   up.  There was no one walking in that alleyway or by the

24   generators.  When I turned right onto whatever, I don't

25   know what they call this alleyway that runs here, when I

1   turned right, there was no one in front of me or walking

2   down the alleyway.  The only individual I saw was the

3   individual stepping off the back loading dock, which was

4   Mr. Ashford.

5       Q.  Did you get the opportunity through your

6   investigation and through processing Mr. Ashford to

7   determine his height and weight?

8       A.  I got his height off his driver's license.

9       Q.  That would be five foot three?

10      A.  Yes.

11      Q.  Short gentleman?

12      A.  Yes.

13      Q.  And did you take notice to his weight?

14      A.  I did not -- I think we got that later in the

15  morning.

16      Q.  And tell me, sir, when you were buzzed out of

17  the control area down in the Sheriff's Department in the

18  basement, who did that for you?

19      A.  Deputy Brenneman.

20      Q.  And was he telling you what was occurring as

21  you were buzzing out?

22      A.  As soon as I left the control room, Deputy

23  Brenneman was letting me know what was going on.  From

24  the control room to the first door I exited is maybe 50

25  feet.  The second door that I exited is right next to

164

1    the first door I exited.  I just have to use a key to

2    get through that one.  Then it is about ten feet through

3    another door, a right-hand turn out a door which is

4    immediately behind the other one, and then in my

5    cruiser.

6        Q.  So, the longest part of this would be waiting

7    for that garage door to go up?

8        A.  Correct, that's the longest part.

9        Q.  Really, within seconds of coming up.  Did you

10   take notice to the length of the film we were watching,

11   the DVD, the elapsed time?

12       A.  The fixed one, the 111, the one that's fixed

13   over the door.

14       Q.  The one that was greatly illuminated around

15   the individual around the back door.

16       A.  That's the fixed camera.  Yes, I did.

17       Q.  That was totally about three minutes start to

18   finish?

19       A.  It was actually five minutes from start to

20   finish, but the individual went off frame about 3:30.

21   That's the last time you see him.

22       Q.  And once it just shows nothing except for the

23   landing, that's after the person was being arrested and

24   taken?

25       A.  Correct.

1    Q.    And in your experience working here at the

2    courthouse in the last, I guess -- working five years,

3    sir?

4    A.    Just about five years.

5    Q.    And from working your shift, people always

6    come through the alleyway.  Is that correct?

7    A.    The alleyway on a good Friday and Saturday

8    night, there is people walking up the alleyway.

9    Q.    Bars letting out, restaurants closing?

10    A.    Yes.

11    Q.    And the individuals that come through, do they

12    ever come towards the recycling bin or other areas where

13    this individual was found that night?

14    A.    The people walking home usually from the bars

15    or restaurants, no.  We get a lot of guys pushing

16    shopping carts or people like that will go up to the

17    recycling bins or garbage cans.

18    Q.    Are these people arrested?

19    A.    No.  We usually tell them just to get away,

20    move away.

21    Q.    And in this case, the individual you took into

22    custody was Ken Ashford?

23    A.    Kenneth Ashford, yes.

24    Q.    And did he break any windows --

25    A.    No.

1    Q.    -- to the courthouse?  Did he deface with

2  spray paint the courthouse that evening?

3    A.    No.

4    Q.    And the damage that we see here that you are

5  pointing to in the pictures, these pictures are taken a

6  few days afterwards?

7    A.    The morning after.

8    Q.    The morning after.  So, are you aware if there

9  were any deliveries or any other items that were brought

10  through those doors after he was taken into custody and

11  when these pictures were taken?

12    A.    The only delivery I know that's made at any

13  time of the morning hours is the CVC individuals.  They

14  usually come around 5:30 or 6:00.  Those are the people

15  that put the sodas and food in the food machines in the

16  vending area.  We don't let those people in the

17  building.  Maintenance has to do that when they get here

18  at 6:30 or 7:00.  But, they come through those doors.

19    A.    They come through those doors.  Or, if they

20  were bringing a large shipment, like I said, the bay

21  door goes up.

22    Q.    In your experience, I imagine, in your

23  profession, you investigate other crimes?

24    A.    We don't investigate.

25    Q.    You don't -- strike that.  Looking at here

167

1    with that screwdriver and knowing this courthouse, that

2    mark, is that enough to open up a door?

3                    ATTORNEY KOBESKI:   Your Honor, that

4    calls for speculation.

5                    THE COURT:   It does.

6                    ATTORNEY GROSS:   Withdrawn.

7    BY ATTORNEY GROSS:

8        Q.   Detective Brady -- Corporal Brady, I was

9    trying to promote you.

10       A.   Hey, it is all right.

11       Q.   Yesterday, I took the judge back down to an

12   attorney.  We'll be consistent.

13                    Looking here at these doors and this

14   damage and looking at the video as well, you cannot say

15   with certainty that Kenneth Ashford was at that back

16   door, can you?

17       A.   After I watched the video and --

18       Q.   As you saw it right there that day.  You were

19   not present.  Correct?

20       A.   I was not present at the time or when anyone

21   was at the door, the back door.  I was not watching the

22   video.

23       Q.   You mentioned about generators.  You saw the

24   individual walking away from the doors toward the

25   generators?

168

1      A.   Correct.

2      Q.   And the generators, you were looking toward

3  the back door, toward the alleyway, or toward the

4  building?

5      A.   They are toward the back alleyway, which is

6  back here.  They are still along the side of the

7  building, but it backs up.  The generator is like -- it

8  is what I would call half of a tractor trailer.  That's

9  what it looks like.  It looks like a tractor trailer

10  like cut in half, but it is green and it starts about

11  three-quarters -- it is about 25 feet long and it backs

12  up to the alley.

13     Q.   Looking at the items that Mr. Ashford was

14  wearing that evening, you said he had on dark sneakers

15  or dark boots?

16     A.   They were dark.  I couldn't tell if they were

17  boots or sneakers.

18     Q.   And as well, you were aware soon after this

19  incident that his family was, well, alleging that it was

20  not him?

21          ATTORNEY KOBESKI:   I object as to

22  relevance.

23          ATTORNEY GROSS:   As far as the

24  collection of the evidence, based on what he knew to be

25  upcoming issues --

1                    THE COURT:  Sustained.

2   BY ATTORNEY GROSS:

3       Q.  You would agree that the depiction of the

4   pictures is what occurred, despite your memory of what

5   someone is wearing.  Is that correct, sir?

6       A.  Yes.  The camera doesn't lie.  If I am

7   mistaken on something, the camera would tell me.

8                    ATTORNEY GROSS:   Thank you, Corporal.

9                         *   *   *

10                   REDIRECT EXAMINATION

11  BY ATTORNEY KOBESKI:

12      Q.  Corporal, very briefly.  You saw this suspect

13  for about 15 seconds before you went outside.  Correct?

14      A.  Correct.

15      Q.  And in those 15 seconds or so, were you able

16  to tell what he was wearing, get a good visual on him?

17      A.  Yes, I was.

18      Q.  Now, when you went back outside and took the

19  Defendant into custody, was the Defendant wearing the

20  same clothes as the person in the video?

21      A.  He was.

22      Q.  Did he appear to be about the same height and

23  same weight, same build?

24      A.  Same build.  I couldn't tell height and weight

25  on the video.

                        170

1      Q.   Now, you testified that on Friday and Saturday

2   nights after the bars or restaurants let out, you get

3   some foot traffic, people cutting through the alley?

4      A.   Correct.

5      Q.   This didn't occur on Friday or Saturday night?

6      A.   It was a Sunday morning -- I'm sorry, Monday

7   morning.

8      Q.   Sunday night, Monday morning?

9      A.   Correct.

10      Q.   3:00 in the morning?

11      A.   Correct.

12      Q.   Is it fair to say the foot traffic is even

13   less than a Friday or Saturday night when the bars let

14   out?

15      A.   From my experience in working in Central

16   Booking for two years, yes.

17      Q.   You saw no one else around the area?

18      A.   No one.

19            ATTORNEY KOBESKI:   That's all I have.

20            THE COURT:  Anything else?

21            ATTORNEY GROSS:  Nothing, Your Honor.

22            THE COURT:  I have a question.

23            THE WITNESS:  Yes, sir.

24            THE COURT:  You watched the video and you

25   have reviewed the DVD and the tape in preparation for

171

1   today, is that correct, and in preparation of filing

2   charges?

3          THE WITNESS:  Yes.  I watched all that

4   before I filed charges.

5          THE COURT:  Now, the key issue, at least

6   from what I have seen, is that when you came around the

7   corner, I don't care what you saw before you got in your

8   car, I want to talk about when you came around the

9   corner in your squad car, you saw an individual walking

10  away from those back doors.  Is that correct?

11         THE WITNESS:  That's correct.

12         THE COURT:  Did you see any other

13  individuals?

14         THE WITNESS:  None.

15         THE COURT:  Okay.  And you have watched

16  the video.  Is that correct?

17         THE WITNESS:  That's correct.

18         THE COURT:  And you saw your squad car

19  come in and that individual walking away from the doors.

20  Is that correct?

21         THE WITNESS:  That's correct.

22         THE COURT:  And the individual that you

23  took into custody that you saw walking away from the

24  doors, is that individual in court today?

25         THE WITNESS:  Yes.  It is Mr. Ashford in

172

1    the blue shirt.

2                 THE COURT:  I have nothing further.  Does

3    anybody have any further questions?

4                 ATTORNEY GROSS:   No, Your Honor.

5                 THE COURT:  You may step down.

6                 Okay.  Any other witnesses?

7                 ATTORNEY KOBESKI:   No, Your Honor.

8                 THE COURT:  Gentlemen, can I turn the

9    lights on?

10                 ATTORNEY GROSS:   Yes.

11                 ATTORNEY KOBESKI:   Please.

12                 THE COURT:  Do you think we might need

13   this?

14                 ATTORNEY GROSS:   Your Honor, my

15   witness --

16                 THE COURT:  The problem for me is that

17   that overhead creates a lot of ambient noise for them.

18   It becomes like a white noise for them.  Turn it off at

19   least for a period of time.

20                 ATTORNEY GROSS:   Correct.  I will have

21   pictures, but then I will just put it back up.

22                 THE COURT:  All right.  That will power

23   down and then should be okay.   Okay.

24                 ATTORNEY KOBESKI:   Your Honor, the

25   Commonwealth would move to introduce Commonwealth's

173

1   Exhibits 1, 2, 4 and 5 into the record.

2                    THE COURT:  Any objection?

3                    ATTORNEY GROSS:   None, Your Honor.

4                    THE COURT:  1, 2, 4 and 5 may be admitted

5   into the record.

6                    ATTORNEY KOBESKI:   The Commonwealth

7   would rest.

8                    THE COURT:  All right.

9                    ATTORNEY GROSS:  Two matters to raise

10  before the Court.

11                   THE COURT:  At the bar?

12                   ATTORNEY GROSS:   Best outside the

13  earshot of the jury.

14                   THE COURT:  We'll take our break at this

15  point, ladies and gentlemen.  We'll take about a

16  15-minute break and proceed on from there.

17                          *   *   *

18                   (Jury left the courtroom at 10:45 a.m.)

19                          *   *   *

20                   (The following discussion occurred in

21  open court outside the presence of the jury:)

22                          *   *   *

23                   THE COURT:   Yes, sir.

24                   ATTORNEY GROSS:   Thank you.  Two

25  matters.  First and foremost, Your Honor, if you recall

                              174

1   back in late January of 2009, you allowed counsel, my

2   client, Attorney Kobeski, and others to review the VHS

3   that was provided in your chambers. We reviewed it. I

4   reviewed it and took notes. What was present there

5   today is what I recall seeing on that date. However, my

6   client has asked me to bring your attention to the fact

7   that he believes that what we watched of the VHS was not

8   the actual depiction of the VHS. I am not certain how

9   to handle that aspect. I don't prefer to be a witness

10  in this case.

11          THE COURT:  He can raise the issue

12  through his own testimony or through anyone other than

13  Attorney Kobeski that was present during the review.

14  Did he review it with you?

15          ATTORNEY GROSS:   He was with me.

16          THE COURT:  He can be a witness.  He can

17  say I challenge the authentication of that at this point

18  in time.  But, he needs to present that through either

19  his testimony, Corporal Brady's testimony, or someone

20  else who may have been present.  I don't know if

21  Corporal Brady was there.

22          ATTORNEY GROSS:   There was another

23  deputy that was present at the time.

24          THE COURT:   So, he needs to do it

25  through his own testimony or someone else that was

175

1    present.  That way, he can challenge the authenticity of

2    what was shown to the jury.

3                ATTORNEY GROSS:  Putting that issue aside

4    for a moment.

5                THE COURT:  Okay.

6                ATTORNEY GROSS:    At this point, I ask to

7    make a judgment of acquittal on charges of attempted

8    burglary, Your Honor.  We have evidence that a person

9    was at the back door.  The intent can be seen through

10   circumstantial evidence in these type of cases, but

11   attempted burglary, we heard evidence and there is

12   nothing there.  What crime was there intended to commit

13   therein?  We have a person outside the back of the

14   courthouse fiddling around with a door, despite what's

15   been testified to as seen ajar somewhat.  We don't even

16   see a screwdriver in someone's hand.  We see someone at

17   the back door.  I don't believe legally at this point

18   that attempted burglary can move forward to the jury

19   just based on the fact that where is the intent, what

20   intent, what crime.  Just someone that might be around

21   the back of the courthouse or lurking or wandering back

22   and forth does not give rise to a charge of attempted

23   burglary.

24                And by that same token, Your Honor, we

25   have the issue of attempted criminal trespass.  And

1    trespass is one of those situations where it is not

2    either you are trespassing or you are not.  We can do

3    attempt.  If my client was actually out back of the

4    courthouse, nothing was stated as far as in that area

5    would be a no trespassing area.  Did he attempt to

6    gain -- to trespass inside the courthouse and what

7    actions were taken?  We still don't have --

8             THE COURT:  Are you saying he can't be

9    guilty of attempted trespass?

10            ATTORNEY GROSS:   I am saying you can.

11            THE COURT:  I just want to be clear.

12            ATTORNEY GROSS:  Oh, no, you can, yes.

13   But, the actions taken -- we don't have the information

14   here, Your Honor.  But, from what was presented so far,

15   he's at the back of the courthouse.  We don't see any

16   item in the hands.  We see gloves touching the doors and

17   down at the bottom.  Where that screwdriver came from

18   they have not proven.  They see something.

19            And also, Your Honor, possession of an

20   instrument of a crime, although it is a small charge,

21   still, instrument of a crime is misdemeanor of the first

22   degree and there is not enough to go forward.  Nobody

23   saw the item in his hand, just there afterwards.

24            THE COURT:  With regard to each argument

25   put forth by defense counsel, reviewing the evidence in

177

1  the light most favorable to the Commonwealth, all

2  reasonable inferences therefrom, the Commonwealth has

3  sustained its burden of presenting evidence of attempted

4  burglary, attempted criminal trespass.

5  　　　　　　　Furthermore, the screwdriver, the way and

6  manner in which it was used, as to the Commonwealth

7  meeting their burden with regard to possessing

8  instruments of crime, under the circumstances, we see

9  evidence that the individual depicted in that video is

10 looking through the windows and we know the Sheriff's

11 Department would have probably hundreds of thousands of

12 dollars worth of computer equipment right inside that

13 window.  Furthermore, the items that we have been

14 putting around for the past day, the video, et cetera,

15 that is about $25,000 a unit right there.

16 　　　　　　　The individual approaches the door.  He

17 appears to be shimmying at the door with something.  An

18 object was later found that was stuck in the door.  That

19 was a screwdriver.  The individual that was depicted in

20 the video was taken into custody by the corporal, and

21 that individual was the Defendant.

22 　　　　　　　So, based upon the information presented

23 to the Court, there is easily sufficient evidence to go

24 forward at this point in time.

25 　　　　　　　Let's take a ten-minute break.  Do you

178

1   need to colloquy your client?

2                ATTORNEY GROSS:   He is going to testify.

3   And we still have the issue of authenticity.

4                THE COURT:  He's got to testify.

5                ATTORNEY GROSS:   I No.

6                THE COURT:  So, I don't need to colloquy

7   him.

8                ATTORNEY GROSS:   Oh, he is going to

9   testify.

10                      *   *   *

11                (Recess taken from 10:50 a.m. to 11:05

12   a.m.)

13                      *   *   *

14                   AFTER RECESS

15                      *   *   *

16                THE COURT:  Okay.  Are you ready?

17                ATTORNEY GROSS:   Before we go there,

18   Your Honor, I am going to have my client's mother,

19   Eloise White, testify.  We will be introducing seven

20   photos.  I believe that the Commonwealth is going to

21   either have an offer of proof request or an objection.

22                THE COURT:  Okay.  Tell me what you are

23   going to show.

24                ATTORNEY GROSS:   Your Honor, they will

25   be marked as Defendant's Exhibit Number 1, a set of four

                        179

1   and three pictures of my client's mother, Eloise White.

2   She will testify she is five foot two and

3   three-quarters.  She took ones of herself beside the

4   respective pillars out back of the courthouse last year.

5   She is going to authenticate the picture.  My client is

6   five, three.  He was actually seen behind the pillars.

7                   The other pictures are pictures from

8   the DVD by the Commonwealth.  They are just still

9   frames.  That's good to cast doubt as to my client being

10  back of the courthouse.

11                  Other pictures being presented are my

12  client crouching down as they allege at the back door of

13  the courthouse.

14                  THE COURT:  You really want to show them

15  pictures of your client crouching down?

16                  ATTORNEY GROSS:  I am not -- I am saying

17  the person they described was wearing tan boots as

18  opposed to dark boots as they had described.

19                  But, most importantly, the person they

20  are saying in that picture when you look close is a

21  white gentleman, gold-rimmed glasses, neither of which

22  were found on my client, and my client is not white.

23                  THE COURT:  Let me see the pictures.  So,

24  who is going to testify that this is a white person with

25  gold glasses?

1      ATTORNEY GROSS:   They will speak for

2  themselves.  However, my client's mother can state she

3  actually took the pictures from the DVD.  She cannot

4  offer commentary about who that person might be, except

5  I am looking at this and this is not my son.  That is

6  the extent.  And she can authenticate taking the

7  pictures.

8      THE COURT:   Well, frankly, the pictures,

9  obviously, we made a part of the record, that what is

10  depicted in these photographs isn't anyone's son.  It is

11  a blob.  For her to say that's not my son would infer

12  she can somehow make out the facial characteristics of a

13  blob from a photograph that's lifted from the DVD.

14      Who lifted these from the DVD?

15      ATTORNEY GROSS:   Ms. Eloise White.

16      THE COURT:  What is your position?

17      ATTORNEY KOBESKI:   Your Honor, I will

18  start with the pictures that were allegedly taken from

19  the DVD.  First of all, we don't know if they were

20  edited.

21      THE COURT:   You can ask that question on

22  cross-examination, just like he could ask that of your

23  witnesses.

24      ATTORNEY KOBESKI:   Understood.  But, for

25  her, as you indicated, to testify that he is not my son,

181

1    this person is white, I don't think she would be in a

2    position to testify to those facts.  Like you said, at

3    least the copies of the pictures I have, it doesn't show

4    anything.  What we saw in the video was a blurry vision

5    of cheeks and a chin.

6            THE COURT:  I am inclined to disallow her

7    to testify that that is not her son because, A, she was

8    not there on the night in question; B, I don't think

9    anyone would be in a position without somehow modifying

10   these photographs through pixel imaging to create a

11   photograph that was actually appreciable and discernible

12   with regard to facial characteristics.  We don't have

13   that here.  There is no other way for me to characterize

14   it other than the fact that it is a blur.  And I am not

15   just talking about a blur.  If you cut that photograph

16   out and sever it from what appears to be the body area,

17   you would have no idea what that was.  I am just looking

18   at it and there is no telling that that's a head.  And

19   so, therefore, for her to say that's not my son -- it is

20   somebody.

21           ATTORNEY GROSS:   It is somebody's son.

22           THE COURT:  It is somebody.  But, she

23   can't tell from these photographs -- I don't think

24   anyone can tell from these photograph.  It could be my

25   son.  I couldn't tell you.  So, I don't know -- I don't

1    think she is in a position to be able to tell the jury

2    that that's not her son.

3              ATTORNEY GROSS:   Understood.  Here is

4    the request, though.  We have seen the DVD and we have

5    seen the VHS one time through.  The information I wish

6    to elicit is, essentially, to slow it down at those

7    areas, to still frame it.  The fixed camera -- yes, the

8    fixed camera outside of the loading dock does zoom in

9    upon the face.  You see the characteristics or the face

10   of the individual, despite having the illumination, is

11   extremely light-skinned with glasses, which would fall

12   in line with the question I asked of Corporal Brady, are

13   these glasses gold-rimmed.  That's what's depicted, the

14   shiny outside rim.

15             THE COURT:  Where?  I don't see any of

16   that from the photographs.  I don't see gold.  I see a

17   bit of what appears to be reflection on the individual's

18   right eye.  I don't see anything gold.

19             ATTORNEY GROSS:   You just said yourself

20   you can't see anything.  You can't tell it is a head.

21             THE COURT:  That perhaps could be a

22   reflection off the glasses.

23             ATTORNEY GROSS:   Correct.

24             THE COURT:  It appears to be -- to have

25   different coloration from the rest of the areas of the

183

1   face.  But, for someone to say those are rimmed glasses,

2   gold-rimmed glasses, if you didn't tell me and I didn't

3   hear testimony that there were glasses on the

4   individual, I wouldn't be able to say those were glasses

5   and what shade the rims on the glasses were.

6          You are presenting your client's mom as

7   an expert in an area that, A, she doesn't have expertise

8   in, and B, I don't think anyone in this world of ours

9   would have expertise to decipher and discern the various

10  issues that she wants to testify to.  I mean, you

11  essentially want to put her on the witness stand and say

12  my son is innocent.  That's exactly what you want her to

13  do.  My son is innocent and I know because I am the mom.

14  You are not going to get that in the form of these

15  photographs you want to show.  If you want to put her on

16  the stand and say her son is innocent, she needs to get

17  up and testify of his good character in the form of

18  character testimony.

19          ATTORNEY GROSS:   She did have the

20  opportunity to review the DVD as well and pulled

21  pictures off based on what she had.  Are they the

22  highest quality?  No.  Despite the expensive items we

23  have, the quality is not that great.  However, that is

24  where she got her information from.  Another way is to

25  get up on the stand and review and have them look at it,

184

1      still frame it.  I don't want to mess up anything.

2                THE COURT:  You know, do you have an

3      objection to that, look, still frame, and say that

4      doesn't look like my son?

5                ATTORNEY GROSS:   Still frames you mean

6      from the DVD?

7                THE COURT:  Yes.

8                ATTORNEY GROSS:  It gets us there.

9                ATTORNEY KOBESKI:   Well, I think she can

10     testify that doesn't look like my son and she can

11     testify that's not my son --

12               THE COURT:  I agree.  I mean, she can say

13     that's not my son if she presented alibi.  She is not

14     presenting alibi here.  She can get up and I think she

15     can look at the video and say that doesn't look like my

16     son.

17               ATTORNEY GROSS:   I will let you know as

18     well, the walk on there, I believe she might say the

19     walk of the gentleman in that video is not her son

20     because he has a different swagger or limp to his walk.

21               THE COURT:  That's fine.

22               ATTORNEY GROSS:   So, do we have the

23     conclusion that she can testify?  We'll roll the film

24     and let her watch and talk about her conclusions.

25               THE COURT:  That doesn't look like my

185

1    son's walk, I don't see any problem with that.

2              ATTORNEY KOBESKI:   The only issue I have

3    is one picture, that of the Defendant's mother which

4    looks like it was taken outside of the courthouse.  My

5    issue with that particular photograph is, first of all,

6    her feet are cut off.  You can't tell if she was

7    standing on anything, on tippy toes, what type of shoes

8    she is wearing.  It is a different pole than the

9    pictures where the Defendant allegedly was -- where

10   allegedly the Defendant were taken.  It's a different

11   view, different camera.  I don't see how that

12   testimony --

13             THE COURT:   It is actually an entirely

14   different perspective.  If she had photographs taken

15   from the perspective of the video and the cameras, we

16   could tell.  But, we know angle affects everything.  If

17   you are looking from above and you have got someone

18   standing behind a fixed position, if you are looking up

19   here, it is a lot different than if you are looking

20   straight on, you have got someone looking straight on.

21   You can't tell unless you engage in some extremely

22   difficult mathematics that I am not capable of doing to

23   analyze whether or not the photographs taken from above

24   would have any relationship to the photograph of your

25   client's mom standing face on behind a pillar.

1     ATTORNEY GROSS:   Your Honor, I too am

2   not skilled in the perspective analysis, which I think

3   is mathematical dimension.

4     THE COURT:   Right.

5     ATTORNEY GROSS:   However, speaking with

6   her, I also am presenting -- this is what he has

7   requested.   I have advised my client's mother --

8     THE COURT:   I think it is misleading to

9   the jury.   I think it is not scientific.   Therefore, it

10   would not assist the jury in the determination of the

11   photographs taken face on.   There is no re-re-creation

12   of the way that the photographs were taken on that at

13   any time in question.   So, therefore, it would only lead

14   to conjecture, speculation, et cetera, on the part of

15   the jury.   And it would be misleading therefore to the

16   jury.   So, I am not going to allow those to come in.   I

17   would like you to make them part of the record so we

18   have a record of it.   That way, you can preserve your

19   objection and have all the facts of record for

20   preservation of the objection.   Okay.

21     ATTORNEY GROSS:   Of the pictures?

22     THE COURT:   No.   These aren't the

23   photographs -- well, sure, we will make them part of the

24   record, too.   I am specifically talking to the ones I

25   have included as being unscientific.

187

1          ATTORNEY GROSS:   I will submit these

2      four that I will mark as Defendant's Exhibit Number 1.

3          THE COURT:  Four photographs.

4          ATTORNEY GROSS:   For the record, they

5      are.

6          THE COURT:  Are you ready to proceed?

7          ATTORNEY GROSS:  Ms. Eloise White.

8          THE COURT:  Is your client going to

9      testify?

10         ATTORNEY GROSS:   Mr. Ashford is not

11     going to testify.  I don't think that has changed, if

12     you would colloquy him on that, both a decision of his

13     and mine.

14         THE COURT:  Mr. Ashford, come forward,

15     please.

16                    *   *   *

17         (Defendant's Exhibit Number 1 marked for

18     identification.)

19                    *   *   *

20         THE COURT:  Mr. Ashford, I have been told

21     by your attorney that you do not wish to take the

22     witness stand.  Is that correct?

23         THE DEFENDANT:  That's correct.

24         THE COURT:  Can we place the Defendant

25     under oath.

188

1                          *   *   *

2                    KENNETH W. ASHFORD,

3    having been duly sworn according to law, testified as

4    follows:

5                          *   *   *

6                    THE COURT:   Okay, sir.  Are you aware

7    that you have a constitutional right to testify?

8                    THE DEFENDANT:   Yes.

9                    THE COURT:   And have you discussed the

10   benefits and detriments of testifying with your

11   attorney?

12                   THE DEFENDANT:   Yes.

13                   THE COURT:   And after those discussions,

14   have you decided that you voluntarily wish to remain

15   silent?

16                   THE DEFENDANT:   Yes.

17                   THE COURT:   Okay.  Has anyone promised

18   you anything in order to get you to waive your right to

19   testify?

20                   THE DEFENDANT:   No.

21                   THE COURT:   Has anyone threatened or

22   coerced you?

23                   THE DEFENDANT:   No.

24                   THE COURT:   Prior to coming in here

25   today, did you have any drugs, alcohol, or anything of

1    an intoxicating nature?

2              THE DEFENDANT:   No.

3              THE COURT:   Do you understand what's

4    going on here today?

5              THE DEFENDANT:   Yes.

6              THE COURT:   Do you have any questions for

7    me or your attorney before I accept your waiver?

8              THE DEFENDANT:   Let me see.   Then again,

9    I was threatened by my past record.

10             THE COURT:   That's not someone

11   threatening you.   That's being threatened by the

12   prospect of having your past record used against you if

13   you take the witness stand.   What I am talking about,

14   has anybody threatened you with harm or violence or

15   anything along those lines in order to get you to waive

16   your right to counsel?

17             THE DEFENDANT:   No.

18             THE COURT:   Are you satisfied with the

19   representation of your counsel at this point in time?

20             THE DEFENDANT:   I am going to say to a

21   certain extent, yes.

22             THE COURT:   Do you wish to have

23   additional time with him to discuss the benefits or

24   detriments of your right to testify or do you believe

25   you are voluntarily waiving your right to testify?

1          THE DEFENDANT:  I am voluntarily.

2          THE COURT:  I have a document that says,

3  "By signing this form, I acknowledge that I have a

4  constitutional right to testify.  I have discussed with

5  my attorney the benefits and detriments of testifying.

6  And after said discussion, I voluntarily waive my right

7  to testify.  Furthermore, by signing this form, I aver,"

8  which means I am stating, "that I was not promised

9  anything in return for waiving my right to testify, nor

10  was I forced to waive my right to testify."  If you

11  could have him sign that.

12          ATTORNEY GROSS:   May 12.

13          THE COURT:  Okay.  We will make that a

14  part of the record.

15          You may be seated.  Thank you.

16          Bring the jury in.

17                 *   *   *

18          (Jury entered the courtroom at 11:20

19  a.m.)

20                 *   *   *

21          THE COURT:  Attorney Gross.

22          ATTORNEY GROSS:  Thank you, Your Honor.

23  Defense calls Eloise White to the stand, please.

24                 *   *   *

25

1          ELOISE WHITE,

2    called as a witness on behalf of the Defendant,

3    having been duly affirmed according to law, testified as

4    follows:

5                    *   *   *

6              THE COURT:  All right.  You may proceed.

7              ATTORNEY GROSS:    Thank you.

8                    *   *   *

9                 DIRECT EXAMINATION

10   BY ATTORNEY GROSS:

11       Q.   Good morning, ma'am.

12       A.   Good morning.

13       Q.   Could you state your name and where you

14   presently reside.

15       A.   My name is Eloise White.  I reside at 1478

16   Whiteford Road, York, PA.

17       Q.   1740?

18       A.   2.

19       Q.   And how long have you resided in York, ma'am?

20       A.   Ever since '87, 1987.

21       Q.   And ma'am, how are you related to Kenneth

22   Winston Ashford?

23       A.   Kenneth is my son.

24       Q.   How old is Kenneth?

25       A.   Kenneth is 44 years old.

1    Q.   And just so we are clear, is that the

2    gentleman seated to my left?

3    A.   Yes.

4    Q.   Ma'am, I want to bring you back to on or about

5    March 17 of 2008.  Were you aware that your son was

6    arrested that evening?

7    A.   Yes.

8    Q.   And tell me, since that time, have you had the

9    opportunity to review a DVD depicting what's alleged to

10    be Kenneth trying to break into the courthouse?

11    A.   Yes.

12    Q.   About how many times have you reviewed that

13    DVD?

14    A.   Oh, a number of times.  About -- over 15

15    times.

16    Q.   Were you present in court here today when that

17    DVD was played for the jury?

18    A.   No, I wasn't.

19    Q.   Would you be able to familiarize yourself with

20    that DVD if we, in fact, played it again?

21    A.   Yes.

22    ATTORNEY GROSS:  To that end, Your Honor,

23    could we ask that the lights be turned down and I

24    approach the media cart.

25    THE COURT:  Yes.

193

1                          *   *   *
2                  (DVD played in open court.)
3                          *   *   *
4   BY ATTORNEY GROSS:
5       Q.   Ma'am, I have here a video that's playing.   Do
6   you recognize looking at this video?
7       A.   Yes.
8       Q.   And before we go any further, let me hit full
9   screen 4.  Is that better now?
10      A.   Yes.
11      Q.   Ma'am, when was the last time you actually
12  looked at this video, if you can recall?
13      A.   I think it was about three days ago.
14      Q.   And please, try to speak into the microphone
15  loudly so the jury can hear you as well as everyone
16  else.
17                Ma'am, from looking at this video, were
18  there certain areas that caused you to hesitate about
19  the identity of the person in the video?
20      A.   Yes.
21      Q.   Is it past this point or did we already pass
22  it?
23      A.   Well, right at the door, the person is too big
24  to be my son.
25      Q.   Just now or do I have to go forward, ma'am?

                            194

1     A.   It was right at the door.  He was too big to

2  be my son.

3     Q.   Do you desire me to go back?

4     A.   Yes.  Right there.  And he also is a

5  lighter-skinned person than my son.  Features are

6  different.

7     Q.   When you were looking at this video, was it on

8  a personal computer or on a TV?

9     A.   It was on a personal computer first.  And then

10  it was on a big screen TV.  And then it was on the

11  computer.

12     Q.   Now, ma'am, I realize looking here at these

13  pictures, looking at this, this is just, for lack of a

14  better word, a blob.  You cannot make out who that is in

15  that picture?

16     A.   Not there, you can't.

17     Q.   If you could tell me -- is it a little bit

18  further past this point -- where you were able to say

19  whether or not it might be an individual that is your

20  son?

21     A.   He didn't look like my son.

22     Q.   And ma'am, as you were looking through this

23  video, do you recall two times the person came to the

24  door?

25     A.   Three times.

1      Q.   Three times.  Right there, ma'am, that we saw.

2      A.   The face changes.  It becomes a different

3 person.

4      Q.   Is that mustache similar to your son's?

5      A.   No.

6      Q.   How does your son usually keep his facial

7 hair?

8      A.   Neatly trimmed and --

9      Q.   Similar to what he is donning here today in

10 court?

11      A.   Yes.

12      Q.   Did you take notice the shoes the gentleman

13 was wearing?

14      A.   Yes.  The person that was at the door had on

15 New Balance sneakers.

16      Q.   Did you have an opportunity to pick your son

17 up that evening or that morning?

18      A.   Yes.

19      Q.   And what was he wearing?

20      A.   He was wearing brown Wolverine boots with

21 black soles.

22      Q.   Those shoes that were shown, are they the same

23 shoes your son had on that morning?

24      A.   No.

25      Q.   Ma'am, have you ever looked at the VHS that

196

1    was recorded that evening?

2         A.   No, I never saw it.

3         Q.   Are you familiar with your son's walk and how

4    he moves, his mannerisms?

5         A.   Yes.

6         Q.   Are you able to comment about his mannerisms

7    if you saw it again or if you saw it the first time?

8         A.   Are you talking --

9         Q.   The VHS.

10        A.   I never saw the VHS.

11        Q.   Would you be able to pick out a walk similar

12   to your son's if you saw it?

13        A.   Yes.

14             ATTORNEY GROSS:   Your Honor, if I may, I

15   believe that the walking aspect is in the VHS as opposed

16   to the DVD.  So, I will click out of this screen.

17             ATTORNEY KOBESKI:   Before she can

18   testify that's his walk of the son, she has to talk --

19   she has to testify about how he walks.

20             THE COURT:  I don't know how you explain

21   that.  It is one of those that's not his walk.

22             ATTORNEY GROSS:   We could give a brief

23   precursor not to elaborate.

24             THE COURT:  Fine.

25   BY ATTORNEY GROSS:

1    Q.   Ma'am, is there anything specific about your

2  son's walk that stands out from other folks?

3    A.   Yes.  He has a funny looking little walk.  On

4  the DVD -- on the DVD, the person has long strides.  My

5  son don't take long strides.  He has a funny little

6  walk.  I mean, I can tell his walk.

7              THE COURT:  I don't know what you are

8  asking.

9              ATTORNEY GROSS:  May we please switch

10  over to the VHS as opposed to the DVD.

11              THE COURT:  I am not sure --

12  BY ATTORNEY GROSS:

13    Q.   Ma'am, you mentioned your son has shorter

14  strides.  Anything specific as far as movements of

15  shoulders or head that you take note to?

16    A.   Well, I just can tell -- I can tell his walk.

17  And, you -- if I see, that's why I could tell the

18  difference in the DVD.  I have never seen the VHS.

19    Q.   It will be up in a moment, ma'am.

20              ATTORNEY KOBESKI:   Your Honor, may we

21  approach before that VHS is played?

22              THE COURT:  Yes.

23                        *   *   *

24              (The following discussion occurred at

25  sidebar:)

198

1          ATTORNEY KOBESKI:   I don't think she can

2    testify to that.

3          ATTORNEY GROSS:   State it.

4          THE COURT:  What?

5          ATTORNEY KOBESKI:   Your Honor, I am

6    going to object to defense counsel playing the video and

7    having the witness testify whether or not that looks

8    like her son's walk.  First of all, I believe that would

9    call for an expert opinion to say --

10         THE COURT:  She is probably an expert on

11   her son's walk.

12         ATTORNEY GROSS:   Reasonable

13   understanding.  A person testifies to --

14         THE COURT:  It has nothing to do with

15   intoxication.

16         ATTORNEY KOBESKI:   Judge, I think it is

17   just -- I mean, I think it is misleading in that, I

18   mean, she wasn't there on the night in question.

19         THE COURT:  It is not misleading.  It is

20   not misleading.  It is not misleading.  She is creating

21   a defense.  Now, what you need to do, you need to

22   cross-examine her on it.  She saw one step from the DVD

23   and she was able to say.  The fact of the matter is the

24   DVD was depicting the individual leaving when the police

25   arrived.  I am sure his gait when the police arrived was

1   a lot different than his gait when he is having a cute

2   little walk.

3            Let's go through this.  This was supposed

4   to be one day.  How was this ever going to take one day?

5            ATTORNEY KOBESKI:   We can squeeze it in.

6            THE COURT:  You didn't think very well.

7            ATTORNEY GROSS:   Start at nine and

8   finish at five.

9            THE COURT:  She can testify to it.  But,

10   be quick with the testimony, because what you are doing,

11   you are showing this video again and again and again.

12   In fact, the video was far better when you showed it

13   than when he showed it because there is a point where it

14   stopped and it looks like his face actually in the

15   video.

16            ATTORNEY GROSS:   Why do you think I

17   jumped over it?

18            THE COURT:  I understand that.  But, I am

19   saying you need to quit showing the video.  It is not

20   doing anyone any good.

21            (The discussion at sidebar was

22   concluded.)

23                        *   *   *

24   BY ATTORNEY GROSS:

25       Q.   Eloise, please focus on the screen.  Do you

1    see the gentleman walking?

2        A.   Yes.

3        Q.   Please watch for a few moments.  You have

4    never seen this before, ma'am.  Is that correct?

5        A.   No, I haven't.

6        Q.   What you saw there on that video, this is from

7    March 17, 2008.  The person depicted in that video, is

8    their walk similar to this which is exhibited by your

9    son?  Does that look like your son's walk?

10       A.   That's similar to my son's walk.

11       Q.   Is that your son -- you can't tell that's your

12   son, can you?

13       A.   No, I can't tell.

14               THE COURT:  Did you say that was similar?

15               THE WITNESS:  I said the walk was similar

16   to it.

17               THE COURT:  It is similar to your son's

18   walk?

19               THE WITNESS:  That one is similar.

20   BY ATTORNEY GROSS:

21       Q.   What about the DVD?

22       A.   The DVD is not the same walk because the DVD

23   is jumping, is like jumping.  And when the person comes

24   around the pole there, they are striding and their toe

25   is turned up.

1      Q.   So, the person that's walking and got

2   arrested, you're saying that's your son, their walk?

3      A.   It looks like him, like his walk.

4      Q.   The DVD, ma'am, you saw the DVD when the

5   person was walking?

6      A.   Yes.

7      Q.   Looks like your son?

8      A.   Well, they jumped -- that one was jumping.   I

9   can't tell that was his walk because they jumped.   The

10   DVD, when it was cut, it was jumping.   It wasn't, you

11   know, just walking.   It was jump, jump, jump, jump.   It

12   didn't -- it didn't really show the walk.   Only time

13   they showed the walk was when the guy was coming around

14   the pole.   And right when he is coming around the pole,

15   it stops, the face flashes, and you can see it is a real

16   light-skinned person when they are striding, walking

17   around the pole.

18      Q.   Okay.   And ma'am, looking at both of these,

19   ma'am, do you recognize an individual being your son,

20   Kenneth Ashford, in those pictures?

21      A.   No.   In the DVD, I don't.   And on the VHS, the

22   walk, I'd have to look at it again, because you went

23   kind of fast there.   But, it kind of -- kind of looked

24   like him when he walked there.

25      Q.   The walk of the man that was walking up and

1  getting arrested?

2      A.   Yes.

3      Q.   What about the walk of the man that was in

4  front of the camera breaking into the courthouse?

5      A.   No.

6              ATTORNEY GROSS:    Thank you, ma'am.

7  Those are all the questions I have, Your Honor.

8              THE COURT:   All right.   Cross-examine.

9                      *   *   *

10                  CROSS-EXAMINATION

11  BY ATTORNEY KOBESKI:

12      Q.   Ma'am, I am a little confused.   You testified

13  just now that the person who was walking in the DVD

14  didn't look like your son's stride.   Correct?

15      A.   Right.

16      Q.   But right before that, you testified that you

17  really couldn't tell what the stride was like in the DVD

18  because of the quality.   It was kind of poor, jumping

19  around.   Correct?

20      A.   At certain points of it, you could see the

21  walk.   It is a stride, long stride, wide strides.

22      Q.   The DVD shows an individual walking from the

23  door to the police vehicle when it pulls up.   Correct?

24      A.   Yes.   It's jumping.

25      Q.   And that's when the police come up and arrest

1    the individual.  Correct?

2        A.   Yes.  The DVD is jumping.  The DVD that you

3    have, it jumps.  It doesn't show the person really

4    walking.  That just showed the person walking.  But, the

5    DVD has the person jumping, jumping, like, it is

6    jumping.  It is not smooth.

7            THE COURT:  Ma'am, listen to the

8    question.  Because of the quality, that's what you are

9    talking about, jumping.  The individual is not jumping.

10    It's the quality of the DVD that makes it look like he

11    is jumping.  Is that correct?

12            THE WITNESS:  Yes.

13            THE COURT:  Okay.  Proceed.

14            ATTORNEY KOBESKI:   Thank you.

15            THE COURT:  Please don't let her testify

16    in the narrative.

17            ATTORNEY KOBESKI:   Yes, Judge.

18    BY ATTORNEY KOBESKI:

19        Q.   Ma'am, you weren't present behind the

20    courthouse on March 17, 2008, were you?

21        A.   No, I wasn't.

22        Q.   You can't explain why your son was arrested

23    behind the courthouse near the doors, can you?

24        A.   Well, I was informed --

25        Q.   Ma'am, you personally can't explain.  You have

1   no personal knowledge of why your son was arrested on

2   that night.  Correct?

3        A.   Correct.

4        Q.   Now, you testified when you were watching the

5   DVD that the individual who came up to the door had on

6   New Balance sneakers.

7        A.   Yes.

8        Q.   Now, how are you able to 100 percent say they

9   are New Balance sneakers, because they look like brown

10  boots to me?

11            THE COURT:  Counsel, I don't want to hear

12  your testimony.

13            ATTORNEY KOBESKI:   Can I bring the

14  picture back up?

15            THE COURT:  That's fine.  But, I don't

16  want to hear your testimony in the case.  You are not a

17  witness in this case.

18  BY ATTORNEY KOBESKI:

19       Q.   Ma'am, do you see that picture?  Do you see

20  the feet of the individual?

21       A.   I can hardly see it.  I can hardly see that.

22       Q.   Do those look like New Balance sneakers to

23  you?  I will let it play.  Tell me when you see New

24  Balance sneakers.

25            THE COURT:  Better get your hand on the

205                                                    205

1      pause button then.

2    BY ATTORNEY KOBESKI:

3        Q.   Do you see New Balance sneakers there?

4        A.   You have to wait until it turns to the side

5    and gets ready to walk off.  Pause it then and you will

6    see the New Balance sneakers.  And when he kneels down

7    at the door with the screwdriver or whatever they have,

8    you will see it then.

9        Q.   Ma'am, if you could tell me when to pause when

10   you see the New Balance sneakers.

11       A.   When he kneels down is when you are able to

12   see them.

13               THE COURT:  Are there any more

14   appearances in this?

15               ATTORNEY KOBESKI:   Yes, Your Honor, in a

16   moment.

17               THE WITNESS:  Okay.

18               THE COURT:  Do you want him to stop?

19               THE WITNESS:  As soon as the shoes show,

20   you can stop it.

21               THE COURT:  You need to tell him when the

22   shoes show.

23               THE WITNESS:  All right.  Okay.

24   BY ATTORNEY KOBESKI:

25       Q.   So, you are telling me from that view --

1    A.   I missed it.  It is when his foot was out.

2    Q.   I apologize, ma'am.

3    A.   Okay.

4    Q.   You are telling me that from that, you can

5    tell that's a New Balance sneaker?

6    A.   Maybe zoom it.  See, I had video that you

7    could zoom it in.  You could zoom it in.  My big screen.

8    Q.   No, ma'am.  I am asking you, ma'am, from this

9    can you tell that's a New Balance sneaker?

10    A.   Yes.  When you zoom it, if you zoom it in, you

11    can tell it is a New Balance sneaker.  It has on the

12    toe, it has like black, like black mesh, and on the side

13    it has the N on it.  And around the top, it has the dark

14    rim around the top of his shoes and on the bottom of it.

15    Q.   Let me stop that right there.  That doesn't

16    look like a brown boot to you?

17    A.   No.

18    Q.   What kind of equipment do you have?

19    A.   I have a big screen TV and I have --

20    Q.   Well, ma'am, you would agree this is a pretty

21    big screen TV, wouldn't you?

22    A.   I'd say the screen has poor color, because you

23    could tell on the photos that there was more color in

24    the photos that was taken.  And my big screen is

25    clearer.  And when it is paused and it is zoomed in, you

1    can see the different faces and everything on it.

2         Q.   You didn't bring any equipment with you today.

3    Correct?

4         A.   I couldn't bring it.  If possible -- if I

5    could have, if somebody would adjourn to my house, I

6    could show it to them.

7         Q.   Ma'am, you testified that the features on the

8    individual in the DVD look different than the features

9    on your son.  Correct?

10        A.   The person that's in this video has different

11   features from my son.  And they have lighter skin than

12   my son.

13        Q.   Let me ask you this --

14        A.   And they are bigger than my son.

15        Q.   You said specifically the facial features are

16   different.  Correct?  You said the individual in the DVD

17   has a mustache.  Does your son not have a mustache?

18        A.   There is one picture in the DVD --

19        Q.   Ma'am, that's not my question.  Does your son

20   have a mustache?

21        A.   My son has a mustache.

22        Q.   Thank you.  What, aside from the mustache and

23   the lighter skin as you allege, is different about the

24   facial features that you see on this DVD?

25        A.   On the DVD, when the person is running down by

1    the trash cans, if you stop it, pause it and zoom it,

2    you see the person doesn't have a mustache, nor does he

3    have glasses.  And the clothes on the person in this DVD

4    changes.

5         Q.  Ma'am, I asked you about the facial features.

6    Please listen to my questions and answer my questions.

7              THE COURT:  Counsel, I need to control

8    the witness.  When she doesn't appropriately answer, you

9    need to interrupt and ask me to caution her.  What you

10   are doing is asking her questions, allowing her to

11   testify in the narrative and stopping her at the

12   conclusion of her answer.

13             ATTORNEY KOBESKI:    I apologize.

14   BY ATTORNEY KOBESKI:

15        Q.  Ma'am, aside from the mustache and lighter

16   skin, what other different facial features does your son

17   have from the person in the video, specifically?

18        A.  What different facial features?

19        Q.  Yes.

20        A.  The one person, they have a pug nose, a short

21   nose, a pug nose.

22        Q.  Your son --

23        A.  They have a bushy mustache.

24        Q.  Which your son doesn't have?

25        A.  Exactly.

1        Q.   And a pug nose, which your son doesn't have.

2   Correct?

3        A.   Exactly.

4            ATTORNEY KOBESKI:   Your Honor, I don't

5   have anything else.

6            THE COURT:  Any redirect?

7            ATTORNEY GROSS:   One question.

8                        *   *   *

9                   REDIRECT EXAMINATION

10  BY ATTORNEY GROSS:

11       Q.   Ma'am, is this video, this DVD, like the DVD

12  you had a copy of?

13       A.   Yes.

14            ATTORNEY GROSS:   Thank you.  That's all

15  I have.

16            THE COURT:   All right.  Just to

17  reiterate, ma'am.  The person depicted in the VCR tape

18  that's walking away from the doors and getting arrested

19  by the corporal, that individual has the same stride

20  that your son does.  Correct?

21            THE WITNESS:  When it is shown on the

22  VHS?

23            THE COURT:  Yes.

24            THE WITNESS:  It looks like my son.

25            THE COURT:  Okay.

1        THE WITNESS:  On the DVD, it is jumping,

2  like I said.

3        THE COURT:  Okay.  I just wanted to ask

4  you about the VHS.  Okay.  You may step down.

5        Can I put the lights on?

6        ATTORNEY KOBESKI:   Yes.

7        ATTORNEY GROSS:   I have no objection.

8  Yes.

9        THE COURT:  Any additional witnesses?

10        ATTORNEY GROSS:   No further witnesses or

11  evidence, Your Honor.  Just ask that the evidence that

12  had been submitted be of record.

13        THE COURT:  Okay.  Any objection?

14        ATTORNEY KOBESKI:   No, Your Honor.

15        THE COURT:  We will make those items of

16  record.  They are Defendant's Exhibits what?

17        ATTORNEY GROSS:   1.

18        THE COURT:   The photographs?

19        ATTORNEY GROSS:   Yes.

20        THE COURT:  They have already been made a

21  part of the record.

22        Ladies and gentlemen, we are going to

23  take a break at this point in time.  I am going to

24  release you for lunch until 1:30.  I want to caution you

25  do not discuss this matter with anyone, nor should you

211                    211

1    allow anyone to discuss it in your presence.  If someone

2    does discuss it in your presence or solicit to discuss

3    it, let my tipstaff know immediately and we'll inquire

4    into that.

5                    Wear your juror badges prominently when

6    you go out to lunch.  Today is market day.  When you go

7    to the market, wear it prominently so anyone who works

8    in the courthouse will know to steer clear from any

9    conversation in your presence, hopefully.

10                    Have a good lunch, ladies and gentlemen.

11                              *   *   *

12                    (Jury left the courtroom at 11:55 a.m.)

13                              *   *   *

14                    (The following discussion occurred in

15    open court out of the presence of the jury:)

16                              *   *   *

17                    THE COURT:  Any specific jury

18    instructions you want me to pull for either of your

19    cases?

20                    ATTORNEY GROSS:    Missing evidence as it

21    pertains to the gloves.

22                    ATTORNEY KOBESKI:   I think that was

23    explained.

24                    THE COURT:  It was explained.  However,

25    that's not the key for missing evidence.  I will take a

                              212                    212

1     look at it and see.  Please remind me of that when we

2     get back.

3                    Anything else?

4                    ATTORNEY GROSS:   We are going to be

5     asking for the charge for the simple trespass, that the

6     instruction for simple trespass must be included as

7     well.  I think it fairly arises from the evidence as

8     presented thus far.

9                    THE COURT:  Okay.  Counsel.

10                   ATTORNEY KOBESKI:   It is lesser

11    included, I believe.  So, I believe that would be

12    proper.

13                   THE COURT:  I don't believe so, but I

14    will take a look at it.  I don't think it is a lesser

15    included of criminal trespass.  What's the cite for

16    criminal trespass?

17                   ATTORNEY KOBESKI:   3503.

18                   ATTORNEY GROSS:   Defiant trespass, (b).

19                   THE COURT:  Do you want defiant trespass

20    (b) to be given?

21                   ATTORNEY GROSS:   Yes.

22                   THE COURT:  Not (b)(1)?

23                   ATTORNEY GROSS:   (b)(1) -- well, I mean,

24    I would love to -- I think that would be for you, Your

25    Honor, as a summary offense.

1          THE COURT:  I just want to make sure what
2    you are asking me to give, because --
3          ATTORNEY GROSS:   It would have to be
4    defiant trespass.
5          THE COURT:  The criminal trespass -- what
6    you are doing, you are adding an additional charge.  I
7    don't think it is lesser included, because criminal
8    trespass specifically requires entry by subterfuge into
9    any building or occupied structure or separately secure
10   or occupied portion thereof; whereas, the person who
11   commits the offense of defiant trespass knowing that he
12   is not licensed or privileged to do so enters or remains
13   in any place.  That does not include the building.  So,
14   your client technically could be found guilty of the
15   offense of walking out on that property and getting on
16   the loading dock.  And they thereafter can also be
17   guilty of the criminal attempt criminal trespass because
18   they are not lesser included.  One is an occupied
19   structure or separately secured, maintained portion
20   thereof.  It is akin to a lesser included of burglary.
21   The only missing thing is with intent to commit a crime
22   therein.  And the same cannot be said for defiant
23   trespass.  If I walk on that loading dock, I am not
24   committing criminal trespass, but I can if it is
25   properly posted be guilty of defiant trespass.

1          ATTORNEY GROSS:   It really cuts -- even

2    argument, Your Honor, because we do have signs at the

3    courthouse that have been alluded to, but no evidence of

4    trespassing when a person is not there for their

5    ordinary business.  And usually, loitering and prowling

6    would be involved.  However, I am not going to sit here

7    and ask for other --

8          THE COURT:  I don't think it is

9    appropriate under the circumstances.  I don't think it

10   is lesser included.  If you want me to add it, I will

11   add it.  I think what can happen is he can be found

12   guilty of that as well as criminal attempt criminal

13   trespass because we do have some testimony, one of the

14   deputies said, yes, it is posted out there.  You said

15   when was it posted.  He said I don't recall exactly, but

16   I think it was here when they built the place.

17         ATTORNEY GROSS:   Which for my client's

18   sake, if he were found guilty of both, the sentences

19   could then run consecutive to one another based on R Fel

20   status.  That could bring you up to an additional nine

21   months in jail.

22         THE COURT:  I am not sure what those

23   numbers would extrapolate.

24         ATTORNEY GROSS:   More than just --

25         THE COURT:  Yes.

1          ATTORNEY KOBESKI:   I apologize.  He was

2     charged under criminal trespass, Subsection (a)(1)(ii),

3     not the (i).  It was breaking into a building.  But I

4     believe the same argument would apply, just for

5     clarification.

6          THE COURT:  Yes.  If he is convicted of

7     both of them, I am going to sentence him separately.

8     That's the point, because they are not lesser included.

9     There is no merger issue.

10          ATTORNEY GROSS:   The answer is leave it

11     as it is.

12          THE COURT:  All right.  That's what I

13     will do.  We'll see you at 1:20.

14                    *    *    *

15          (Luncheon recess taken from 12:00 noon

16     until 1:30 p.m.)

17                    *    *    *

18                  AFTER RECESS

19                    *    *    *

20          THE COURT:  Are we ready for closing

21     statements?

22          ATTORNEY GROSS:   I think you wanted us

23     to remind you about the missing evidence instruction.

24          THE COURT:  Yes.

25          ATTORNEY GROSS:   Only issue is it's

1    going to be cumulative.

2              THE COURT:  That's an argument for the

3    jury.  If the item is available to that party and not to

4    the other, which I don't know the answer to that.

5    Second, that it appears the item contains or shows

6    special information material to the issue.  And third,

7    the item would not be merely cumulative.  So, I will

8    give you the instruction.  You can argue it.

9              ATTORNEY GROSS:   Okay.

10             THE COURT:  Are we ready?

11             ATTORNEY GROSS:   I believe so.

12             THE COURT:  Bring the jury in, please.

13                          *   *   *

14             (Jury entered the courtroom at 1:35 p.m.)

15                          *   *   *

16             THE COURT:  Folks, has anyone overheard

17   anything about this case or been solicited to discuss

18   this case over the lunch hour?

19             (No response.)

20             THE COURT:  We are going to proceed to

21   closing statements at this point in time.

22             You may close.

23             ATTORNEY GROSS:   Thank you, Your Honor.

24             May it please the Court, Attorney

25   Kobeski, ladies and gentlemen of the jury.  Like I said,

                       217                        217

1    this case would not take terribly long, and there we

2    are.  It is about a day.

3             Before I begin, I just want to remind you

4    of the oath that you took prior to being placed on this

5    jury and the promises that you made, listen to the

6    evidence, weigh the evidence, and, most importantly,

7    follow the instructions from the Judge.

8             Everything that you are going to need to

9    make the determination in this case came from the

10   witness stand and the evidence presented also from the

11   overhead.  It is your choice to take into account

12   everything and either believe some of the evidence, none

13   of the evidence, or believe it all.  It is strictly up

14   to you.  And that's the job that you have, all 12 of you

15   together.

16             Now, in this case, it is very

17   straightforward.  My client, Kenneth Ashford, is charged

18   with attempting to commit a burglary.  And the Judge

19   will give you the instructions.  But, basically, did he

20   attempt, namely, did he make a substantial step to

21   making the commission of that crime possible.  Did he

22   attempt to break in, to gain access to, go into the

23   courthouse in the early morning hours of March 17, 2008.

24             And also, you are going to have to decide

25   whether or not the courthouse is a building.  No

218

1    surprise, it is.  This is a building.

2                    As well, did he intend to commit a crime

3    therein?  That's the area I suspect where the issue is

4    going to be, what was the intent of Mr. Ashford, if you

5    believe the person at the door was Mr. Ashford based on

6    the evidence presented, namely, the light complexion,

7    the gloves, can we see his face, all those different

8    areas.  If you don't believe it was Mr. Ashford, the

9    inquiry is over.  It is not him.  Move on.  Acquit Mr.

10   Ashford.  If you believe that that may have been Mr.

11   Ashford at the door, then you can look at and decide

12   what was the intent.

13                   Now, we heard evidence that there were

14   computers that you could see from the windows outside

15   the back of the courthouse.  However, what you saw up

16   there on the video, that tells the story.  It is your

17   recollection of what the video depicts that night in the

18   dark.  It is for you.  You have to decide what was the

19   intent of somebody to go inside.  Was it an attempt?

20   Then you think attempt at what.  All we see was the

21   garbage can, the scanning machine, garbage can,

22   computers, and the scan equipment that no one can pick

23   up.

24                   You look at Mr. Ashford.  By the

25   statement of Corporal Brady, five foot three.  A figure

1    was there.  An intent to commit a crime therein if you

2    believe Mr. Ashford was the person outside at the door

3    at the back of the courthouse.

4              We can concede the person walking away

5    from the VHS that was arrested by Corporal Brady was Mr.

6    Ashford.  His mother took the stand, Eloise White, and

7    said, you know, that has the walk, looks similar to my

8    son.  She knew he was arrested that night.  We don't

9    have a problem with that.  Yep, that was him that was

10   arrested.

11             The issue is at the door, who was there.

12   There are breaks in the evidence.  We have Deputy

13   Brenneman watching it from inside.  There were lapses in

14   what he saw.  But, even he while watching it can say I

15   don't know if it is Mr. Ashford or not.  He just saw

16   somebody with a black hoodie and a pair of jeans walking

17   around the courthouse and near the door.

18             We also have Corporal Brady.  He saw Mr.

19   Ashford.  Why?  Because he arrested him.  He said get

20   down.  Mr. Ashford is right there.  He shows up as he

21   saw my client walking away from the back of the

22   courthouse.

23             You have to keep in mind as well the

24   screwdriver.  This is not like one of those cases from

25   CSI where we have these analyses on the screwdriver.  We

1    just have a screwdriver, kind of clear with red on it,

2    flat-head screwdriver.  Not found in my client's

3    possession.  Found at the back door and actually

4    underneath the back door, because I guess someone came

5    out and pushed the door open causing the dragging.  And

6    it pushed it back open once the deputy came out and

7    pushed that back.  That's what we have.

8             The only thing found on my client, Mr.

9    Ashford, were a pair of glasses, a few identification

10   cards as was described in the property record.  He also

11   had a hat, pair of gloves.

12            The question that you might have is these

13   gloves.  The gloves that were used in the alleged

14   commission of this crime, where are they?  My client has

15   no control over that.  They are not here.  I don't know

16   where they went.  It is not our burden.  The burden is

17   on the Commonwealth.  You might have to consider why

18   aren't those gloves here.  Again, the judge will give

19   you an instruction on that.  At that point, what could

20   they prove or disapprove in this case?

21            Also, the hat.  Did you hear any evidence

22   about the hat being tested for DNA?  Nothing really to

23   say that was my client.  You might say, yeah, well, I

24   saw the video of him getting arrested.  Right from

25   square one, you can tell the issue has been that was not

1   me.  What tells the story on whether or not it is you,

2   DNA.  We have heard nothing on that.

3              Next issue is criminal trespass.  You

4   have to decide whether that person at the back of the

5   courthouse on that early March 17 morning, whether or

6   not that was Mr. Ashford and did he attempt, did he take

7   a substantial step to break into, to gain access to the

8   courthouse.  And also, did he have a right to be there

9   at that time.  That's for you to decide as a jury.

10             I submit from the pictures that most

11   likely will be going out with you when you deliberate --

12   you saw four pictures of the door, if I may.

13             ATTORNEY KOBESKI:   Yes.

14             ATTORNEY GROSS:   Thank you, sir.

15             These pictures right here, they will be

16   going with you as you deliberate.  But, we see -- you

17   see scratches up and down on this door.  You are also

18   going to see that the major scratch, dent or impression

19   is located right in the middle of the handles on the

20   door.  If you are looking at the video, where was that

21   person jimmying that screwdriver?  At the bottom of the

22   door and also on top of the handles up top.  That's

23   where that motion was from what was shown on the film.

24   And if a person was sticking a screwdriver in two

25   heavy-duty doors, is that really enough to take that

1   step to breaking into a secure facility?  I submit that

2   it was not.

3              We also have possession of an instrument

4   of a crime.  The Commonwealth is alleging that my

5   client, Mr. Kenneth Ashford, possessed an instrument of

6   a crime, namely, the screwdriver.  And the judge will

7   give you the law on that point.  And you might think it

8   rather ridiculous that a screwdriver could be part of a

9   crime, but he will explain to you the letter of the law,

10  that this item right here, that screwdriver, that it was

11  utilized in this case to facilitate the commission of a

12  crime.  And just the mere fact that somebody may or may

13  not have it and use it in a manner that would make the

14  crime possible to happen as opposed to, it might help,

15  but that it was necessary for a person to break into the

16  courthouse, I submit that it was not.  It's a

17  screwdriver, a screwdriver that has no prints on it and

18  a screwdriver that was not found in my client's

19  possession.  That being said, I would ask that you find

20  him not guilty of that charge.

21             And then finally, we have institutional

22  vandalism.  Again, is this an institution.  I will make

23  it easy for you, yes, it is.  This is an institution.

24  It is a courthouse.  But, did my client, Mr. Kenneth

25  Ashford, knowingly damage the courthouse in his access

1     that night?  There are a lot of marks on that door.   A
2     lot of things go in and out of that door.  Who knows
3     what caused those damages.  And you see somebody on the
4     video and they are fiddling with an item at the door,
5     but there is no direct proof that he caused that damage
6     and what amount.  You heard testimony that they used the
7     loading dock for larger items.  But, also, especially on
8     that morning, Corporal Brady said that maintenance lets
9     in individuals for the vending machines, sodas and
10    candies when they are coming in.  You have to determine
11    from your own experience what people use to bring in
12    items of the vending type, namely, sodas and candy,
13    chocolates, larger cases.  Things go in and out of
14    there, equipment.  Anything could happen to those doors.
15    To say beyond a reasonable doubt it was Mr. Ashford,
16    that clearly is not present.  We would ask that you find
17    him not guilty on that point.  The Commonwealth has not
18    proven their case beyond a reasonable doubt.

19              You hear that over and over, beyond a
20    reasonable doubt.  And Judge Kelley will explain to you
21    it is not beyond all doubt, it is not to a mathematical
22    or scientific principle as far as doubt.  It is strictly
23    if a reasonable person in a matter of importance in
24    their life which causes them hesitation, causes them to
25    take a moment before they act, that's reasonable doubt.

1    And a great example is buying a house.  You don't have

2    to jump into it.  You think about it, speak to your

3    spouse if you have one, weigh the options.  And before

4    you sign on the dotted line for your mortgage and your

5    note, you are going to make some decisions, do I have

6    enough bathrooms, enough bedrooms, acreage, give or

7    take.  You weigh it over.  And if you choose not to act

8    or buy that house based on everything in front of you,

9    that's reasonable doubt.

10           And in this case, there are a few items

11   that I suspect create that doubt.  First and foremost,

12   looking at the DVD, especially the fixed DVD, we have a

13   person in a black hooded sweatshirt and a pair of jeans.

14   Okay.  Wonderful.  Person on there has gloves on.  You

15   also see their face from time to time throughout.  The

16   face is a light-colored individual.  And you can also

17   see the lighting conditions out there as well, which I

18   think is more impressive from our standpoint from the

19   other DVD, on the one that's controlled from the toggle

20   switch.  Mr. Ashford, well, you see him.  What color is

21   he?  Is that the same color of the individual who was

22   depicted on that DVD?  I suspect it is not.  Even if you

23   are looking at a video from this distance, can you prove

24   beyond a reasonable doubt that that person in that video

25   is him?  I suspect that it is not.

1          Also, what happened during that period of

2    time where Officer Brenneman got up and let Corporal

3    Brady out?  There is no other camera showing who else

4    may have been around that area.  We heard evidence that

5    people do walk through there at all hours.  This is the

6    time where bars would let out.  We don't know who else

7    is around.  Could somebody else be wearing a black

8    sweatshirt and pair of jeans?  That's for you to decide.

9    That's not mine.  That's yours.

10         However, we have evidence presented that

11   the person who was walking away toward the police car

12   and arrested was Mr. Kenneth Ashford.  At that point,

13   what was he doing illegal?  I am going to say nothing.

14   You also heard that it took a few times for him to

15   comply to get down to the ground.  Again, roll the

16   video.  What could you see?  He was told to get down.

17   He got down.  He was arrested, bottom line.

18         Throughout everything here, you have to

19   realize, and I would ask that you call upon your own

20   experiences, what one person sees isn't what another

21   person sees.  It doesn't mean they are lying.  It just

22   means their perspective is different than someone

23   else's.

24         In this case, we have Mr. Ashford.  He

25   was out around the back of the courthouse.  There is no

1    evidence tying him to a screwdriver.  The deputies

2    cannot say for sure that was him, especially Mr.

3    Brenneman who was watching him the entire time.

4                We have missing evidence, namely, the

5    gloves.

6                We also have damage to the door that's

7    depicted in these pictures that's not in the area that

8    you see on the film of where that damage should have

9    been.  Is there another person that did this?  I don't

10   know.  Was it the man that slapped into it with crates

11   of soda?  I don't know either.  But, right there would

12   be reasonable doubt as pertains to Mr. Ashford.

13               So, I would ask that when you take all of

14   this information together, respect one another's

15   opinions.  Respect your own perspective of what you have

16   seen.  And I am sure not all 12 of you are looking at

17   the exact same -- in the exact same way at that video.

18   Have respect for one another.

19               And I would ask throughout all of this,

20   why in the world would somebody try to break into the

21   courthouse?  And also, think to yourself, has the

22   Commonwealth proved beyond a reasonable doubt that the

23   facility, the place is not open to the public.  We heard

24   nothing about the front door of the courthouse being

25   closed.  Do the courthouse people come in at 3:00 in the

1   morning?  That's for you to decide.

2           But, I would ask that when you weigh all

3   the evidence together that you would come back and find

4   my client not guilty of criminally attempting to break

5   in to commit a burglary inside the courthouse, that he

6   attempted to commit criminal trespass of the courthouse,

7   that he possessed an instrument of a crime because it is

8   a screwdriver.  If someone wants to break in, they break

9   in with many other things.  You can see, is that an

10  instrument of crime?  Also, find him not guilty of

11  institutional vandalism for causing maybe possibly a

12  mark on the door, which, according to the evidence, is

13  not real specific on where it is.  So, I'd ask that you

14  go back, respect one another, and come back with a

15  verdict of not guilty for my client.

16          Thank you.

17          ATTORNEY KOBESKI:   May it please the

18  Court, Attorney Gross.  When each of you walked into the

19  courthouse yesterday and today, no one told you to leave

20  your common sense at the doors.  In fact, it is urged

21  that jurors do use their common sense when they are

22  deliberating the case, which you guys will be doing very

23  shortly.

24          With that being said, it is your job to

25  determine, first, who was the person in the video that

228                    228

1   you watched; and second, what was the person in the

2   video doing.

3          First things first, there should be zero

4   doubt in your mind that the person that you saw in the

5   video was, in fact, that man, the Defendant.  Deputy

6   Brenneman testified yesterday that he did not lose sight

7   of the suspect, whoever that may be, at any point in

8   time.  He said he moved for two seconds to let Corporal

9   Brady out, but he still didn't lose sight of that person

10  in the video, not once.  And he watched this suspect

11  until he was taken into custody by Corporal Brady.  The

12  person that Corporal Brady took into custody, there is

13  no question about that, it was the Defendant, Mr.

14  Ashford.

15         There is no wiggle room here, members of

16  the jury.  There is no argument.  There was no one even

17  in the same vicinity as the Defendant in the early

18  morning hours of March 17th.  Maybe if there was someone

19  else that was in the video or they saw someone else back

20  there when they were arresting the Defendant, then maybe

21  there is an argument.  But, there was no one else there.

22  No wiggle room.  The person on that video was Kenneth

23  Ashford.

24         Now, what was the Defendant doing back

25  there?  That's the next question.  You are permitted to

1    infer what the Defendant was thinking, what the

2    Defendant was intending to do through what is called

3    circumstantial evidence.  Now, no matter what each of

4    you have seen on TV shows or what you have heard on TV

5    shows, circumstantial evidence does not necessarily mean

6    that it is bad evidence.  In fact, most criminals do not

7    walk around telling everyone what they are thinking and

8    what they are intending to do.  However, that would make

9    my job easier.  It just didn't happen.  Criminals just

10   don't do that.

11               Circumstantial evidence is used all the

12   time to prove the intent of a particular defendant.  And

13   in this case, I submit to you that the circumstantial

14   evidence in this case proves what the Defendant's intent

15   was in the early morning hours of March 17, last year.

16               Let's look at what we know didn't happen

17   in this case.  Again, the Defendant did not go to the

18   back doors of the courthouse and Corporal Brady didn't

19   start talking out loud.  Oh, I am damaging this door

20   with this screwdriver.  I am possessing this screwdriver

21   and I am using it in this criminal endeavor I am on.

22   Why am I prying on the door?  I am trying to get inside

23   even though I have no permission to get in here.  When I

24   get inside, I will steal and leave.  You can infer all

25   of those things from the circumstantial evidence that's

1     present in this case.

2                The Defendant, first of all, went to the

3     back doors of the courthouse and he didn't go to the

4     front doors.  He didn't try to get buzzed in.  What does

5     that tell you?  He was trying to open the door with a

6     screwdriver.  Do people who think they have permission

7     to be in a place go to the back door and try to open it

8     with a screwdriver?  No.  You heard testimony that the

9     courthouse was not open to the public.  It is Monday

10    through Friday, I believe 8:00 to 4:30.  And by that

11    point, it was not open to the public.  Using a

12    screwdriver to get inside.  He knew he didn't have

13    permission to be there.

14                Why would he come at 3:00 in the morning?

15    Think about it, ladies and gentlemen.  It is dark

16    outside.  He knew no one could see him.  He knew there

17    would be no other people around.  No, there was no other

18    people from the bars.  It was a Sunday night going into

19    Monday morning.  Bars are not open on Sunday night.

20    That's common sense.

21                The Defendant, as you saw in the video,

22    tried to cover up his face the best he could.  Couldn't

23    really see much, except his eyes, a little bit of his

24    chin, maybe his cheeks.  Why would he do that?  So no

25    one could identify who he was.  He was trying to cover

1    it, conceal himself, because he knew what he was doing

2    was a crime.

3              You heard Deputy Brenneman testify that

4    the Defendant was looking through the windows of the

5    Sheriff's Office. Whether or not the Defendant knew it

6    was the Sheriff's Office at the time, who knows. What

7    would he see? The lights were turned on. The blinds

8    were open. Dark outside. You could see clearly into

9    the building. Cubicles. Lots and lots of electronic

10   equipment, computers, personal items in each cubicle, I

11   should say. The Defendant saw what he wanted to take.

12             You also heard testimony that at the back

13   doors, you could look in. There is a safe. It is not

14   some huge gigantic safe as Attorney Gross indicated.

15   You heard the testimony. It is a small safe. Maybe it

16   is heavy, maybe it is not. What's usually in the safe?

17   Valuables. You see a safe, you want it. As soon as he

18   saw it, he tried to pry the door open.

19             Ladies and gentlemen, you may be asking

20   yourself how can we know for sure, how can we know for

21   certain what the Defendant was intending to do when he

22   was trying to pry the door open. He didn't say it out

23   loud. We don't know by direct evidence. We have to

24   infer his intent was that he was trying to pry open the

25   door and trying to get inside. A person doesn't try to

1    pry open the door unless they want to get inside.   There

2    shouldn't be any issue as to that.   The only issue was

3    what he was going to do once he got inside.

4                 Members of the jury, remember the video.

5    Remember what the Defendant did immediately prior to

6    prying open the door.   What was that?   Looking in the

7    windows.   Looking around making sure no one could see

8    him.   He saw, as I said, computers, electronic

9    equipment, personal effects.   It is not rocket science.

10   The Defendant saw what he wanted and he tried to take

11   it.   Fortunately for us, he got caught in the process.

12   It may not seem like a smart thing to do.   Why would

13   someone want to break into the courthouse?   Members of

14   the jury, the criminal doesn't have to pass an IQ test.

15   It may not seem like the smartest thing to do.

16                 Now, this is a multi-million dollar

17   building that you guys are seated in, I am standing in.

18   This is a gold mine.   There is an endless amount of

19   possibility for someone to steal.   Tons of items to

20   take.   It is a gold mine.   Again, maybe not the smartest

21   thing to do, but I submit that man didn't have to pass

22   an IQ test to be a criminal.

23                 Ladies and gentlemen, bear with me for a

24   moment.   Let's assume all the facts in this case are the

25   same except for the building.   So, the Defendant was

                              233                           233

1    caught and substitute the courthouse with a home.  Okay.

2    Doesn't have to be your home or my home, just a

3    hypothetical home.  All the same facts.  That 3:00 in

4    the morning, the Defendant dressed all in black at the

5    back door of a home with a screwdriver trying to get in

6    and he is caught before he can get inside.  I think it

7    is safe to say we can all agree that the Defendant was

8    attempting to burglarize that home.  Just because this

9    is a courthouse doesn't make it any different.

10           Now, in any attempt case, you have to

11    infer what the intent is, because by its very nature it

12    is an attempt to complete a crime.  Should the sheriff

13    have let the Defendant continue to open the door and run

14    in here and steal a computer, steal the safe, and not

15    arrest him until he was running outside?  No.  That

16    doesn't make any sense.  In Pennsylvania, there is a

17    crime of attempt.  And there is a reason for that.  If a

18    crime could be prevented, not only is society better

19    off, but it is still a crime.  So, if someone is going

20    to see someone about to commit a crime, they are going

21    to try to stop it.  It is common sense.  That's their

22    job on a daily basis.  That's their job.  So, they are

23    supposed to stop it.

24           Did he make a substantial step?  He sure

25    did.  Not only was he there looking through windows, but

1    he took the next step.  He took this out, this flat-head

2    screwdriver, which would be perfect to put in the

3    crevices of the door.  He was trying to pry it open.

4    You saw him.  If that's not a substantial step, I don't

5    know what is, ladies and gentlemen.

6              This really is a straightforward case.

7    On March 17 of 2008, the Defendant committed four

8    offenses.  I am going to ask you to find him guilty of

9    committing all those offenses.

10             Thank you.

11             THE COURT:  Okay.  Ladies and gentlemen,

12   the next portion of the trial is the portion where I

13   give you the instructions on the law to be applied

14   during the course of your deliberations.

15             First and foremost, I think it probably

16   would behoove you to select one of you to be the

17   foreperson.  He or she is the one who will announce the

18   verdict in open court.  Also, that person can act kind

19   of as a stimulator of conversation, take any votes that

20   are necessary, kind of get you involved in the analysis

21   of the evidence.

22             I have a verdict slip for you, which will

23   assist you by listing the offenses the Defendant has

24   been charged with.  It simply says guilty or not guilty

25   of each offense, and you will circle either guilty or

1    not guilty.  And they are not depending upon each other.

2    They are not mutually exclusive.  You go through each

3    one and analyze and determine whether or not the

4    Commonwealth has sustained their burden.  Then at the

5    very bottom, you will each sign your signature.  Okay.

6              Now, let me give you the offenses the

7    Defendant has been charged with.  And they are criminal

8    attempt to commit the offense of burglary, criminal

9    attempt to commit the offense of criminal trespass,

10   possession of an instrument of crime, and institutional

11   vandalism.

12             The accused in this case is charged with

13   the offense of criminal attempt -- or the crime of

14   criminal attempt to commit burglary.  A person may be

15   guilty of the crime even if the ultimate goal of the

16   crime is not actually achieved if his or her conduct

17   meets the test of being an attempt to commit a crime.

18   The crime in this case the Defendant is accused of

19   attempting to commit is the crime of burglary.  To be

20   guilty of completing that crime, the following elements

21   must be proven:  First, that the Defendant entered into

22   a location; second, that the Defendant entered into the

23   location with the intent to commit a crime; third, that

24   the location was not open to the public at the time; and

25   fourth, that the Defendant did not have permission or

1     lawful authority to enter.

2               Okay.  So, for this case, for the offense

3     to be actually committed, a person has to have done

4     those things.  Okay.  Again, I will go through them.

5     First, that the Defendant entered into a location;

6     second, that the Defendant entered the location with the

7     intent to commit a crime inside; third, that the

8     location was not open to the public at the time; and

9     fourth, that the Defendant did not have permission or

10    lawful authority to enter.  And the final thing is that

11    the location is a building or structure that is not

12    adapted for overnight accommodations, but in which a

13    person was present at the time of entry by the

14    Defendant.  Okay.  Okay.  So, it has to be a building or

15    structure that had a person present at the time.

16              Now, that is the consummated crime of

17    burglary.  But, in order for a defendant to be found

18    guilty of attempt, you must find the following things

19    for the conduct to be sufficient to constitute -- I am

20    having trouble.

21              In order for a conduct to be sufficient

22    to constitute an attempt to commit a crime, you need to

23    have the following factors to be present:  First, that

24    the Defendant did a certain act; second, that the

25    Defendant did the act with the intent to commit the

1    crime of burglary; and third, that the act constituted a

2    substantial step towards the commission of the crime of

3    burglary.  Okay.

4                    So, you know what burglary was.  I told

5    you what that is.  Now, to commit the offense of

6    attempted burglary, you need to prove that the Defendant

7    did a certain act; second, that the Defendant did the

8    act with the intent to commit the crime of burglary; and

9    third, that the act was a substantial step towards the

10   commission of the crime of burglary.  Okay.  It was a

11   substantial step toward the actual commission of the

12   crime.

13                   Let me address the issue of intent.  A

14   person cannot be guilty of attempt to commit a crime

15   unless he or she had a firm intent to commit the crime.

16   If he or she has definitely not made up their mind,

17   their purpose uncertain or wavering, he or she lacks the

18   type of intent that is a requirement for an attempt.

19                   Let me now discuss the issue of a

20   substantial step, because remember, there has to be a

21   substantial step toward the commission of a crime.  A

22   person cannot be guilty unless he or she does an act

23   that constitutes a substantial step towards the

24   commission of the crime.  An act is a substantial step

25   if it is a major step toward the commission of the

238                                          238

1   crime, and it also strongly corroborates the jurors'

2   belief that the person at the time he or she did the act

3   had a firm intent to commit that crime.  An act can be a

4   substantial step even though other steps would have to

5   be taken before the crime could actually be carried out.

6        If you are satisfied that the three

7   elements of attempt to commit burglary have been proven

8   beyond a reasonable doubt, you should find the Defendant

9   guilty.  Otherwise, you should find the Defendant not

10  guilty.

11       And again, attempt to commit burglary,

12  which is the Defendant was attempting to enter into a

13  location that at the time he was attempting to enter the

14  location he had the intent to commit a crime inside,

15  that at the time he was attempting to enter the location

16  the location was not open to the public; and fourth,

17  that the Defendant did not have permission or lawful

18  authority to enter the structure he was trying to get

19  into; and fifth, that it was a building or structure

20  that while not adapted for overnight accommodations,

21  there were persons present at the time.  So, that's the

22  first offense.

23       The next offense is criminal attempt to

24  commit criminal trespass.  The accused in this case is

25  charged with the crime of criminal attempt to commit

1   criminal trespass.  A person may be guilty of the crime

2   even if the ultimate goal of the crime is not achieved

3   if his or her conduct meets the test of being an attempt

4   to commit the crime.

5            The crime in this case, as I told you,

6   the Defendant is accused of attempting to commit is

7   criminal trespass.  To be guilty of the crime of

8   criminal trespass, the following elements must be proven

9   beyond a reasonable doubt.  This is the actual

10  consummated crime.  Again, I have got to give you the

11  definition of the crime so you can determine whether or

12  not there was an attempt.  First, that the Defendant

13  broke into or entered into a location.  This includes

14  gaining entry by deception or secretly remaining in

15  place.  Broke into includes entrance by force, breaking,

16  intimidation, unauthorized opening of locks or picking

17  of locks or forcing of locks, or through any -- or

18  entering in through any opening not designed for human

19  access.  I think that's in case you have like a dog door

20  or something.  It is not something that was made for

21  human access.  Second, that the Defendant knew that he

22  did not have permission or lawful authority to enter

23  into the location or to break into the location.  Third,

24  that the location was a building or occupied structured

25  or separately secured or occupied portion thereof.

1    An occupied structure is any structure,

2    vehicle or place adapted for overnight accommodation of

3    persons or for carrying on business inside whether or

4    not it was actually occupied at the time.

5    The Defendant could not be guilty of

6    criminal trespass if you find that the location was open

7    to the public at that time or that the location was

8    abandoned or that the Defendant reasonably believed that

9    the owner of the location would have permitted him to

10   enter.

11   So, that's the consummated crime of

12   criminal trespass.

13   And the Defendant -- just to kind of

14   point it out to you, because I think this is the easiest

15   way to point out the difference, the difference between

16   burglary and criminal trespass is, in burglary, the

17   Commonwealth has to prove that someone had an intent to

18   commit a crime.  With criminal trespass, you don't have

19   to prove that.  You just have to prove that someone

20   broke into a structure.

21   Okay.  And again, for the crime of

22   criminal attempt to commit criminal trespass to be

23   consummated, you must find that the Defendant did a

24   certain act and that the Defendant did the act with the

25   intent to commit the crime of criminal trespass.  And

1    third, that the act constituted a substantial step

2    towards the commission of the crime of criminal

3    trespass.

4           Again, let me address the issue of

5    intent.  A person cannot be guilty of an attempt to

6    commit a crime unless he or she had a firm intent to

7    commit that crime.  If he or she has definitely not made

8    up their mind, their purpose uncertain or wavering, he

9    or she lacks the type of intent that is a requirement

10   for an attempt.  That's the problem.  I am saying intent

11   and attempt at the same time.

12          Let me now discuss the issue of

13   substantial step.  A person cannot be guilty of an

14   attempt to commit a crime unless he or she does an act

15   that constitutes a substantial step towards the

16   commission of the crime.  An act is a substantial step

17   if it is a major step towards the commission of the

18   crime and also strongly corroborates the jurors' belief

19   that the person at the time he or she did the act had a

20   firm intent to commit that crime.  An act can be a

21   substantial step even though other steps would have to

22   be taken before the crime could be carried out.

23          If you are satisfied that the three

24   elements of the attempt have been proven beyond a

25   reasonable doubt, then you should find the Defendant

1    guilty.  Otherwise, you must find the Defendant not

2    guilty.

3             Okay.  Those are the two initial

4    offenses.  And now I want to move on to the next two

5    offenses.  And hopefully, they are a little bit easier

6    to comprehend than those last two.

7             The next two offenses the Defendant has

8    been charged with is possessing a criminal instrument

9    and institutional vandalism.

10            With regards to the possessing a criminal

11   instrument, in order to find the Defendant guilty of

12   possessing a criminal instrument as charged, you must be

13   satisfied that the following three elements have been

14   proven beyond a reasonable doubt:  First, that the

15   Defendant possessed a certain item.  It is specifically

16   alleged here to be a screwdriver.  Second, that the item

17   was an instrument of crime.  An instrument of crime is

18   in this case specially made for criminal use or in this

19   case specially adapted for criminal use or anything that

20   is used for criminal purposes and possessed by the

21   Defendant at the time of the alleged offense under

22   circumstances not manifestly appropriate for lawful uses

23   to have.  That a thing could somehow facilitate the

24   possible commission of a crime is not enough; to be an

25   instrument of crime, the thing must be something that

243                                            243

1     the Defendant would need to use or use in the commission

2     of the underlying offense.   Third, that the Defendant

3     possessed the instrument with the intent to employ it

4     criminally, that is, with the intent to attempt or to

5     commit a crime with it.

6                    The Commonwealth has charged here that

7     the crime the Defendant intended to commit with the

8     instrument alleged, that is the screwdriver, was the

9     offense of burglary or criminal trespass.   Okay.   And

10    just to kind of boil it down for you, because I know

11    sometimes these instructions can be extremely verbose,

12    which is why I have sometimes difficulty tripping over

13    them, it is any instrument that is adapted for use in

14    the commission of a crime whether it is specially

15    adapted for use in the commission of a crime or it is

16    just adapted by the way and manner that it is used.

17    Okay.   But, it has to be possessed for the purpose of

18    using it during the crime.

19                    Let me give you an example.   If I have a

20    license to carry a firearm, me possessing the firearm is

21    perfectly legal.   Okay.   Nothing illegal about it.

22    Therefore, I can't be convicted of the crime of

23    possession of an instrument of crime.   On the other

24    hand, let's say I am walking into the bank with a note

25    in my hand that says give me all your money, this is a

                            244                            244

1  stickup, and I have got a gun in my belt and I also have

2  a license to carry the gun, okay, under those

3  circumstances, that gun, even though it could have been

4  lawfully possessed by me in any other set of

5  circumstances, in this set of circumstances, you might

6  find that I possessed it for the purpose of using it in

7  the armed robbery. This is a stickup. Okay. So, even

8  though you have an item that otherwise could be lawful,

9  if you are using it in such a way to facilitate the

10  crime and your intent was to use it in the facilitation

11  and commission of a crime, then you can be guilty of the

12  offense of possessing criminal instruments. Okay.

13      The last offense the Defendant has been

14  charged with is the offense of institutional vandalism.

15  The Defendant has been charged with institutional

16  vandalism. To find the Defendant guilty of this

17  offense, you must find that the following elements have

18  been proven beyond a reasonable doubt: First, that the

19  Defendant vandalized or defaced or damaged a certain

20  piece of property which was either a church, a

21  synagogue, or a facility or place used for religious

22  worship or other religious purposes, or a cemetery or a

23  mortuary, a facility used for the purpose of burying or

24  memorializing the dead, a school, an educational

25  facility, a community center, a municipal building, or a

1    courthouse facility, or a state or legal government

2    building, or a juvenile detention center, et cetera, et

3    cetera.  Okay.  The key here is, ladies and gentlemen,

4    the courthouse is an institution under this statute

5    because it is specifically listed as such.

6              The issue for you to determine is that

7    the Defendant actually defaced or damaged the property.

8    Okay.  To desecrate means to deface, damage, pollute, or

9    otherwise physically mistreat a place or thing in a way

10   that the alleged desecrator knows will outrage the

11   sensibilities of persons who are likely to observe or

12   discover his or her actions.  To outrage the

13   sensibilities of other persons does not simply mean to

14   cause discomfort to viewers who -- I'm sorry.  I gave

15   you the wrong -- that was an additional instruction for

16   another offense.  My apologies.  That's for desecration

17   of an institution.

18             Let me go back and read this for you

19   again.  My apologies, everyone.

20             For the offense of institutional

21   vandalism, you must find the Defendant vandalized,

22   defaced or damaged certain property, okay, and that the

23   property was, among other things, a courthouse facility.

24   Okay.  And that's it.  There is another offense where

25   you actually desecrate certain places, but that's not

1   obviously alleged here. So, my apologies. And you must

2   find that the Commonwealth has proven that offense

3   beyond a reasonable doubt.

4                  Those are the offenses that you are to

5   consider. And again, they are listed here in the

6   verdict slip, the four offenses, and it says guilty or

7   not guilty of those various offenses.

8                  Now, let me give you instructions on the

9   way and manner in which you are to conduct your

10  deliberations.

11                 A fundamental principle of our system of

12  criminal law is that the Defendant is presumed to be

13  innocent. The mere fact that he was arrested and is

14  accused of a crime is not any evidence of the

15  Defendant's guilt.

16                 Furthermore, the Defendant is presumed

17  innocent throughout the trial and unless and until you

18  conclude, based upon careful and impartial consideration

19  of the evidence, that the Commonwealth has proven the

20  Defendant guilty beyond a reasonable doubt. It is not

21  the Defendant's burden to prove that he is not guilty.

22  Instead, it is the Commonwealth that always has the

23  burden of proving each and every element of the crime

24  charged and that the Defendant is guilty of that crime

25  beyond a reasonable doubt. A person accused of a crime

1    is not required to present any evidence or prove

2    anything in his or her own defense.  If the Commonwealth

3    fails to meet that burden, then your verdict must be not

4    guilty.  On the other hand, if the Commonwealth's

5    evidence does meet its burden, then your verdict should

6    be guilty.

7              Although the Commonwealth has the burden

8    of proving the Defendant guilty, this does not mean the

9    Commonwealth must prove its case beyond all doubt or to

10   a mathematical certainty, nor must it demonstrate the

11   complete impossibility of innocence.

12             A reasonable doubt is a doubt that would

13   cause a reasonably careful and sensible person to pause

14   and hesitate or refrain from acting upon a matter of

15   highest importance in his or her own affairs.  A

16   reasonable doubt must fairly arise out of the evidence

17   that was presented or out of the lack of evidence that

18   was presented with regard to some element of each of the

19   crimes charged.  A reasonable doubt must be a real

20   doubt.  It may not be an imagined doubt, nor may it be a

21   doubt manufactured to avoid carrying out an unpleasant

22   duty.

23             To summarize, you may not find the

24   Defendant guilty based upon a mere suspicion of guilt.

25   The Commonwealth has the burden of proving the Defendant

1    guilty beyond a reasonable doubt.  If it meets that

2    burden, then the Defendant is no longer presumed

3    innocent and you should find him guilty.  And, if the

4    Commonwealth does not meet its burden, then you must

5    find the Defendant not guilty.

6            The evidence in this case is of two

7    different types.  On the one hand, there is direct

8    evidence, which is testimony by a witness from his or

9    her own personal knowledge, such as something he or she

10   saw or heard.  An example of this would be if I were to

11   walk outside right now and as I was walking outside and

12   looked up in the sky and saw it was raining and I put my

13   hand out and felt that it was raining, I would come in

14   and take the witness stand, take the oath and say,

15   ladies and gentlemen, I walked outside and it is

16   raining.  That's direct evidence.  That's based upon my

17   observations.  Direct evidence are direct observations

18   that I am testifying to.

19           On the other hand, if I were to talk

20   about circumstantial evidence, circumstantial evidence

21   would be if I walked out the same door, walked out and

22   saw puddles on the corner, saw a lady across the street

23   that was wiping away the last remnants of rain or what

24   appeared to be rain off the top of her umbrella and I

25   saw a couple of cars going by and they were doing the

1   last rotations with their windshield wipers, but I

2   looked up in the sky and it was not raining, I could

3   come in here and I can take the witness stand and take

4   the oath and say, ladies and gentlemen, I think it was

5   raining.  I think it just rained.  I don't have any

6   direct evidence.  I can't tell you I saw it raining, but

7   what I can tell you is these observations that I had.

8   Those observations are circumstantial evidence of my

9   testimony that it is had just stopped raining.  Each

10  little nugget is a little piece of circumstantial

11  evidence that I am using to support my ultimate

12  proposition that I walked outside and it had just

13  rained.

14          Okay.  And now, the key for

15  circumstantial evidence is, and you heard it when I gave

16  you the instructions, in most of these instances we need

17  to show what a defendant's intent was, what they were

18  thinking, what their thought process was.  It is what in

19  the law we call the mens re.  That's the mind of the

20  individual who is doing the things.  For instance, just

21  to give you one example, and I don't want to draw

22  attention to this offense, but remember with regard to

23  burglary, the Commonwealth must prove that the Defendant

24  was doing the act to get into the courthouse to commit a

25  crime inside.  Okay.

1   Now, we can't tell what a person's intent
2   is because people don't walk around with cartoon bubbles
3   over their head saying I am thinking this or I am
4   thinking that.  The way we look at what a person's
5   intent is we are looking at their actions.  Generally
6   speaking, in the absence of someone saying this is what
7   I am going to do, the way we look at what their intent
8   is we are looking at their actions.  And some of the way
9   we can do that is by looking at the circumstantial
10   evidence.  Their actions are circumstantial evidence of
11   what their intent was.  Okay.
12   The key for you, ladies and gentlemen, is
13   not whether or not circumstantial evidence is good or
14   bad.  The key for you with regard to circumstantial
15   evidence of a person's intent is whether or not the
16   quality and quantity of that evidence supports the
17   ultimate proposition.  With the example I gave you, it
18   is whether the quantity and quality of the observations
19   I made when I walked outside support the proposition
20   that it had just stopped raining.
21   As judges of the facts, you are the sole
22   judges of the credibility of the witnesses and their
23   testimony.  This means you must judge the truthfulness
24   and accuracy of each witness's testimony and decide
25   whether to believe all, part or none of their testimony.

1    The following are some of the factors
2    that you may and should consider when judging
3    credibility and deciding whether or not to believe
4    testimony.

5    Was the witness able to see, hear, or
6    know the things about which he or she testified?

7    How well could the witness remember or
8    describe the things about which he or she testified?

9    Was the ability of the witness to see,
10   hear, know, remember, or describe those things affected
11   by youth, old age, or by any physical, mental, or
12   intellectual deficiency?

13   Did the witness testify in a convincing
14   manner?  How did he or she look, act, and speak while
15   testifying?  Was his or her testimony uncertain,
16   confused, self-contradictory, or evasive?

17   Did the witness have any interest in the
18   outcome of the case, any bias, prejudice, or other
19   motive that might affect his or her testimony?

20   How well does the testimony of a witness
21   square with the other evidence in the case, including
22   the testimony of other witnesses?  Was it contradicted
23   or supported by the other testimony and evidence?  Does
24   it make sense?

25   If you believe some part of the testimony

252                                    252

1    of a witness to be inaccurate, consider whether the

2    inaccuracy casts doubt upon the rest of his or her

3    testimony.  This may depend on whether he or she has

4    been inaccurate in an important matter or in a minor

5    detail and on any possible explanation.  For example,

6    did the witness make an honest mistake or simply forget

7    or did he or she testify in a deliberate or false

8    fashion?

9            Now, you note I told you this previously,

10   the Defendant did not take the witness stand in this

11   case.  It is entirely up to the defendant in every

12   criminal trial whether or not to testify.  He has an

13   absolute right founded on the Constitution to remain

14   silent.  You must not, and I am telling you for the

15   third time, draw any inference of guilt or any other

16   inference adverse to the Defendant from the fact that he

17   did not testify in this case.

18           There is a question about what weight, if

19   any, you should give to the failure of the Commonwealth

20   to produce the gloves in this case as potential evidence

21   in the trial.

22           If three factors are present, and there

23   is no satisfactory explanation for the party's failure

24   to produce an item, the jury is allowed to draw a common

25   sense inference that the item would have been

253                          253

1    unfavorable to that party.  The three necessary factors

2    are, first, the item is available to that party, the

3    party who didn't produce it and no other; second, that

4    the item contains special information material to the

5    issue; and third, the item would not merely be

6    cumulative evidence.

7            Therefore, if you find these three

8    factors present, and there is no satisfactory

9    explanation for the Commonwealth's failing to produce

10   the gloves, you may infer, if you choose to do so, that

11   it would have been evidence unfavorable to the

12   Commonwealth.

13           If you decide that a witness deliberately

14   testified in a false fashion about a material point,

15   that is about a matter that could affect the outcome of

16   the trial, you may, for that reason alone, choose to

17   disbelieve the rest of his or her testimony, but are not

18   required to do so.  You should not only consider the

19   deliberate falsehood, but all other factors bearing on

20   the witness's credibility in deciding what to believe.

21           You should not decide the case on which

22   side had the greater number of witnesses or the greater

23   amount of evidence.  Instead, you should decide which

24   witnesses to believe and which evidence to accept on the

25   basis of whether or not the testimony or evidence is

1   believable.

2           In deciding which of the several

3   witnesses to believe, it is proper for you to consider

4   whether or not the testimony of each witness is

5   supported by other evidence in the case.  However, you

6   should recognize that it is entirely possible for a

7   single witness to give truthful and accurate testimony

8   and that his or her testimony may be believed even

9   though a greater number of witnesses of apparently equal

10  reliability contradicted him or her.  The question for

11  you to decide, based upon all the considerations I am

12  discussing with you, is not which side produced the most

13  evidence, but which evidence you believe.

14          Speeches of counsel are not part of the

15  evidence and you should not consider them as such.

16  However, in deciding the case, you should very carefully

17  consider the evidence in light of the various reasons

18  and arguments each lawyer presented.  It is the right

19  and duty of each lawyer to discuss the evidence and in a

20  manner that is most favorable to the side he or she

21  represents.  You should be guided by each lawyer's

22  argument to the extent they are supported by the

23  evidence and insofar as they aid you in applying your

24  own reason and common sense.  However, you are not

25  required to accept the arguments of either lawyer.  It

1   is for you and you alone to decide the case based upon

2   the evidence as it was presented from the witness stand

3   and in accordance with the instructions I am now giving

4   you.

5         Before you retire to decide this case,

6   I'd like to provide you with some final guidelines for

7   the way in which you conduct your deliberations and how

8   you may properly arrive at your verdict.

9         It is my responsibility to decide all

10   questions of law.  Therefore, you must accept and follow

11   my rulings and these instructions on matters of law.  I

12   am not, however, the judge of the facts.  It is not for

13   me to decide what the true facts concerning the charges

14   against the Defendant are.  You, the jurors, are the

15   sole judges of the facts.  It will be your

16   responsibility to consider the evidence, to find the

17   facts and, applying the law to the facts as you find

18   them, to decide whether the Defendant has been proven

19   guilty beyond a reasonable doubt.

20         Your decision in this case, as in every

21   case you hear, is a matter of considerable importance.

22   Remember that it is your responsibility as jurors to

23   perform your duties and to reach a verdict based upon

24   the evidence as it was presented during trial.  However,

25   in deciding the facts, you may properly apply your own

256

1   common sense and draw upon your own everyday knowledge

2   of life as each of you has experienced it.  You should

3   keep your deliberations free of any bias or prejudice.

4   Both the Commonwealth and the Defendant have a right to

5   expect you to consider the evidence conscientiously and

6   to apply the law as I have outlined it to you.

7   In arriving at your verdict, you should

8   not concern yourselves with any future consequences of

9   your verdict, including what the penalty might be if you

10  were to find the Defendant guilty.  As I told you

11  previously, the question of guilt and the question of

12  penalty are decided separately.

13  Upon retiring to deliberate, you should

14  select one of you to be the foreman.  He or she is the

15  one who will announce the verdict in the courtroom after

16  you have finished deliberating upon your verdict.

17  Your verdict must be unanimous.  That

18  means in order to return a verdict, each of you must

19  agree to it.  You have a duty to consult with each other

20  and to deliberate with a view towards reaching an

21  agreement if it can be done without doing any violence

22  to your own individual judgment.  Each of you must

23  decide the case for yourself, but only after there has

24  been impartial consideration with your fellow jurors.

25  In the course of your deliberations, each of you as

257                    257

 1   jurors should not hesitate to reassess your original

 2   views if convinced that your original opinion was

 3   erroneous.   However, no juror should surrender an honest

 4   conviction as to the weight and effect of the evidence

 5   merely because of the opinion of your fellow jurors or

 6   for the mere purpose of returning a verdict.

 7          Let me suggest to you in closing that I

 8   think you will best be able to deliberate if you treat

 9   the opinions and arguments of your fellow jurors in the

10   same fashion and manner that you want your own opinions

11   to be treated.

12          Counsel, any additions?

13          ATTORNEY KOBESKI:   No, Your Honor.

14          ATTORNEY GROSS:   No, Your Honor.

15          THE COURT:   Okay.   Let me give you the

16   verdict slip.

17          And the two alternates, I am going to

18   thank you very much for your service in this case.   We

19   are going to release you at this time.

20          And we will release the jury to begin

21   deliberating on your verdict.   We'll await your

22   decision, ladies and gentlemen.   Okay.

23                *    *    *

24          (Jury retired to deliberate at 2:30 p.m.)

25                *    *    *

1          THE COURT:   Anything to go out?

2          ATTORNEY KOBESKI:   I do, Judge.   I would

3     like for the -- well, I am sure the pictures.

4          ATTORNEY GROSS:   That's correct.

5          ATTORNEY KOBESKI:   I don't think the

6     screwdriver is necessary.   But, I would like -- I

7     believe they have the VHS.   And I would like to send the

8     videos back.

9          THE COURT:   The video?   Do we have a DVD

10    player back there?

11         ATTORNEY GROSS:   I think we do.

12         THE COURT:   Does that play, the DVD

13    player --

14         ATTORNEY KOBESKI:   It just plays on a

15    computer.

16         THE COURT:   So, the VHS player we do

17    have.   Okay.   Any objection?

18         ATTORNEY GROSS:   The only issue, I

19    guess, I think it is important to have the DVD as well.

20         THE COURT:   That's fine, but I don't have

21    a personal computer.

22         ATTORNEY GROSS:   I understand.

23    Therefore, I would oppose having the VHS go out.

24         THE COURT:   Okay.   I guess no one is

25    going to come up with the idea, okay, judge, I will get

1    a computer.

2                ATTORNEY KOBESKI:   I will.

3                THE COURT:  Okay.  There we go.  Geez,

4    this isn't rocket science, guys.  There was a time the

5    Court didn't provide any of the playing instrumentality.

6    Okay.

7                ATTORNEY KOBESKI:   Yes.

8                THE COURT:  So, the VHS can go back, as

9    can the DVD, as can the screwdriver, as can the

10   photographs.

11               ATTORNEY GROSS:   I don't believe they

12   asked for the screwdriver.

13               THE COURT:  Why not?  They are not going

14   to stab each other with it.

15               ATTORNEY GROSS:   I have no objection to

16   anything else, no other evidence.

17               THE COURT:  Okay.  They will all go out.

18   Photographs, the DVD, the VCR.  Tell the jurors that

19   they can expect a computer for the DVD.  And the

20   screwdriver.

21                              *   *   *

22               (Jury entered the courtroom at 3:55 p.m.)

23                              *   *   *

24               THE COURT:  You may take the jury

25   verdict.

                              260                    260

1  THE CLERK:   Ladies and gentlemen of the
2  jury, have you agreed upon a verdict?
3  THE JURY:  We have.
4  THE CLERK:   Who shall speak for you?
5  THE FOREPERSON:  I will.  My name is
6  Martha Tassia.
7  THE CLERK:  What say you in the issue
8  joined between the Commonwealth of Pennsylvania and
9  Kenneth Winston Ashford, the Defendant, do you find the
10  Defendant guilty or not guilty criminal attempt
11  burglary?
12  THE FOREPERSON:  Guilty.
13  THE CLERK:  Do you find the Defendant
14  guilty or not guilty of criminal attempt criminal
15  trespass, break into structure?
16  THE FOREPERSON:  Guilty.
17  THE CLERK:   Do you find the Defendant
18  guilty or not guilty of possession of instruments of
19  crime?
20  THE FOREPERSON:  Guilty.
21  THE CLERK:  Do you find the Defendant
22  guilty or not guilty of institutional vandalism?
23  THE FOREPERSON:  Guilty.
24  THE CLERK:   Ladies and gentlemen of the
25  jury, hear your verdict as the Court has recorded it,

1    you found the Defendant guilty of criminal attempt

2    burglary, guilty of criminal attempt criminal trespass,

3    break into structure, guilty of possession of

4    instruments of crime, guilty of institutional vandalism,

5    and so say you all?

6                    THE JURY:   Yes.

7                    THE COURT:   Counsel, anything?

8                    ATTORNEY GROSS:   No.   We do not wish to

9    poll the jury.

10                   THE COURT:   Thank you very much.

11                   We'll make the jury verdict slip a part

12   of the record.   I see the foreperson has endorsed her

13   signature on it, and everyone else has endorsed their

14   signature.

15                   Ladies and gentlemen, you may be seated.

16   I want to thank you very much for your service in this

17   case as jurors.   I am going to return you to the Central

18   Jury Room.   You are excused for the day.   You are to

19   return tomorrow to the Central Jury Room.

20                   If I don't see you for the remainder of

21   the week, I want to thank you very much for your service

22   during the course of the week and giving your time to

23   the County of York.   We couldn't do our jobs unless

24   there are individuals like yourselves to perform this

25   very important function.

1         Thank you very much, and drive safely.

2         (The jury left the courtroom at 3:57

3    p.m.)

4         THE COURT:  Mr. Ashford, come forward,

5    please.  Mr. Ashford, the Court also finds that the

6    Commonwealth has sustained its burden in proving you

7    guilty beyond a reasonable doubt of the offense of

8    criminal mischief, summary offense.

9         Okay.  It looks like I am not going to be

10   able to do sentencing in this case until July.  I'm

11   pretty backed up.

12        ATTORNEY GROSS:   Let me just explain.

13   You have to be sentenced within 60 days.  However,

14   because of the Court's schedule, do you oppose

15   sentencing occurring more than 60 days from today's

16   date?

17        THE DEFENDANT:  Not if I can be

18   transferred back to --

19        ATTORNEY GROSS:   I am not sure if that's

20   going to happen, because you have to have a pre-sentence

21   investigation performed upon you.

22        THE COURT:  It would be much longer than

23   60 days any way.  I am looking at -- actually, it would

24   be less than 60 days.  My apologies.  But, it won't be

25   until July.

1       ATTORNEY GROSS:   That's the way it is.

2       THE COURT:   The Court hereby schedules

3  sentencing for Monday, July 6, 2009, at 9:30 a.m.

4       The Court also orders a full pre-sentence

5  investigation, including a recommendation in this case.

6       ATTORNEY GROSS:   And, Your Honor, as

7  well, my client actually posted bail on the 17th of

8  March, 2008.  We are asking, and if you wish, I'll make

9  a follow-up with a written motion, but we'd like to make

10  an oral motion to revoke his bail nunc pro tunc at this

11  time.

12       THE COURT:   Do you have any objection to

13  his bail being revoked?

14       ATTORNEY KOBESKI:   None.

15       THE COURT:   The Defendant's bail is

16  hereby revoked.  He is remanded to await sentencing.

17       (The proceedings were concluded.)

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

       I hereby certify that the proceedings and evidence and Charge are contained fully and accurately in the notes taken by me on the trial of the above cause, and that this copy is a correct transcript of the same.

Judith A. Greenholt, RPR
Official Court Reporter

265                                                            265

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA



```
*CP-67-CR-0002467-2008*
```

| COMMONWEALTH | : | CP-67-CR-0002467-2008 |
|---|---|---|
| | : | |
| VS | : | |
| | : | |
| KENNETH W. ASHFORD | : | |

York, Pa., Tuesday, May 12, 2009

Before the Honorable Thomas H. Kelley, VI, Judge

APPEARANCES:

        JUSTIN F. KOBESKI, Esquire
        Assistant District Attorney
        For the Commonwealth

        RONALD J. GROSS, Esquire
        For the Defendant

RECEIVED/FILED
YORK COUNTY
JUDICIAL CENTER
2009 MAY 21  PM 3:18
DON O'SHELL
CLERK OF COURTS

                * * *

                V E R D I C T

        (The jury entered the courtroom at 3:55
p.m.)

        THE COURT:  You may take the jury
verdict.

        THE CLERK:   Ladies and gentlemen of the
jury, have you agreed upon a verdict?

1

266

THE JURY:  We have.

THE CLERK:   Who shall speak for you?

THE FOREPERSON:  I will.  My name is Martha Tassia.

THE CLERK:  What say you in the issue joined between the Commonwealth of Pennsylvania and Kenneth Winston Ashford, the Defendant, do you find the Defendant guilty or not guilty criminal attempt burglary?

THE FOREPERSON:  Guilty.

THE CLERK:  Do you find the Defendant guilty or not guilty of criminal attempt criminal trespass, break into structure?

THE FOREPERSON:  Guilty.

THE CLERK:   Do you find the Defendant guilty or not guilty of possession of instruments of crime?

THE FOREPERSON:  Guilty.

THE CLERK:  Do you find the Defendant guilty or not guilty of institutional vandalism?

THE FOREPERSON:  Guilty.

THE CLERK:  Ladies and gentlemen of the jury, hear your verdict as the Court has recorded it, you found the Defendant guilty of criminal attempt burglary, guilty of criminal attempt criminal trespass, break into structure, guilty of possession of

2

instruments of crime, guilty of institutional vandalism, and so say you all?

THE JURY:   Yes.

THE COURT:   Counsel, anything?

ATTORNEY GROSS:   No.  We do not wish to poll the jury.

THE COURT:   Thank you very much.

We'll make the jury verdict slip a part of the record.  I see the foreperson has endorsed her signature on it, and everyone else has endorsed their signature.

Ladies and gentlemen, you may be seated. I want to thank you very much for your service in this case as jurors.  I am going to return you to the Central Jury Room.  You are excused for the day.  You are to return tomorrow to the Central Jury Room.

If I don't see you for the remainder of the week, I want to thank you very much for your service during the course of the week and giving your time to the County of York.  We couldn't do our jobs unless there are individuals like yourselves to perform this very important function.

Thank you very much and drive safely.

(The jury left the courtroom at 3:57 p.m.)

THE COURT:   Mr. Ashford, come forward, please.  Mr. Ashford, the Court also finds that the Commonwealth has sustained its burden in proving you guilty beyond a reasonable doubt of the offense of criminal mischief, summary offense.

3

Okay.  It looks like I am not going to be able to do sentencing in this case until July.  I'm pretty backed up.

ATTORNEY GROSS:   Let me just explain. You have to be sentenced within 60 days.  However, because of the Court's schedule, do you oppose sentencing occurring more than 60 days from today's date?

THE DEFENDANT:  Not if I can be transferred back to --

ATTORNEY GROSS:   I am not sure if that's going to happen, because you have to have a pre-sentence investigation performed upon you.

THE COURT:  It would be much longer than 60 days any way.  I am looking at -- actually, it would be less than 60 days.  My apologies.  But, it won't be until July.

ATTORNEY GROSS:   That's the way it is.

THE COURT:  The Court hereby schedules sentencing for Monday, July 6, 2009, at 9:30 a.m.

The Court also orders a full pre-sentence investigation, including a recommendation in this case.

ATTORNEY GROSS:   And, Your Honor, as well, my client actually posted bail on the 17th of March, 2008.  We are asking, and if you wish, I'll make a follow-up with a written motion, but we'd like to make an oral motion to revoke his bail nunc pro tunc at this time.

THE COURT:  Do you have any objection to his bail being revoked?

4

269

ATTORNEY BORTNER:    None.


THE COURT:  The Defendant's bail is
hereby revoked.  He is remanded to await sentencing.

jag - 5/19/09

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA



COMMONWEALTH           :    CP-67-CR-0002467-2008

                          :

VS                    :

                          :

KENNETH W. ASHFORD    :

### PROOF OF SERVICE

On 5/19/09, I the undersigned served the Order dated 5/12/09 in this matter by personal service upon each of the following offices:

York County Clerk of Courts Office
    a) Original
    b) Copy for private defense counsel/pro se
       defendant to be served by Clerk

York County District Attorney's Office

Judge Thomas H. Kelley, VI

York County Adult Probation Department

                         Judith A. Greenholt, RPR
                         Official Court Reporter

1

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH                   :    CR-2467-2008

       VS.                        :    CRIMINAL  LAW

KENNETH W. ASHFORD            :

AND NOW, this_____day of_____,2009, upon the herein motion for arrest of judgment presented, it is hereby order that a hearing on the merits is scheduled for the_____day of _____,2009, before the honorable_____,to be held in court room #_____,at_____a.m./p.m.,in the York judicial center located at 45 n. George street, York, pennslvania,17401.

BY THE COURT

_____

J.

7

IN THE COURT OF COMMON PLEAS YORK COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

Commonwealth of Pennsylvania                    :              :

        vs.                              :              no.cp-67-cr-2467-2008

    Kenneth w. Ashford

## MOTION FOR ARREST OF JUDGMENT

AND NOW on this____day of _____,2009, comes the defendant Kenneth w. Ashford, who present the following facts:

1.the defendant was arrested on march 17, 2008, and charged with several charges related to an attempt to break into the York, pa. county courthouse.

2.on may 12, 2009, the defendant was convicted by an jury of criminal intent to commit burglary, criminal intent to commit criminal trespass, possession of instrument of crime, institutional vandalism, and criminal mischief.

3.the verdict was against the weight of the evidence, and the defendant could not have received a fair trial, since exculpatory evidence was missing. A simple instruction to the jury by the court that evidence is missing, which has occurred in this case is not a cure.

4.Exculpatory evidence missing is a **hat**, which the defendant is accused of wearing, that was located next to the loading dock doors, that the defendant is accused of trying to break into, and **gloves** that the individual who was attempting to break into the courthouse wearing.

5.sheriff CYPRIAN IGWE testified on may 12, 2009, at the defendant's trial to collecting the missing evidence, which places the **hat and gloves** in the possession of the commonwealth. IF the missing items would have been secured and preserved properly, **DNA** testing would have insued the defendant's innocence.

1

6.materiality inquiry in connection with a claimed brady violation is not just a matter of determining whether, after discounting the inculpatory evidence inlight of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions; rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. [per Flaherty, c.j.,with one justice concurring and three justice concurring in result.] com. v. simmons, 804 A.2d 625, 569 pa.405, sup. 2001.

7.evidence is"material" to guilt or punishment, and must be disclosed to defendant if favorable, when there is reasonable probability that, had evidence been disclosed to defense, result of proceeding would have been different; "reasonable probability" is probability sufficient to undermine confidence in the outcome. Com. v. jones, 637 A.2d 1001, 432 pa. super. 1994.

8.under brady v. Maryland, 373 U.S. 83 [1963]. A defendant is entitled to all exculpatory evidence, and the defendant asserts that with the missing favorable evidence, verdict would have been different. Failure of the commonwealth to disclose exculpatory material warrants dismissal of all charges, or new trial.

9.no pro se rule require a defendant to demonstrate prejudice to establish his entitlement to preclusion of evidence under the mandatory discovery rule. Comm.. v. Galloway, 771 A2d 65, super. 2001. Criminal law 627.8 [6].

## COUNSEL IS DEEMED INEFFECTIVE

1.counsel was not working in the best interest of this defendant. Counsel had a legal obligation to move for dismissal when counsel was informed that the defendant had not been brought to trial within **365 DAYS**, which is a violation of PA. R. CRIM. P. 600 [G]. commonwealth v. marcone, 487 pa. 572, 410 A.2d 759 [1980]. Pennsylvania code of professional responsibility cannon 6: D6-101 [1977]. And also for not arguing that there is a brady violation concerning missing evidence favorable to the defense. Brady v. Maryland, 373 U.S.83 [1963].

2.evidence that would tend to exculpate a defendant or reduce the penalty may not, as a constitutional matter. Be withheld, and a rule of court to the contrary must give way. [per pomeroy, j.,with two justice concurring and three justice concurring in the result.] com. V. martin, 348 A2d 391, 465 pa. 134, sup. 1975.

2

3.evidence is always relevant and material to defense, for purpose of discovery request, if it tends to show that specific crime of which defendant stands accused was committed by someone else. Com. V. novasak, 606 A.2d 447, 414 pa. super. 21, super. 1992.

4.the defendant made a request for the pre-trial discovery on july 2, 2008, and has not received the exculpatory hat and gloves involved in this case. Suppression of evidence favorable to the defendant has ensued prejudice, by not being able to present evidence that would have exonerated the defendant.

5.suppression by prosecution of evidence favorable to accused violates due process where evidence is material either to guilt or to punishment, irrespective of good faith of the prosecution. Comm.. v. freeman, 433 A.2d 499, 289 pa. super. 1981.

## FURTHER SUPPORTING EVIDENCE

1.counsel Ronald j. gross, esq.,is ineffective for not objecting to the altered vhs surveillance tape, and the altered dvd version. On January 26, 2009, counsel Ronald j. gross, esq.,the defendant, and the district attorney seth bortner, esq.,reviewed the vhs surveillance tape at the York county courthouse inside judge Thomas h. kelley's conference room, after viewing the vhs surveillance tape, attorney Ronald gross,esq.,expressed to the court that all his client was doing was walking and not committing any crime, SEE: transcript date January 26, 2009, judge Thomas h. kelley's court room., at the defendant's trial on may 11, 12, 2009, upon viewing the vhs surveillance tape which shows an individual attempting to break into the courthouse, this extra footage was not on the vhs tape on January 26, 2009, which is clearly tampering with evidence. 42 pa. c.s.a. 4911. Tampering with public records or information.

2.the defendant's mother mrs.eloise white, has a copy of the dvd version, and still pictures from the dvd version, the defendant has viewed the dvd version several times, which shows the defendant being arrested, and later on the dvd shows an individual of a caucasian descent attempting to break into the courthouse, but during trial on may 11,12, 2009, upon viewing the dvd version, which shows an individual attempting to break into the courthouse, and then shows the defendant being arrested, the arrest and the attempt of the individual trying to break into the courthouse have been switched to gain an conviction. The defendant was in custody befor the attempted break in occurred. This is clearly tampering with tangible evidence and altering evidence. Commonwealth v. barger, 249 PA Super 59, 375 A.2d. 756 (1977). Which has prejudiced the defendant severely.

3. The commonwealth never established a chain of custody with the hat, gloves, and VHS surveillance tape or with the DVD version. The defendant asserts that prejudice has ensued by the commonwealth's willfully suppressing or withholding favorable exculpatory evidence, and altering evidence to obtain an conviction.

3

4.The court error when it denied the defendant's mother to testify to the still pictures she took off of the DVD version, the defendant's mother could have testified to wear the pictures come from ,and the jury should have been allowed to view all evidence involved in this case, the courts denial to allow the still pictures taken from the DVD version was in fact prejudice to the defendant, whether or not the pictures were to blurry to establish identity, pictures clearly showed the complexion of the individual attempting to break into the courthouse was of a lighter skin tone then the defendant. Com. V. Jones, 637 A.2d. 1001, 432 PA. Super. 1994. Criminal Law 700 (2.1)

5.The defendant did not have a fair and impartial jury of his peers, all jurors was of a Caucasian descent, and the defendant is a black male, this was an extravagant prejudice to the defendant.

6.On January 26, 2009, counsel Ronald J. Gross, esq., the defendant, and district attorney Seth Bortner, esq., reviewed the VHS tape o the attempted break in of the courthouse, which clearly showed cpl. Shawn Brady assaulting the defendant, by striking the defendant on the head with his collapsible baton, while the defendant was laying on the ground and handcuffed. The defendant viewed the DVD version earlier of the attempted break in of the York county courthouse , which also showed the defendant being assaulted by cpl Shawn Brady, but upon viewing the VHS tape and the DVD version May 11, 12, 2009, at the defendants trial there had been alterations done to the VHS surveillance tape and the DVD version, since the assault on the defendant by cpl Shawn Brady had been removed from the VHS surveillance tape and the DVD version. This act is clearly altering and tampering with tangible evidence. The defendants mother has a copy of the DVD version, that was given to her by John P. Nebblett, esq., which clearly shows the defendant being assaulted. The defendant did not receive a fair trial by the court allowing the prosecution to introduce or show tainted evidence, which has extremely prejudiced the defendant. 42 PA. C.S.A. 4911 Tampering with public records or information. Commonwealth v. Barger, 249 PA Super. 59, 375 A.2d 756 (1977)

7. The VHS surveillance tape and DVD version was unsealed at trial on may 11, 2009, the VHS tape and DVD version was out of the defendants and Jury's view for an entered day unsealed. The chain of custody has been broken, which has prejudiced the defendant. bY ALLOWiNG THE CommoNWEALTH TO SWiTCH THE VHS And DVD SURVEiLLANCE, THE VHS And DVD SURVEiLLANCE WAS ViEWED oN MAY 12, 2009,

4

## RELIEF SOUGHT

The defendant Kenneth w. Ashford, respectfully request that the verdict be vacated, and or grant a new trial, and dismiss all charges for the reason stated in this motion for arrest of judgment, for the commonwealth's failure to disclose exculpatory material, which deprived the defendant of a fair trial. Com. v. Johnson, 815 A.2d 563, 572 pa. pa. 283, sup. 2002.,and for the defendants ineffective counsels refusal to argue rule 600 [G], and other issue that have prejudiced the defendant that are stated inside this motion for arrest of judgment,concerning alterations of the **VHS** surveillance tape and the **DVD** version.

I,Kenneth w. Ashford, duly swear that the above statements given are correct to the best of my knowledge, information, and belief.

DATE: *MAY 15, 2009*

*Kenneth w. Ashford*

KENNETH W. ASHFORD, PRO SE

3400 CONCORD ROAD
YORK, PA.  17402

5

277

## PROOF OF SERVICE

I, Kenneth w. Ashford, declare that I am mailing the foregoing motion for arrest of judgment to the following individuals by U.S. mail on this date:

CLERK OF COURT
45 NORTH GEORGE STREET
YORK, PA. 17401

YORK COUNTY DISTRICT ATTORNEY OFFICE
45 NORTH GEORGE STREET
YORK, PA. 17401

JUDGE THOMAS H. KELLEY
45 NORTH GEORGE STREET
YORK, PA. 17401

DATE: *MAY 15, 2009*

*Kenneth w. Ashford*

KENNETHW. ASHFORD, PRO SE
3400 CONCORD ROAD
YORK, PA. 17401

6

### IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
### CRIMINAL DIVISION

COMMONWEALTH OF        :
PENNSYLVANIA            :      CP-67-CR-2467-2008
                             :

        vs.              :
                             :
KENNETH W. ASHFORD,      :
    **Defendant**             :

#### ORDER

AND NOW, TO WIT, this _26th_ day of _May_ 2009, after a review of Defendant's Motion For Arrest of Judgment, the motion is returned to Defendant. Defendant is represented by Ronald Gross, Esquire.

Attorney Gross has not withdrawn as Defendant's counsel. Attorney Gross or an attorney retained by Defendant may file the motion after entering their appearance. Defendant may proceed pro se after filing the appropriate motion. If Defendant does not wish to proceed pro se and can not afford an attorney, Defendant is directed to apply for counsel through the Public Defender's Office.

The Court hereby directs the Clerk of Courts to provide copies of this Order to Defendant and Attorney Gross.

BY THE COURT,

_____
THOMAS H. KELLEY VI, Judge

RECEIVED/FILED
YORK COUNTY
JUDICIAL CENTER
2009 MAY 27   AM 11: 36

DON O'SHELL
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS OF YORK COUNTY PENNSYLVANIA
CRIMINAL DIVISION

DON O'SHELL
CLERK OF COURTS
2009 JUN 12 PM 1:52
RECEIVED/FILED
YORK COUNTY
JUDICIAL CENTER

commonwealth of Pennsylvania                    :

        vs.                                      :        NO. CP-67- CR-2467-2008

    kenneth w. Ashford, PRO SE            :

## SUPPLEMENTAL MOTION

AND NOW this 12 day of June ,2009, comes the defendant Kenneth w. Ashford, pro se, who presents the following facts:

1. the defendant was arrested on march 17, 2008, and charged with several charges related to an attempt to break into the york pa. county courthouse.

2. the defendant filed a motion for arrest of judgment on may 15, 2009, the judge returned a order, and the motion, because the defendant has a counsel of record, but allowed the defendant to file the motion for arrest of judgment once the defendant has filed the proper motion to withdraw counsel, or retain another counsel to file the motion. the defendant has filed a motion to withdraw counsel on june 1, 2009, which is still pending.

3. the defendant has resubmitted the motion for arrest of judgment on june 1, 2009, and now submits that the prosecution has done nothing other than make blanket assertions.

4. new trial is warrant on challenge to weight of evidence only if verdict is so contrary to evidence as to shock one's sense of justice. Com. V. fox, 619 A.2d 327, 422 Pa. super. 224, super. 1993, appeal denied 634 A.2d 222, 535 Pa. 659. Criminal law 936 [1]. the defendant asserts that the verdict was against the weight of the evidence.

5. none of the witnesses that testified at the defendant's trial on may 11, 12, 2009, to seeing the defendant at the doors of the courthouse with a screwdriver on march 17, 2008, attempting to break into the courthouse. verdict cannot rest on disbelief of some testimony by jury; there must be evidence that, if believed, is strong enough to support finding of guilt beyond reasonable doubt. Com. V. wiley, 432 A.2d 220, 288 Pa. super 397. Super. 1981. Criminal law 561 [1].

1

6.there was doubt that should have shocked the courts senses, the evidence offered to support guilty verdict is in contradiction to physical fact, then evidence is insufficient as of law. Com. V. smith, 853 A.2d 1020, super. 2004. Criminal law.

7. no physical or circumstantial evidence placed the defendant at the doors of the courthouse attempting to break into the courthouse, and there was exculpatory evidence missing that could have exonerated the defendant. Hence the verdict should be vacated and all charges dismissed.

I, Kenneth W. Ashford, Pro se, duly swear that the above statement given are true and correct to the best of my knowledge, information, and belief.

DATE: June 12, 2009

Kenneth W. Ashford
KennetH W. AShForD, PRO se
3400 ConcorD RoaD
YorK, PA. 17402

2

## PROOF OF SERVICE

I, Kenneth w. Ashford, declare that I am mailing the foregoing ~~████████~~ *SupplemenTal moTion* to
the following individuals by U.S. mail on this date:

CLERK OF COURT
45 NORTH GEORGE STREET
YORK, PA. 17401

YORK COUNTY DISTRICT ATTORNEY OFFICE
45 NORTH GEORGE STREET
YORK, PA. 17401

JUDGE THOMAS H. KELLEY
45 NORTH GEORGE STREET
YORK, PA. 17401

DATE: *June 12, 2009*                    *Kenneth n. Ashford*

KENNETH W. ASHFORD, PRO SE
3400 CONCORD ROAD
YORK, PA. 17401

3

KENNETH W. BISHFORD, # 2947
"THIS CORRESPONDENCE ORIGINATES
FROM AN INMATE INSTITUTION"
3400 CONCORD ROAD
YORK, PA. 17402

CLERK OF COURT
YORK COUNTY COURTHOUSE
45 NORTH GEORGE STREET
YORK, PA. 17401

DON O'SHELL
CLERK OF COURTS

2009 JUN 12  PM 1:52

RECEIVED/FILED
YORK COUNTY
JUDICIAL CENTER

CM

IN THE COURT OF COMMON PLEAS OF YORK COUNTY,

PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH | : | No. CP-67-CR-0002467-2008 |
| | : | |
| VS | : | |
| | : | |
| KENNETH ASHFORD | : | |

York, PA, Monday, June 29, 2009

Before the Honorable Thomas H. Kelley, VI, Judge

APPEARANCES:

        JUSTIN F. KOBESKI, Esquire
        Assistant District Attorney
        For the Commonwealth

        RONALD A. GROSS, Esquire
        For the Defendant

\* \* \*

## TRANSCRIPT OF PROCEEDINGS

\* \* \*

Reported by:

Beth L. Ness, RMR
Official Court Reporter

1

1          ATTORNEY KOBESKI:   Your Honor, the next

2     case is the Commonwealth versus Kenneth Ashford, case

3     number 2467 of 2008.   I believe this is the scheduled

4     date and time to address defense counsel's motion to

5     withdraw as counsel.

6          THE COURT:   Is that what it is?  I

7     thought it was a litany of motions that have been filed

8     by the Defendant pro se.

9          ATTORNEY GROSS:   Your Honor, he did, and

10    I filed a motion to withdraw on top of that.  And I

11    think, with all due respect, if we would hear my motion

12    first and then hear his motion, I think that might make

13    the most sense.

14          Your Honor, in this case I filed the

15    motion to withdraw appearance of counsel upon request of

16    my client, and I received information that he filed with

17    the Clerk of Courts which was forwarded by your office

18    alleging my ineffectiveness, then order from the

19    Superior Court he had filed a motion as well which then

20    came back to us dated June 5.

21          This has been a pattern throughout

22    representation.  I believe that Mr. Ashford wants me to

23    withdraw.  I wish to withdraw.  I don't believe there's

24    any opposition from the Commonwealth, and we're not at a

25    critical stage because sentencing is coming up.  There's

2                                                    285

1    enough time for him to secure counsel if he chooses.

2                    I believe he does say he thinks he can do

3    a better job by himself, but I would ask that I

4    withdraw.  I have prepared a motion as well authorizing

5    my withdrawal of counsel and three copies if I can bring

6    that towards you.

7                    THE COURT:  Okay.  All right.  All right,

8    Mr. Ashford.  You do want him to withdraw as counsel; is

9    that correct?

10                   THE DEFENDANT:  Yes, Your Honor.

11                   THE COURT:  Do you understand at this

12   point in time you're going to be proceeding pro se which

13   means representing yourself?

14                   THE DEFENDANT:  Yes, sir.

15                   THE COURT:  Okay.  You understand that if

16   you represent yourself and continue to represent

17   yourself, you're going to be held to the same standards

18   as a lawyer would be held to, knowledgeable about the

19   law and how to enforce your rights?  Do you understand

20   that?

21                   THE DEFENDANT:  Yes, sir.

22                   THE COURT:  Okay.  Obviously you have the

23   right to counsel, so you may seek to employ counsel.  If

24   you cannot afford counsel, counsel can be appointed for

25   you through the public defender's office, but you need

1  to make application to the public defender's office.  Do

2  you understand that?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  Okay.  You can fill out an

5  application down at the prison, but you need to qualify

6  financially.  If you can afford an attorney on your own,

7  you should get an attorney as soon as possible.  Do you

8  understand that?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Because right now, because

11 you have asked him to withdraw as counsel, you've sought

12 his removal as counsel, you are really proceeding pro se

13 because you haven't had anyone to say that they are

14 going to enter their appearance on your behalf.  Do you

15 understand that?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  You've just kept filing pro

18 se motions with me.  In fact, frankly, if I don't get a

19 motion from you every two or three days, I feel like I'm

20 not loved anymore.  I'm being facetious when I say that.

21           What you need to do is you need to

22 consolidate your motions into one motion, and

23 furthermore, if would you like counsel to represent you,

24 you need to get counsel as soon as possible.  Do you

25 understand, Mr. Ashford?

1          THE DEFENDANT:  Yes.  I understand.

2          THE COURT:  I'm going to issue this

3   written order.

4          And now, to wit, this 29th day of June

5   2009, upon request for leave of Court to withdraw

6   appearance of court, it's hereby ordered that Ronald J.

7   Gross, Esquire, is removed as counsel of record for the

8   Defendant.

9          Furthermore, I've advised the Defendant

10   of his right to counsel and the fact that if he cannot

11   afford counsel, counsel can be appointed through the

12   public defender's office.

13          I have signed that order.  I'll give it

14   to the Clerk of Courts.  It will be scanned and then

15   will be disseminated to the appropriate parties.

16          In the interim, Mr. Ashford, again, if

17   you wish to have counsel, you need to make application

18   or get private counsel to enter his or her appearance on

19   your behalf as soon as possible.  When do I have

20   sentencing scheduled for?

21          ATTORNEY GROSS:  Monday morning.  I would

22   suspect --

23          THE COURT:  Are you going to be ready to

24   go forward on Monday?

25          THE DEFENDANT:  Excuse me?

1   not limited to, ineffective assistance if that's what

2   your allegation is, and we'll deal with it all in one

3   fell swoop.  Okay, sir?

4                    THE DEFENDANT:  Yes, sir, Your Honor.

5                    THE COURT:  So I'm going to see you on

6   Monday.  We'll do sentencing, and then thereafter we'll

7   incorporate all your motions.  Actually, you might do

8   well for yourself to kind of put them all in one post

9   sentence motion.  You might do even better for yourself

10  if you got counsel.

11                   THE DEFENDANT:  I can read from the

12  motion that I have written out.

13                   THE COURT:  Okay.  That's fine.  We'll

14  deal with that after sentencing.  Okay?

15                   THE DEFENDANT:  Well, I thought the

16  motion was to be heard before sentencing.

17                   THE COURT:  In arrest of judgment?

18                   THE DEFENDANT:  Yeah.

19                   ATTORNEY KOBESKI:  Your Honor, I believe

20  that would be more properly addressed in a post sentence

21  motion as Your Honor has suggested.

22                   THE COURT:  I guess I could do it now,

23  but I think it's better to just deal with it all at one

24  time, you know.  Just for the sake of judicial economy,

25  I need to deal with it all at one time.  Okay?  I'm not

1    saying I'm not going to deal with it, sir.  What I'm

2    saying is I'm telling you we'll hear it all subsequent

3    to sentencing.  Okay?

4                    THE DEFENDANT:  All right.

5                    THE COURT:  Fair enough.  Thank you.  All

6    right.  We'll see you on Monday for purposes of

7    sentencing.

8                    (The proceeding concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T I O N

2

3          I hereby certify that the proceedings and

4   evidence are contained fully and accurately in the notes

5   taken by me on the trial of the above cause, and that

6   this copy is a correct transcript of the same.

7

8

9

10                                      _____
11                                          Beth L. Ness, RMR
                                         Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

COMMONWEALTH                    :        CR-2467-2008
                                :
        VS.                     :        CRIMINAL ACTION - LAW
                                :
KENNETH ASHFORD                 :
                                :

## ORDER

AND NOW, this _____ Day of _____, 200_, upon the herein

Request for Leave of Court to Withdraw Appearance of Counsel it is hereby Ordered that

Ronald J. Gross, Esquire is removed as counsel of record for the Defendant.

BY THE COURT,

J. Thomas H. Kelley, VI

**BLAKE & GROSS, L.L.C.**
ATTORNEYS AND
COUNSELORS AT LAW
29 East Philadelphia Street
York, PA 17401
717-848-3078
FAX 717-848-2777